

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DGR
F. #2018R00788

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 22, 2021

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Tanejia Moore,
              Criminal Docket No. 20-239 (S-2) (BMC)

Dear Judge Cogan:

      The government writes in advance of the defendant Tanejia Moore's (the "defendant") sentencing, which is currently scheduled for June 29, 2021 at 11:45 a.m. For the reasons set forth below, the government respectfully submits that a sentence within the applicable range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is appropriate.

      I.    Background

      The defendant played a small role in a large drug trafficking organization run by members of a violent street gang. As set forth below, while the defendant's role was limited to transporting narcotics from New York to Maine, it was the enterprise's ability to find willing participants like the defendant that helped it operate with impunity for many years.

      The drug conspiracy was led by members of the Bully Gang, a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York; those members included co-conspirators Moeleek Harrell, Derrick Ayers and Bermon Clarke, among others. (Id. ¶ 5). The Bully Gang had many criminal rackets, including its Maine drug trafficking operation, which generated hundreds of thousands of dollars each month through illegal drug sales. (Id. ¶ 9).

      The Maine drug trafficking operation began at least as far back as 2016. Together with Harrell and others, Derrick Ayers and Bermon Clarke recruited drug dealers,

often from Bed-Stuy, to travel to Maine to operate drug "trap" houses for weeks to months at a time. (Id. ¶ 5). The conspiracy's leaders would organize travel for the drug dealer, often sending him or her by bus from Manhattan to Boston, Massachusetts, and then from Boston to Portland, Maine, where the drug dealer would be transported to the trap house by other conspirators. (Id.)

The organization's "trap" houses were placed throughout Maine and changed from time to time to evade law enforcement detection. (Id.) The "trap" houses were often assigned a designated cellular telephone for the trap house operator to conduct drug transactions and send the specific counts of money and drugs at the location back to Ayers and Clarke . (Id.) The conspirators referred to these devices as "trap phones." (Id.) To help evade law enforcement surveillance, these "trap" phones were replaced and recirculated frequently. (Id.)

The organization re-supplied drugs to the trap houses during the drug dealer's trip and used specialized vehicles to help accomplish this without law enforcement detection. (Id.) Specifically, in the course of the conspiracy, multiple vehicles with concealed "trap" compartments were used by co-conspirators, including Ayers, Clarke, Amanda Walton, and Nia Govan, to transport money and drugs between the trap houses. (Id.) At the time that Ayers, Clarke and others were arrested in June 2020, three cars were seized and searched by law enforcement that contained these concealed "trap" compartment, including the following:

Hidden Compartment in Volvo S90 Registered to Bermon Clarke[1]



---

[1]   This compartment was installed behind the passenger side dashboard.

Hidden Compartment in Subaru Outback Registered to Nia Govan[2]



Hidden Compartment in Hyundai Sonata Seized from Derrick Ayers



In addition to using these "trapped" vehicles, the conspiracy also used co-conspirators to transport drugs on themselves, including the defendant, who concealed narcotics inside of her vagina on a bus trip from Maine to New York. Seized messages reveal that the defendant was recruited into assisting the conspiracy's leaders by her co-defendant, Devin John Jason Williams. Specifically, on January 8, 2020, Bermon Clarke and Williams had the following exchange about the defendant:

---

[2] This compartment was installed behind a vehicle control panel in the dashboard.

3

| | |
|---|---|
| CLARKE: | Bro said ur home girl wanted to bus a move |
| WILLIAMS: | Big facts |
| CLARKE: | See what's up wit her |
| WILLIAMS: | She on deck right now |

In that exchange, Clarke asked Williams about the defendant and inquired if she wanted to make a trip to Maine ("bus a move") and Williams confirmed that the defendant was ready ("She on deck right now"). In the same exchange, Williams gave Clarke the defendant's telephone number.

The same day, Clarke subsequently messaged the defendant and coordinated the trip, sending the defendant a car and meeting her at a specific location. Thereafter, Clarke instructed her to buy a bus ticket to Boston. After the defendant told Clarke that the bus was leaving, they had the following exchange:

| | |
|---|---|
| DEFENDANT: | Quick question don't laugh |
| DEFENDANT: | Can I pee With it or I gottah do the whole process over again? |
| CLARKE: | Whole thing over |
| CLARKE: | Just as long as shit go back where it need to be |
| DEFENDANT: | Damn okay and of course |

In that exchange, the defendant asked Clarke if she could use the bathroom with the drugs concealed inside of her vagina. Clarke confirmed that she would have to do the "whole thing over" if she went to the bathroom, but instructed "as long as shit go back where it need to be."

Hours later, the defendant told Clarke she had arrived, and Clarke sent an Uber to pick her up. Six hours later, the defendant told Clarke she was 30 minutes away and then told Clarke she was "in" and asked "Hold on to it or give it to somebody ?" Thereafter, she asked "How much was I supposed to get do you know ?" and Clarke responded "300".

II. <u>Applicable Guidelines Range</u>

The defendant pled guilty to violating 21 U.S.C. §§ 846 and 841(b)(1)(C). The government agrees with the calculation set out in the PSR with the exception of the two-point "safety valve" reduction, which is not applicable at this time. Accordingly, the government submits that the following calculation applies:

| | | |
|---|---|---|
| Base Offense Level (§§ 2D1.1(a)(5) and 2D1.1(c)(8)) | | 18 |
| Less: Minimal Participant | | -4 |
| Total: | | <u>14</u> |

| | |
|---|---:|
| Less: Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Adjusted Offense Level: | 12 |

With a Criminal History Category of I and an adjusted Offense Level of 12, this produces a Guidelines range of 10 to 16 months.

### III.   The Appropriate Sentence

#### A.   Applicable Law

In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory. The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns. Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(6).

B.  Discussion

The government submits that a sentence within the applicable Guidelines range, which may include a term of imprisonment along with home detention or community confinement, is appropriate. (PSR ¶ 67).

As detailed above, the Bully Gang's Maine drug trafficking scheme was a long-term, widespread, and sophisticated operation. For years, the co-conspirators were responsible for trafficking devastating quantities of narcotics, including crack and heroin, between New York and Maine, and dispersing those narcotics into the surrounding communities. Members of the conspiracy employed extensive measures to conceal their crimes and evade law enforcement detection, including specialized vehicles with concealed compartments and a rotating supply of "trap" houses, phones, and operators, each of which were routinely replaced. To protect their illegal business, the defendant's conspirators carried numerous firearms. All told, the operation generated hundreds of thousands of dollars in proceeds at the expense of communities throughout the northeast.

The defendant's role, while limited, was important to the conspiracy's success. Transporting narcotics in vehicles with concealed compartments was one option, and using people like the defendant was another. Varying the methods of transportation increased the odds that the enterprise's drugs would complete their one-way trip to Maine. In addition, by using a person with limited connections to the conspiracy's leaders, limited the overall risk to the enterprise.

Overall, the defendant's limited role and minimal participation in the scheme is captured by the applicable Guidelines range and a sentence within that range would achieve the goals of sentencing.

IV.    Conclusion

For the reasons set forth above, the government submits that a sentence within the applicable Guidelines range is appropriate.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:      /s/
Drew G. Rolle
Nicholas J. Moscow
Lindsey R. Oken
    Assistant U.S. Attorneys

Virginia T. Nguyen
    Special Assistant U.S. Attorney

(718) 254-7000

cc:    Peter Baldwin, Esq. (Counsel to the defendant) (by ECF)
       U.S. Probation Department (by E-Mail)