

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

LRO
F. #2018R00788

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 29, 2021

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Devin-John Jason Williams,
               Criminal Docket No. 20-239 (S-2) (BMC)

Dear Judge Cogan:

      The government writes in advance of the defendant Devin-John Jason Williams's (the "defendant") sentencing, which is scheduled for October 6, 2021 at 11:00 a.m. The defendant repeatedly traveled between New York and Maine, working with members and associates of the "Bully Gang" to traffic drugs, including cocaine base, also known as "crack," and heroin. For the reasons set forth below, the government respectfully submits that a sentence within the applicable range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 37 to 46 months is appropriate.

      I.    Background

          A.    Overview of the Drug Trafficking Organization

      The defendant was a member of a complex and long running interstate drug trafficking operation that transported drugs and drug dealers from New York to Maine where they operated drug "trap" houses. (PSR ¶ 5). The conspiracy was led by members of the Bully Gang, a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York; those members included co-conspirators Moeleek Harrell, Derrick Ayers and Bermon Clarke, among others. (Id. ¶ 6). The Bully Gang had many criminal rackets, including the operation of the Maine drug trafficking operation, which generated hundreds of thousands of dollars each month through illegal drug sales. (Id. ¶ 6).

The Maine drug trafficking operation began at least as far back as 2016. Together with Harrell and others, Derrick Ayers and Bermon Clarke recruited drug dealers, often from Bed-Stuy, to travel to Maine to operate drug "trap" houses for weeks to months at a time. (Id. ¶ 5-6). The conspiracy's leaders would organize travel for the drug dealer, often sending him or her by bus from Manhattan to Boston, Massachusetts, and then from Boston to Portland, Maine, where the drug dealer would be transported to the trap house by other conspirators. (Id.)

The organization's "trap" houses were placed throughout Maine and changed from time to time to evade law enforcement scrutiny. (Id. ¶ 6). The "trap" houses were often assigned a designated cellular telephone for the trap house operator to conduct drug transactions and send the specific counts of money and drugs at the location back to Ayers and Clarke . (Id.) The conspirators referred to these devices as "trap phones." (Id.) To help evade law enforcement surveillance, these "trap" phones were replaced and recirculated frequently. (Id.)

The organization re-supplied drugs to the trap houses during the drug dealer's trip and used specialized vehicles to help accomplish this without law enforcement detection. (Id.) Specifically, in the course of the conspiracy, multiple vehicles with concealed "trap" compartments were used by co-conspirators, including Ayers, Clarke, Amanda Walton, and Nia Govan, to transport money and drugs between the trap houses. (Id.) At the time that Ayers, Clarke and others were arrested in June 2020, three cars were seized and searched by law enforcement that contained these concealed "trap" compartment, including the following:



Hidden Compartment in Volvo S90 Registered to Bermon Clarke[1]



---

[1]  This compartment was installed behind the passenger side dashboard.

Hidden Compartment in Subaru Outback Registered to Nia Govan[2]



Hidden Compartment in Hyundai Sonata Seized from Derrick Ayers



B.   The Organization's Drug Sales and Money Laundering

Messages recovered from cellular telephones used by the conspirators, including Ayers, Clarke and the numerous "trap" phones used by individuals like the defendant, reveal the coordination of the drug operation and the large quantities of crack and heroin being distributed from each trap house. On an almost daily basis, Ayers and Clarke

---

[2]   This compartment was installed behind a vehicle control panel in the dashboard.

3

kept detailed drug counts for the trap houses in operation. For example, on August 8, 2019 Ayers and Clarke discussed the current supply of drugs at six trap houses in Maine:

> CLARKE: Lil homie
> [Redacted Street Address] Livermore me
> (100u)
>
> P (50u)(-25d)
>
> Cup
> [Redacted Street Address] Corinth me
> (50u)
>
> Fat nigga
> [Redacted Street Address] searsport
> (70u)
>
> Dirk
> [Redacted Street Address] Swanville
> (70u)
>
> Ace
> [Redacted Street Address] Troy me
> (50u +25d)
>
> Chuck
> [Redacted Street Address] Dixmont me
> (100u)
>
> AYERS: Lil homie wrong

In that exchange, Clarke identified each of the drug dealers assigned to the "trap" houses using their street names ("Lil homie" "P" "Cup" "Fat nigga" "Dirk" "Ace" "Chuck") along with the drug counts at each location, using "u" for "up" which is crack and "d" for "down" which is heroin. After receiving the counts, Ayers flagged that the drug counts for "Lil Homie" were "wrong."

