

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

|  |  |
|---|---|
| DGR<br>F. #2018R00788 | *271 Cadman Plaza East*<br>*Brooklyn, New York 11201* |

December 12, 2022

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Tyquawn Lane
                   Criminal Docket No. 20-239 (S-3) (BMC)

Dear Judge Cogan:

        The government writes in advance of the sentencing hearing for defendant Tyquawn Lane (the "defendant") in the above-captioned matter, which is scheduled for December 16, 2022. For the reasons set forth herein, the government respectfully submits that the Court enter a sentence within the applicable Guidelines range of 77 to 96 months.

I.    <u>Background</u>

        The defendant was a member of a violent racketeering enterprise known as the "Bully Gang," and, for years, he helped manage the affairs of the enterprise by engaging in the trafficking of crack, heroin and fentanyl between New York and Maine and the laundering of drug proceeds derived from that activity. (Pre-Sentence Investigation Report ("PSR") ¶¶ 8–12). Through his conduct, the defendant enriched himself and the other members of the enterprise, while simultaneously destroying numerous communities.

        A.    <u>The Defendant's Membership in the Bully Gang</u>

        The Bully Gang originated from, and, for a time, its members largely resided, in the Bedford-Stuyvesant section of Brooklyn. (PSR ¶ 8). Many of its members, including the defendant, promoted the enterprise over social media, using common vernacular and syntax to refer to themselves and others in the gang. For example, the defendant, like others in the gang, use the letters "bg" to identify himself on social media, as shown here, in a February 15, 2013 post to his "bg_brickz" Instagram page:



In this post—which was posted less than three weeks before his first federal drug arrest in Vermont—depicts the defendant alongside Joelle Joyce, also known as "Jae O" one of the original members of the Bully Gang. Like the defendant (bg_bricksz) Joyce also highlighted his membership in the Bully Gang, using the name "bg_Jae_o".

Members often memorialized deceased members of the Bully Gang, such as Charles Williams, also known as "YB," a founding member of the enterprise who was killed. The defendant did this too, as shown in this February 11, 2016 post to his Instagram, where he claimed that he and others "do this for YB," a reference to Williams, and bragged that "#ITSABULLYSWORLD":



2

Members would also promote the enterprise through posts flaunting the money members had made. For example, the defendant posted on August 4, 2016 the he "Caught The Bag Now The Money Got Flexing" along with "#BullyShit". The same post also called for the release from jail of Bully Gang founder Moeleek Harrell, also known as "Moe Money," who was incarcerated at the time:



B.     <u>The Drug Trafficking and Money Laundering Scheme</u>

As set out below, the Bully Gang was not a benign group the defendant wanted to promote on social media. It was a criminal enterprise with a sophisticated drug trafficking operation that the defendant actively participated in for years.

The enterprise's drug trafficking operation began at least as far back as 2016. Together with others, defendants Derrick Ayers and Bermon Clarke recruited drug dealers, including the defendant, to travel to Maine to operate drug "trap" houses for weeks to months at a time. (<u>Id.</u> ¶¶ 15). The conspiracy's leaders would organize travel for the drug dealer, often sending him or her by bus from Manhattan to Boston, Massachusetts, and then from Boston to Portland, Maine, where the drug dealer would be transported to the trap house by other conspirators. (<u>Id.</u>)

3

Bully Gang members Bermon Clarke, Derrick Ayers and Moeleek Harrell had a reliable source of personnel to operate the drug stash house: the Bully Gang itself. Members and associates, including the defendant, were among those sent to operate stash or "trap" houses, distribute narcotics, and facilitate the transfer narcotics proceeds from Maine back to New York.

The organization's "trap" houses were placed throughout Maine and changed from time to time to evade law enforcement detection. (PSR ¶¶ 14-15) The "trap" houses were often assigned a designated cellular telephone for the trap house operator to conduct drug transactions and send the specific counts of money and drugs at the location back to Ayers and Clarke . (Id.) The conspirators referred to these devices as "trap phones." (Id.)  To help evade law enforcement surveillance, these "trap" phones were replaced and recirculated frequently. (Id.)

The organization re-supplied drugs to the trap houses during the drug dealer's trip and used specialized vehicles to help accomplish this without law enforcement detection. (Id.) Specifically, in the course of the conspiracy, multiple vehicles with concealed "trap" compartments were used by co-conspirators, including Ayers, Clarke, Amanda Walton, and Nia Govan, to transport money and drugs between the trap houses. (Id.)