The operators of the trap house would send Clarke detailed counts of the drugs they had on hand and sales made to date, a practice that the conspirators maintained for years using cellular telephones. For example, a message stored in Clarke's Apple iCloud dated back to May 2018, and had the following exchange between Clarke and a conspirator ("CC-1") operating a stash house:

> CC-1: D 23.49f Old
> D20.01f&9.4g1 New

4

> U 22.42g
> 0.40g=50$U

In that message, CC-1 reported to Clarke the counts of drugs and money on hand, specifically counting the amount of crack ("U") and heroin ("D"). This practice continued throughout the conspiracy. For example, on November 8, 2019, Clarke received the following message from another co-conspirator who had just travelled from New York to Maine:

> CC-2:   6251
> 75u
> 51.85d
> A:559
> L:3051
> T:10

In that message, CC-2 sent the amounts of crack (75 grams) heroin (51.85 grams) he had along with the amounts of the debts owed by certain customers previously identified by Clarke. On a regular basis, ranging from bi-weekly to every few days, the conspiracy's runners would pick up drug proceeds from the trap house operator and re-supply the house with drugs. That money was laundered using different methods, including washing the cash through large deposits into or wire transfers through intermediary bank accounts in the names of defendants Amy Sonnenblick, Amanda Walton, Christina Estevez and Chinasa Strachan, among others. (PSR ¶ 6-7).

C.  The Defendant's Trips to Maine to Operate Trap Houses

Seized messages and location information for a cellular telephone used by the defendant showed that, between November 2019 and March 2020, the defendant made multiple trips to Maine, where he remained for weeks or months at a time, in order to sell narcotics as part of the organization. (PSR ¶ 7-8).

The defendant, like many other "trap" house operators, was born and raised in Brooklyn but traveled up to Maine for the sole purpose of trafficking narcotics. Seized messages confirm that the defendant handled large quantities of drugs and cash, and generated thousands of dollars for the organization through drug sales.

In connection with his involvement in the conspiracy, the defendant provided regular updates to Clarke on his narcotics sales. For example, on November 8, 2019, when asked, "[w]hat u got left," the defendant reported a count of $11,500 ("11500"), 10.96 grams of heroin ("10.96") and 43.54 grams of crack ("43.54"). The defendant provided another drug count on November 28, 2018, messaging "45 & 50" and "Everything else is up." In a subsequent exchange, on December 5, 2019, the defendant messaged Clarke about a pick-up of cash that was "short" by $600 ("6 bills") and asked Clarke to provide "confirmation" that Clarke had "approved it."

The defendant's drug counts were also passed on to Clarke through a "trap phone" as well as through other co-conspirators. Defendant Amanda Walton, for instance, sent Clarke several messages detailing drug counts at the trap house where the defendant was stationed. The co-conspirators' coded communications used the letter "d" as an abbreviation for "down"—a slang term for heroin, an opiate—and the letter "u" for "up"—a slang term for crack cocaine, a stimulant.[3]

Beyond dealing drugs, the defendant assisted his co-conspirators in other ways. For instance, on November 28, 2019, the defendant relayed information to Clarke regarding another co-conspirator's plans ("One of my bro's tryna put a month in"). Later, on December 14, 2019, Clarke asked the defendant, "Your man ready[?]," to which the defendant responded, "Yeah facts" and "What time you need him to be ready[?]" The next morning, on December 15, 2019, Clarke responded, "Now" and the defendant provided Clarke with an address in Brooklyn, New York.

Similarly, on January 8, 2020, the defendant provided Clarke with contact information for defendant Tanejia Moore, informing Clarke that Moore was "on deck right now" and offering to contact her ("Want me to hit her up"):

| | |
|---|---|
| CLARKE: | Yo |
| WILLIAMS: | Yeah bro |
| WILLIAMS: | What's the word ? |
| CLARKE: | Bro said ur home girl wanted to bus a move |
| WILLIAMS: | Big facts |
| CLARKE: | See what's up wit her |
| WILLIAMS: | She on deck right now |
| CLARKE: | Where she at |
| WILLIAMS: | In the ville |
| WILLIAMS: | Want me to hit her up |
| CLARKE: | Yea |
| WILLIAMS: | Kopy |