The defendant travelled to Maine to sell drugs as part of the gang's racket. While in Maine, the defendant would stay in touch with the conspiracy's leaders, reporting back drug quantities and money totals for locations and other conspirators in Maine. For example, on May 2, 2018, the defendant, using a telephone number he linked to his bg_bricksz Instagram page, messaged with a conspirator about a trap house in Waterville, Maine, and wrote "[Co-Conspirator] $3159", which was a total amount of money held by one of their co-conspirators and represented drug proceeds. Notably, the same co-conspirator separately sent the same drug proceeds total.

The defendant oversaw activities at stash houses and reported back debts owed to the conspiracy. A screen captured message from a co-conspirator's phone, showed the defendant discussing these topics in real time:



In that message, the defendant explained that a person referred to as "Jess" owed three different amounts (125, 45, and 220), and that they related to narcotics debts. Specifically, 125 was for a half gram of heroin, also known as "d" or "down."

Reflecting the Bully Gang's penchant for violence, the defendant was victimized by his fellow Bully Gang members when he was punished for violating the enterprise's rules. In recorded jail calls between Moeleek Harrell and incarcerated Bully Gang members, Harrell described how he and Ayers arranged for the defendant to be physically assaulted by other Bully Gang members as punishment for the defendant selling drugs for his own profit in Maine, as opposed to selling for the benefit of his co-conspirators. (PSR ¶¶ 30-33). Notably, during the incident, Harrell described taking a gun off of the defendant's person prior to the fight. (Id. ¶ 32 ("I go in his pockets, he got the chop on him. Take the chop bro, take the chop from him.")

C.   The Defendant's Arrest

In August 2018, Maine Drug Enforcement Agency ("MDEA") investigated drug trafficking activity involving the defendant. A search warrant was executed at a "trap" house on August 22, 2018, and the defendant was found with 49 grams of heroin and $2,500 in cash. The defendant's arrest was publicized in Maine. Ayers and Clarke discussed a newspaper article on the defendant's arrest and the drug seizures, with Clarke telling Ayers via text message: "This not a good week." The defendant pled guilty to drug trafficking charges in Maine, and he was incarcerated in Maine until his transfer to federal custody on the instant offense. (PSR ¶ 34).

5

II.  PSR Objections

The government notes the following objections to certain paragraphs in the PSR: [1]

- **Paragraph 18**: In the second to last sentence starting with "The regularly travelled," replace the word "The" with "They."

- **Paragraph 25**: "Lavant" should be stricken and replaced with the word "Levant."

- **Paragraph 34**: The government objects to this paragraph insofar as it overstates the time the defendant was in custody prior to the instant offense and fails to distinguish his prior federal sentence from the instant offense. The instant offense is distinct from the defendant's 2013 District of Vermont conviction. To clarify this fact, the words "and has been in continuous custody since that date" should be removed, as the defendant was in and out of custody between 2017 and 2018.

  The first sentence of paragraph 34 should be revised to state: "In 2015, the defendant was released from federal custody and placed on supervised release following a 2013 conviction in the District of Vermont for possession with intent to distribute heroin. Between 2015 and 2018, the defendant was remanded for violating the terms of his supervised release. Three months after being released from federal custody on the D. Vt. supervised release violation, on August 22, 2018, he was indicted in Maine state court for new drug trafficking activity, which charges are related to the instant offense.

- **Paragraph 77**: The sentence "The circumstances of this case are not available" should be stricken. As reflected in the December 12, 2022 PSR Addendum, the government provided defense counsel and Probation additional information obtained from Maine law enforcement for this July 27, 2018 arrest. The arrest related to Maine state law enforcement's car stop of the defendant who was driving without a license. During the stop, he lied to police, providing a fake name. The defendant was found with $800 to $900 cash in $20 and $50 denominations. The passenger in the defendant's vehicle was found with more than $3,000 in cash in her pockets. Inside the vehicle were three cellular telephones and zip lock bags of marijuana. Notably, the passenger's listed address of 5 East Pond Road, Oakland Maine, which was a location used in furtherance of the instant offense.

---

[1]   In view of the expedited sentencing schedule set at the parties' request, the government sets out its objections to the PSR as part of this submission with a copy to Probation for its own review ahead of sentencing.