---

[3] The drug quantity attributed to the defendant was derived from counts recovered from electronic communications. That number is likely a conservative estimate of the total quantity of drugs distributed by the organization during the time the defendant participated in the conspiracy, as reflected by the more than six kilograms of cocaine seized at the time of the June 25, 2020 arrests of Ayers and Clarke. Additionally, in his exchanges with Clarke, the defendant confirmed that he used multiple devices to communicate with his conspirators. For example, on November 3, 2019, the defendant instructed Clarke to "[c]all the other phone."

| | | |
|---|---|---|
| WILLIAMS: | She said what she need | |
| WILLIAMS: | Do you want her math | |
| CLARKE: | Id | |
| CLARKE: | Yea | |
| WILLIAMS: | [Redacted Telephone Number] | |

Moore ultimately did, in fact, traffic drugs as a member of the conspiracy and, on January 20, 2021, pleaded guilty to violating 21 U.S.C. §§ 846 and 841(b)(1)(C).

II.   Applicable Guidelines Range

The defendant pled guilty to violating 21 U.S.C. §§ 846 and 841(b)(1)(C). The applicable Guidelines range, as set forth in the PSR and the parties' plea agreement, is not in dispute:

| | |
|---|---|
| Base Offense Level (§§ 2D1.1(a)(5) and 2D1.1(c)(8)) | 24 |
| Total: | 24 |
| Less: Acceptance of Responsibility (§ 3E1.1(a)) | -3 |
| Adjusted Offense Level: | <u>21</u> |

With a Criminal History Category of I and an adjusted Offense Level of 21, this produces a Guidelines range of 37 to 46 months.

III.   The Appropriate Sentence

A.   Applicable Law

In <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory. The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns. <u>Booker</u>, 543 U.S. at 220; <u>see</u> 18 U.S.C. § 3553(a). Subsequent to <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id.</u> at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings

7

by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(6).

B.   Discussion

Given the seriousness of the instant offense, and the defendant's role in furthering the operations of the drug trafficking conspiracy, the Court should sentence the defendant to a term of imprisonment within the applicable Guidelines range of 37 to 46 months.

As detailed above, the Maine drug trafficking scheme was a long-term, widespread, and sophisticated operation. For years, the co-conspirators were responsible for trafficking devastating quantities of narcotics, including crack and heroin, between New York and Maine, and dispersing those narcotics into the surrounding communities. Members of the conspiracy employed extensive measures to conceal their crimes and evade law enforcement detection, including specialized vehicles with concealed compartments and a rotating supply of "trap phones" that were routinely replaced and recirculated. To protect their illegal business, the defendant's co-conspirators carried numerous firearms. All told, the operation generated hundreds of thousands of dollars in proceeds at the expense of communities throughout the northeast.

The defendant played an important role in sustaining the operations of the drug trafficking conspiracy. On at least two occasions in 2019, the defendant traveled from New York to Maine, where he was responsible for operating a trap house used to store and sell narcotics. Seized message and location information indicate that, unlike other co-conspirators, the defendant remained in Maine for weeks or months at time. Communications among the co-conspirators, including text messages between the defendant

and a leader of the conspiracy, also reflect the substantial quantities of money and drugs that the defendant managed on behalf of the operation.

Those communications, along with the defendant's repeated and lengthy trips to Maine, reflect the level of trust the defendant had with leaders of the conspiracy. Indeed, in addition to trafficking narcotics on behalf of the conspiracy, the defendant recruited others—like defendant Tanejia Moore—into the operation, demonstrating the defendant's level of involvement as well as his willingness to enrich himself and his co-conspirators at the expense of others.

In his sentencing submission, the defendant asks the Court to vary below the applicable Guidelines range and impose a non-custodial sentence based on, among other things, the defendant's recent rehabilitation efforts and his limited, non-violent role in the charged offense. The government submits, however, that any mitigating effect warranted by those facts is captured in the wide Guidelines range available to the Court. A sentence within the applicable Guidelines range of 37 to 46 months is therefore appropriate.

IV.   Conclusion

For the reasons set forth above, the government submits that a sentence within the applicable Guidelines range of 37 to 46 months is appropriate.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:   /s/
Drew G. Rolle
Nicholas J. Moscow
Lindsey R. Oken
   Assistant U.S. Attorneys

Virginia T. Nguyen
   Special Assistant U.S. Attorney

(718) 254-7000

cc:   Susan G. Kellman, Esq. (Counsel to the defendant) (by ECF)
   U.S. Probation Department (by E-Mail)