III.   Applicable Guidelines Range

The government submits that the Court should apply the following calculation of the defendant's Total Offense Level, which, as set out below is 24:

Racketeering Act One (Narcotics Trafficking Conspiracy):

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2D1.1(a)(5), 2D1.1(c)(8)) | 24 |
| Plus:  Maintained a Premises for Distribution (§ 2D1.1(b)(12)) | +2 |
| Total: | 26 |

Racketeering Act Two (Money Laundering Conspiracy):

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2S1.1(a)(1)) | 26 |
| Plus:  Convicted under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Total: | 28 |

Grouping Analysis:

| | | |
|---|---|---|
| Both counts are treated as one group (§§ 3D1.2(c), 2S1.1 app. n. 6) | | 28 |
| Less: | Acceptance of Responsibility (§ 3E1.1) | -3 |
| Less: | Global Resolution | -1 |
| Total: | | 24 |

This calculation differs from that set out in the PSR in two respects.  First, because the defendant stipulated to committing Racketeering Act Two—money laundering in violation of 18 U.S.C. § 1956—the above calculation includes the two-point increase that applies under § 2S1.1(b)(2)(B) for offenses involving a violation of 18 U.S.C. § 1956.  Section 2E1.1(a)(2) directs the Court to consider each racketeering predicate as if the defendant had been convicted of a separate offense, and, as a result, the two point increase for money laundering applies.  § 2E1.1(a)(2), App. Note 1 ("Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction").

Second, the calculation includes a one level reduction in light of the defendant's participation in the global resolution offered to a number of defendants in this case.  (PSR ¶ 119). Applying these adjustments, the Total Offense Level is 24.

The PSR correctly calculates the defendant's Criminal History Category as IV, although it diverges from the government's calculation of III in the plea agreement.  This difference is accounted for by the two additional points the defendant receives because he

7

committed the instant offense while on supervised release from the District of Vermont conviction in 2013. (PSR ¶¶ 72–74). With those two additional points, the defendant has a total of 7 points and is in Criminal History Category of IV.

With a Total Offense Level of 24 and a Criminal History Category of IV, the applicable Guidelines Range is 77 to 96 months.

IV. The Appropriate Sentence

A. Applicable Law

In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory. The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns. Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(6).

8

B.    <u>Discussion</u>

The government submits that a sentence within the applicable Guidelines range of 77 to 96 months is appropriate. In addition, while the government has no objection to the Court factoring in the defendant's time spent in Maine state custody following his 2018 arrest for conduct related to the Bully Gang's drug trafficking activity, the Court's sentence must include separate additional federal time to reflect the seriousness of the independent federal offenses, and the broader racketeering activity in which the defendant participated, none of which was included in the underlying state conviction.

As an initial matter, the defendant's crimes were serious. He not only sold dangerous drugs from stash houses across Maine and helped launder the drug proceeds those sales generated; he did so as part of a broader racketeering enterprise. The Bully Gang was a violent enterprise that worked to enrich its members like the defendant. The defendant experienced the gang's violence firsthand, as he was beaten for violating its rules. However, he continued his criminal activity with the enterprise unabated.

The defendant's recidivism is itself an important factor supporting the requested sentence. The instant offense was not the defendant's first. Indeed, it was not the defendant's first <u>federal</u> conviction. He committed the instant offense while still on supervised release from a drug trafficking conviction in the District of Vermont. That alone distinguishes him from the majority of the more than 50 defendants in this case and in many others.

A sentence of incarceration beyond that already served in state custody is necessary to both protect the defendant from future crimes from this defendant and promote respect for the law. The defendant's membership in the Bully Gang was not hidden from public view; it was something he highlighted and glorified, all while helping that gang destroy communities both here in New York and in Maine. Those facts are troubling, and when combined with the defendant's multiple prior offenses and sentences, suggest that the defendant does not respect the law, including the judges before whom he has appeared in the past and sought a second (or third) chance only to return to the Bully Gang.

V.	Conclusion

For the reasons set out above, the government submits that a sentence within the applicable Guidelines range of 77 to 96 months is appropriate.

				Respectfully submitted,

				BREON PEACE
				United States Attorney

		By:	  /s/
				Drew G. Rolle
				Nicholas J. Moscow
				Lindsey R. Oken
				Joy Lurinsky
				Assistant U.S. Attorneys
				(718) 254-7000

cc:	Elizabeth Macedonio, Esq. (counsel to the defendant) (by ECF)
	Monica Nejathaim, Esq. (counsel to the defendant) (by ECF)
	Roberta Houlton, Senior U.S. Probation Officer (by Email)