DGR/LRO/JML/VAZ
F. #2018R00788

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MOELEEK HARRELL, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 20-CR-239 (S-8) (BMC)

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS *IN LIMINE*

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Drew G. Rolle
Nicholas J. Moscow
Lindsey R. Oken
Joy Lurinsky
Victor Zapana
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................... 3

RELEVANT BACKGROUND ....................................................................... 4

    I.     Introduction ................................................................................ 4

    II.    The Defendants ......................................................................... 4

    III.   Crimes Related to the Bully Gang .............................................. 6

        A.    Drug Trafficking and Money Laundering ................................... 6

        B.    Violence .............................................................................. 7

    IV.   Procedural History ..................................................................... 9

ARGUMENT ............................................................................................. 10

    I.     Evidence of the Bully Gang, and the Defendants' Participation in the Gang, Is Admissible ................................................................... 10

        A.    Applicable Law .................................................................... 11

        B.    The Proffered Enterprise Evidence ......................................... 20

        C.    Discussion ......................................................................... 36

    II.    "Other Acts" Evidence ............................................................. 39

        A.    Violence Against Women ...................................................... 40

        B.    Money-Making Schemes ....................................................... 43

        C.    Obstruction of Justice .......................................................... 44

        D.    Prior Arrests, Convictions, and Incarceration History ............... 46

        E.    Violence Targeting the Bully Gang .......................................... 55

    III.   Statements by the Defendants and Their Co-Conspirators Are Admissible ............................................................................... 59

        A.    Applicable Law .................................................................... 60

        B.    Discussion ......................................................................... 65

    IV.   News Reports ........................................................................... 77

|   |   |   |   |
|---|---|---|---|
|   | A. | Evidence | 77 |
|   | B. | Discussion | 79 |
| V. |   | Evidence of Significant and Unexplained Wealth | 81 |
|   | A. | Applicable Law | 81 |
|   | B. | Discussion | 82 |
| VI. |   | The Court Should Preclude Improper Defense Arguments and Evidence | 87 |
|   | A. | Prior Acquittals and Dismissals | 87 |
|   | B. | Hearsay Statements by the Defendants | 89 |
|   | C. | Attacks on the Government's Investigation | 91 |
|   | D. | References to Punishment | 95 |
|   | E. | References to Elicit Jury Sympathy | 96 |
| VII. |   | The Court Should Set a Discovery Disclosure Schedule as to the Defendants | 97 |
| VIII. |   | The Court Should Empanel an Anonymous and Partially Sequestered Jury | 98 |
|   | A. | Applicable Law | 99 |
|   | B. | There Are Strong Reasons for Jury Protection | 103 |
|   | C. | Protective Measures Will Not Prejudice the Defendants | 105 |
| CONCLUSION |   |   | 108 |

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions in limine seeking to admit: (1) enterprise evidence related to the charged enterprise, the Bully Gang; (2) statements by the defendants and their co-conspirators, including through witness testimony, phone communications, social media correspondence, YouTube videos, and recorded jail calls; (3) evidence of "other acts"—including evidence of uncharged shootings, sex trafficking, marijuana trafficking, sexual assaults, fraud and other "scamming" activity, and physical and psychological abuse—as direct evidence of the charged crimes or, alternatively, pursuant to Rule 404(b) of the Federal Rules of Evidence; (4) evidence of the defendants' significant and unexplained wealth; (5) proof of news articles, from phone records and published sources, to show motive and consciousness of guilt; (6) evidence of the defendants' prior convictions, terms of incarceration, and terms of supervision; and (7) authentic records and certain records kept in the ordinary course of business using certifications, pursuant to Rule 902.  Because each of these categories of evidence is relevant and admissible under the Rules of Evidence, and because they are not unduly prejudicial, the government should be permitted to introduce them at trial.

The Court should also preclude the defendants from: (1) referencing prior acquittals and dismissals, (2) offering their own hearsay statements to avoid testifying and being subject to cross-examination, (3) attacking the conduct, motives, and timing of the government's investigation, (4) mentioning any consequences attendant to the defendants' convictions, including punishment, and (5) introducing personal details designed to elicit jury sympathy.  In addition, the Court should set a schedule for discovery disclosure obligations by the defendants.

Finally, because of the violent nature of the charged crimes and the substantial risk of obstruction, the Court should empanel an anonymous and partially sequestered jury.

RELEVANT BACKGROUND

I.      Introduction

        The Bully Gang is a violent street gang that began its operations in and around the

Bedford-Stuyvesant neighborhood of Brooklyn, New York.   To make money, members and

associates of the gang engaged in several criminal schemes.   Those schemes included a complex

and long-running multistate drug conspiracy involving dozens of stash houses in Maine; a

conspiracy to smuggle drugs into Rikers Island correctional facilities, including by bribing prison

guards; multiple gunpoint robberies; and a months-long scheme to extort a business owner in

Brooklyn, among other things.   The money the gang made during these schemes was flaunted by

its members, and used to benefit the gang by funding vehicles, trap houses, and weapons used by

the gang, among other things, to commit more crimes.   To advance the gang's operations and

reputation, members and associates of the gang also committed many acts of violence, including

multiple shootings and murders.

II.     The Defendants

        To date, 53 defendants have been charged in this case for committing one or more

crimes connected to the Bully Gang.   The operative indictment, the Eighth Superseding Indictment

(the "S-8 Indictment"), charges 26 defendants and contains a total of 43 charges, including

racketeering, drug offenses, money laundering, firearms trafficking, extortion, murder conspiracy,

and murder.   Five defendants are scheduled to proceed to trial on February 26, 2024: Moeleek

Harrell, Derrick Ayers, Johnny Chiles, Franklin Gillespie, and Anthony Kennedy.[1]

_____

        [1]     In addition to those six defendants, four defendants are scheduled to proceed to trial
in May 2024 (Tiri Brown, Bermon Clarke, Robert Holt and Demetrius Johnson); two defendants
are scheduled to plead guilty on January 31, 2024 (Ronald Davis and Latrell Johnson); and one
defendant remains a fugitive (Romeo Gonzales).   The remaining 41 defendants have pled guilty.

Each of these five defendants performed meaningful roles in the Bully Gang's various criminal schemes:

- Harrell was one of the founders and the leader of the Bully Gang.  He organized and participated in the Maine drug trafficking scheme and the Rikers Island drug trafficking scheme, managing the latter as an inmate at Rikers Island.  He also committed several attempted murders targeting rival gang members with the assistance of other Bully Gang members, including Ayers.

- Ayers was a high-ranking member of the Bully Gang who lead and managed the day-to-day operations of the Maine drug trafficking scheme; assisted with the attempted murders mentioned above; and murdered rival gang member Jonathan Jackson.

- Chiles, a prison guard, was bribed by Harrell to smuggle drugs into a jail facility in connection with the Rikers Island drug trafficking scheme.

- Gillespie was a violent "enforcer" for the Bully Gang who participated in the Maine drug trafficking conspiracy and the Rikers Island drug trafficking scheme, and who committed the murders of Paul Hoilett and Mike Hawley, as well as two gunpoint robberies.

- Kennedy was another longstanding Bully Gang member who organized and facilitated both the Rikers Island drug trafficking scheme and the Maine drug trafficking scheme. Kennedy also assisted Gillespie in committing the Hoilett and Hawley murders.

---

The government is continuing to engage in plea negotiations with several defendants and expects that additional defendants may plead guilty before trial.

III.     Crimes Related to the Bully Gang

    A.     Drug Trafficking and Money Laundering

The Bully Gang orchestrated two complex, years-long drug trafficking schemes: a scheme to sell cocaine base, heroin, fentanyl and other drugs in Maine, and another to smuggle synthetic cannabinoids into Rikers Island and sell them to inmates.

The Maine drug trafficking scheme lasted from at least 2016 until law enforcement's intervention in June 2020. During those years, the Bully Gang arranged to have drugs, including cocaine base (also known as "crack"), heroin, and fentanyl transported from the New York/New Jersey area to Maine. The gang often used an apartment in Carteret, New Jersey to store large quantities of drugs before those drugs were brought to up the east coast. To store and sell the drugs in Maine, the gang acquired an ever-changing roster of stash houses. Many of those stash houses were supplied by residents of Maine who participated in the drug conspiracy. The gang arranged for individuals from Brooklyn, often members or associates of the Bully Gang, to travel to Maine to live in, and deal drugs out of, the stash houses. These individuals usually stayed at the stash houses for weeks or months at a time. During this time, those drug dealers sent regular reports of the quantity of drugs and cash at their respective stash houses. As the drugs ran low, members of the Bully Gang arranged to bring more drugs to "re-up" the stash houses. If Maine law enforcement discovered a stash house, the gang simply continued to sell drugs from other stash houses. The gang made hundreds of thousands of dollars each year from this drug trafficking conspiracy. Some of that money was, in turn, used to further the Maine drug trafficking operation by, for example, purchasing cars used to transport drugs to Maine and paying rent on

stash houses.  Harrell, Ayers, Kennedy, and Gillespie were all involved in the Maine drug trafficking conspiracy.[2]

The Rikers Island drug trafficking conspiracy lasted from at least 2019 until 2021. During that time, members of the Bully Gang arranged for papers soaked in synthetic cannabinoids (also known as "K2") to be smuggled into Rikers Island.  The gang coordinated to bring these K2-soaked papers into the jail facilities in at least three ways.  First, the drugs were mailed to inmates at Rikers, often disguised as legal mail.  Second, the drugs were smuggled in by third-parties or visitors.  And third, the drugs were smuggled in by prison guards who were bribed by the gang.

The inmates who received the K2-soaked papers were typically members or associates of the Bully Gang.  Those inmates then sold the K2 to other inmates for a substantial profit.  The money from the drug sales was transferred into Cash App accounts maintained by girlfriends and other family members on behalf of the inmates.  The gang received over ten thousand dollars per month from these drug sales.  Some of this money was used to continue the conspiracy by purchasing more K2 and bribing guards.  Harrell, Kennedy, and Chiles are all charged for their involvement in the Rikers drug trafficking conspiracy.

B.    Violence

In addition to drug trafficking, money laundering, and bribery, members of the Bully Gang also committed extreme acts of violence and numerous federal firearms offenses.

The Bully Gang engaged in several instances of back-and-forth retaliatory violence with members of rival gangs.  For example, on October 1, 2017, Harrell and Ayers participated in a shooting targeting an individual identified in the S-8 Indictment as John Doe #3, who murdered

---

[2]    Many other defendants—including the four defendants scheduled to go to trial in May—were also involved in the Maine drug trafficking conspiracy.

a member of Bully Gang.  The Bully Gang also engaged in multiple acts of violence targeting members of the rival "Stukes Crew."  On March 3, 2018, Ayers murdered Jonathan Jackson, a member of the Stukes Crew, after a shootout at a "gender reveal" party hosted by Harrell and attended by other Bully Gang members.  A few months later, on June 27, 2018, Harrell and Ayers participated in a shooting targeting John Doe #2, another member of the Stukes Crew.

In addition to murdering Jonathan Jackson, members of the Bully Gang also murdered Paul Hoilett and Mike Hawley, in April 2020, in the midst of the COVID-19 pandemic. On April 11, 2020, Gillespie was driven by Hawley to the vicinity of Buffalo Avenue in Brooklyn, New York, where Gillespie shot Hoilett from behind at point blank range.  Days later, on April 15, 2020, Hawley was murdered by Gillespie and Kennedy after Gillespie came to believe that law enforcement was looking for Hawley.  To commit these murders, Gillespie and Kennedy traveled from the Bully Gang's trap house in Carteret, New Jersey, committed the murders in Brooklyn (Hoilett) and Queens (Hawley), and then returned to the Carteret apartment.  To travel to and from the murders, Gillespie and Kennedy used a vehicle, a 2015 Subaru Outback, that contained a concealed "trap" compartment, which vehicle was regularly used by the gang to transport drugs and drug trafficking proceeds.

Members of the gang also employed violence to make money.  For example, on August 24, 2020, Gillespie robbed three people at gunpoint in Manhattan and, the next day, on August 25, 2020, Gillespie (together with co-conspirator Latrell Johnson) robbed three more people at gunpoint in Manhattan.

Members of the Bully Gang also committed violence in furtherance of the Maine drug trafficking conspiracy.  For example, in August 2017, Bully Gang member Bermon Clarke set fire to a stash house being used by the gang in Maine.  Two people, identified in the S-8

Indictment as John Doe #1 and Jane Doe #1, were inside the stash house when Clarke set it on fire. In addition, the Bully Gang used its network in Maine to facilitate gun trafficking. On multiple occasions, the Bully Gang used Maine residents who participated in the gang's drug dealing activities to purchase guns, which were then used by gang members.

IV.     Procedural History

In July 2020, a grand jury in this District indicted Harrell, Ayers, and Kennedy, among others, for their roles in the Maine and Rikers Island drug trafficking conspiracies. In September 2022, a grand jury returned the operative S-8 Indictment, which charges 26 defendants with crimes related to the Bully Gang's many criminal schemes detailed above. The S-8 Indictment includes charges for racketeering, violent crimes in-aid-of racketeering, and possessing guns in connection with these violent crimes. The racketeering acts alleged in the racketeering count include murder, murder conspiracy, arson, robbery, extortion, bribery, drug trafficking, and money laundering. Many of the racketeering acts are also charged substantively in separate counts of the S-8 Indictment.

In May 2023, the Court ordered the remaining defendants split into two groups for trial: a "New York trial pod" and a "Maine trial pod." The New York pod, scheduled to begin trial on February 26, 2024, consists of five remaining defendants: Harrell, Ayers, Chiles, Gillespie, and Kennedy. That trial will focus on the Bully Gang's crimes in New York, including the murders, shootings, robberies, and the Rikers Island drug trafficking conspiracy detailed above.

<u>ARGUMENT</u>

For the reasons set forth below, the government seeks to admit the following evidence at trial: (1) evidence establishing the existence of the Bully Gang, the charged racketeering enterprise; (2) statements by the defendants and their co-conspirators (including uncharged co-conspirators) as party-opponent admissions and co-conspirator statements, as well as statements against penal interest; (3) evidence of "other acts"—including evidence of uncharged shootings, prior convictions and incarcerations, sex trafficking, marijuana trafficking, sexual assaults, fraud and other "scamming" activity, and physical and psychological abuse—as direct evidence of the charged crimes or, alternatively, pursuant to Rule 404(b); (4) evidence of the defendants' significant and unexplained wealth; (5) proof of news articles, from phone records and from published sources, to show motive and consciousness of guilt; (6) evidence of the defendants' prior convictions, terms of incarceration and terms of supervision; and (7) authentic records and certain records kept in the ordinary course of business using certifications, pursuant to Rule 902.

The Court also should set a discovery disclosure schedule as to the defendants and preclude them from: (1) referencing prior acquittals and dismissals, (2) offering their own hearsay statements to avoid testifying and being subject to cross-examination, (3) attacking the conduct, motives and timing of the government's investigation, (4) mentioning any consequences attendant to the defendants' convictions, including punishment, and (5) introducing personal details designed to elicit jury sympathy. Finally, this Court should empanel an anonymous and partially sequestered jury.

I.    <u>Evidence of the Bully Gang, and the Defendants' Participation in the Gang, Is Admissible</u>

At trial, the government expects to introduce evidence of the existence of the charged racketeering enterprise: the Bully Gang. The government further expects to admit

evidence of the defendants' membership in (and/or association with) the gang, as well as evidence of the gang's racketeering activity. That evidence will be introduced through, among other things, the testimony of cooperating witnesses; photographs and videos depicting members and associates of the gang; social media posts and messages between members and associates of the gang; photographs of the defendants' tattoos; song lyrics and associated records from music-sharing platforms; and recorded jail calls.

Each of the above categories of proffered evidence is highly relevant and probative of the charged crimes, and the defendants will not be unfairly prejudiced by the admission of such evidence. Indeed, evidence concerning the gang and its operations is necessary to prove an essential element of Count One, which charges the defendants with conducting and participating in the conduct of the affairs of the Bully Gang through a pattern of racketeering activity. And because the proffered evidence does "not involve conduct any more sensational or disturbing" than the offenses charged—including the three violent murders charged in the S-8 Indictment—there is no risk of unfair prejudice as to the proffered evidence. See United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992); accord United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (evidence of uncharged acts not unfairly prejudicial when it does not involve conduct "more inflammatory than the charged crime"). Because the probative value of the evidence is not "substantially outweighed" by any prejudicial effect, the evidence should not be excluded under Rule 403.

A.   Applicable Law

1.   Racketeering

To prove racketeering in violation of 18 U.S.C. § 1962(c), the government must prove (1) the existence of an enterprise, (2) that the enterprise had an effect on interstate commerce, (3) that each defendant was associated with or employed by the enterprise, (4) that each defendant engaged in a pattern of racketeering activity, and (5) that each defendant conducted or participated

in the conduct of the enterprise through that pattern of racketeering activity.  Similarly, to prove a violent crime in-aid-of racketeering in violation of 18 U.S.C. § 1959, the government must prove: (1) the existence of an enterprise engaged in or affecting interstate or foreign commerce; (2) that the enterprise was engaged in racketeering activity; (3) that each defendants had or was seeking a position in the enterprise; (4) that each defendant committed the alleged violent crime; and (5) that each defendant's general purpose in committing the violent crime was to maintain or increase his position in the enterprise.  An "enterprise" includes any "partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); see also id. §1959(b)(2); United States v. Mejia, 545 F.3d 179, 203 (2d Cir. 2008) (defining "enterprise" in the context of violence in-aid-of racketeering statute as "'a group of persons associated together for a common purpose of engaging in a course of conduct'" (quoting United States v. Turkette, 452 U.S. 576, 583 (1981))).  An "enterprise" "must have an existence separate from the series of criminal acts that constitute its racketeering activity."  Mejia, 545 F.3d at 203.

   The Second Circuit has, therefore, long upheld the admission of information about uncharged crimes—including, among other violent conduct, murders—in racketeering cases as direct evidence of the charged enterprise.  See, e.g., United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) ("It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise.").  For example, in Mejia, the Second Circuit explained that evidence of an uncharged shooting and narcotics trafficking by MS-13 was properly admitted to establish the "existence of a racketeering enterprise."  545 F.3d at 206 (concluding that the admission of evidence of a prior uncharged shooting was proper because the shooting demonstrated the existence of the racketeering enterprise

and the existence of the conspiracy with which the defendants were charged).  As the Court held, "evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated."  Id. (internal quotation marks omitted).  Likewise, in United States v. Matera, the Second Circuit approved the admission of uncharged murders committed by members of the Gambino Family, including by non-defendants, as direct evidence because it was "offered to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated."  489 F.3d 115, 120 (2d Cir. 2007); see also United States v. Wong, 40 F.3d 1347, 1377-78 (2d Cir. 1994) (finding that the district court properly admitted testimony of an uncharged shootout between rival gangs because the "evidence was probative of the existence, organization, and nature of the RICO enterprise, a central allegation in the indictment").

Uncharged crimes are also admissible as direct evidence of the pattern of racketeering activity, even if a charged defendant did not participate in those crimes.  Such evidence "can constitute some evidence of the nature of the enterprise, which, in turn, can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO."  United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (internal quotations and citation omitted); see also United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of violent activities engaged in by other members and associates of the DeMeo Crew, including uncharged murders, are relevant because they tended to prove: "(i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and

continuity of illegal activities"); cf. United States v. Pizzonia, 577 F.3d 455, 465 (2d Cir. 2009)

("Although no [fewer] than two predicate acts must be committed . . . to demonstrate a pattern of

racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that

they bear to each other or to some external organizing principle that indicates whether they

manifest the continuity required to prove a pattern."   (internal citation and quotation marks

omitted)).

   With respect to the motive requirement for violent crimes in-aid-of racketeering,

the Second Circuit has explained that it may be proved in various ways:

> In order to establish that a crime of violence was committed for the
> purpose of . . . maintaining or increasing position in a RICO
> enterprise, the government is required to prove, inter alia, that the
> defendant's general purpose in committing the crime of violence
> was to maintain or increase his position in the enterprise. . . .
> Self-promotion need not have been the defendant's only, or even his
> primary, concern, if it was committed as an integral aspect of
> membership in the enterprise.   United States v. Concepcion, 983
> F.2d [369,] 381 [(2d Cir. 1992)].   The motive requirement is thus
> satisfied if the jury could properly infer that the defendant
> committed his violent crime because he knew it was expected of him
> by reason of his membership in the enterprise or that he committed
> it in furtherance of that membership.   Id.

United States v. Thai, 29 F.3d 785, 817-18 (2d Cir. 1994) (some citations omitted); see also United

States v. Payne, 591 F.3d 46, 63 (2d Cir. 2010) ("'[T]he motive requirement is satisfied if the jury

could properly infer that the defendant committed his violent crime because he knew it was

expected of him by reason of his membership in the enterprise or that he committed it in

furtherance of that membership.'" (quoting United States v. Pimentel, 346 F.3d 285, 295-96 (2d

Cir. 2003))); United States v. Desena, 260 F.3d 150, 155 (2d Cir. 2001); United States v. Diaz,

176 F.3d 52, 95 (2d Cir. 1999); Concepcion, 983 F.2d at 381.

Under <u>Thai</u> and its progeny, the nature of the charged enterprise, the rules and structure of that enterprise, and the expectations of membership are all relevant to proving whether a defendant committed a violent crime with the purpose of "maintaining or increasing position" within the enterprise.  <u>See, e.g.</u>, <u>United States v. Castro</u>, 659 F. Supp. 2d 415, 421 (E.D.N.Y. 2009) (concluding in Section 1959 prosecution that evidence of an uncharged shooting was admissible to prove the motive for a charged shooting where the motive behind both shootings was to "harm members of rival gangs").

### 2.   Other Acts as Direct Evidence of the Charged Crime

Although Rule 404(b) generally governs the admission of evidence regarding a defendant's other crimes, wrongs, or acts, "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."  <u>Baez</u>, 349 F.3d at 93.  In other words, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy [] is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."  <u>Concepcion</u>, 983 F.2d at 392.  Therefore, crimes committed in furtherance of a racketeering enterprise are admissible as direct evidence of an enterprise or conspiracy, without regard to Rule 404(b).  <u>DiNome</u>, 954 F.2d at 843 (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities).

The Second Circuit's opinion in <u>Wong</u>, 40 F.3d 1347, is particularly instructive.  The Second Circuit held that the district court properly admitted testimony of an uncharged shootout between rival gangs.  In affirming the district court's ruling, the Second Circuit reasoned as follows:

> [T]he evidence [of uncharged acts] was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than

> as evidence of other crimes under Rule 404(b). The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary phase of the trial, [then] during summations of counsel."

Id. at 1378. The Second Circuit held that "this evidence was probative of the existence, organization and nature of the RICO enterprise, a central allegation in the indictment." Id. Therefore, "'the fact that it may also have been probative of a separate uncharged crime is irrelevant.'" Id. (quoting United States v. Coiro, 922 F.2d 1008, 1016 (2d Cir. 1991)); see also Diaz, 176 F.3d at 79 (affirming admission of numerous uncharged criminal acts admitted as "enterprise evidence," i.e., to establish the existence of the charged enterprise, including evidence of drug trafficking, possession of weapons, assaults in aid of racketeering, robbery, and related acts of violence and determining that the evidence was not subject to Rule 404(b)); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (affirming admission of uncharged murders as proof of racketeering enterprise and conspiracy, rather than pursuant to Rule 404(b)).

It is also well established that "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).

Moreover, the Second Circuit has repeatedly upheld the admission of other-acts evidence as direct evidence of the charged crimes where such evidence provides necessary background or context for the charged crimes. See Gonzalez, 110 F.3d at 942 (uncharged burglary

admissible in trial for felon in possession of a firearm because, <u>inter alia</u>, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); <u>United States v. Inserra</u>, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); <u>United States v. Langford</u>, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); <u>Pitre</u>, 960 F.2d at 1119 ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed."). In this respect, "trial court[s] may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." <u>United States v. Coonan</u>, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting <u>United States v. Daly</u>, 842 F.2d 1380, 1388 (2d Cir. 1988)).

    3.    <u>Rule 404(b) Evidence</u>

In the alternative, evidence of uncharged crimes and other acts may be admitted pursuant to Rule 404(b) for numerous permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed. R. Evid. 404(b)(2); <u>see</u> <u>United States v. Ortiz</u>, 857 F.2d 900, 903 (2d Cir. 1988). The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application and applies an "inclusionary approach" to admitting "other acts" evidence under Rule 404(b). <u>See</u> <u>United</u>

States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing Pitre, 960 F.2d at 1118); see also United

States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive

approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

A party must satisfy three requirements for evidence of "other crimes, wrongs or

acts" to be admitted under the Rule.  First, the evidence must be offered for a purpose other than

to prove the defendant's bad character or criminal propensity.  See United States v. Mickens, 926

F.2d 1323, 1328 (2d Cir. 1991) (citing United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989)).

Such permissible purposes include to prove motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident.  Fed. R. Evid. 404(b)(2).  Second, the

evidence must be relevant under Rules 401 and 402 and more probative than prejudicial in

accordance with Rule 403.  See Mickens, 926 F.2d at 1328 (citing Ortiz, 857 F.2d at 903); Levy,

731 F.2d at 1002.  Third, if the defendant requests that the jury be instructed as to the limited

purpose for which the government's evidence is being admitted, the court must furnish such an

instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

The Second Circuit repeatedly has held that evidence of uncharged crimes may be

admitted at trial to establish the existence and development of a criminal relationship between co-

conspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding

admission of evidence relating to the defendant's prior criminal activities with co-conspirators in

charged drug conspiracy as relevant evidence "to inform jury of the background of the conspiracy

charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal

relationship between the participants in the crime developed"); United States v. Pipola, 83 F.3d

556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to

explain how a criminal relationship developed; this sort of proof furnishes admissible background

information in a conspiracy case."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993)
(holding that co-defendants' relationship over a 14-year period, during which stolen property and
narcotics crimes were committed, "was properly admitted to explain how the illegal relationship
between the two [defendants] developed and to explain why [one defendant] . . . appointed [the
other defendant] . . . to a leading position in the Organization"); United States v. Harris, 733 F.2d
994, 1006-07 (2d Cir. 1984) (upholding admission of evidence of defendant's previous narcotics
transactions with informant who posed as prospective narcotics customer in connection with
charged conspiracy, even though informant was not a member of the charged conspiracy, because
the evidence "tended to show the basis for Harris' trust of [the informant]").

    Other-acts evidence is also admissible under Rule 404(b) to "corroborate crucial
prosecution testimony" if it is "direct and the matter corroborated is significant." United States v.
Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted).  And where
impeachment of a government witness based on prior bad acts is anticipated, allowing the
government to elicit the witness' testimony about such acts on direct examination so as to avoid
the appearance that the government is concealing such purported impeachment evidence from the
jury.  See, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 493 (S.D.N.Y. 2011) (citing
Coonan, 938 F.2d at 1561).  Finally, acts that occurred after the charged conduct are also
admissible under Rule 404(b).  E.g., United States v. Goffer, 721 F.3d 113, 124 (2d Cir. 2013)
("Subsequent acts are frequently probative as to intent."); United States v. Germosen, 139 F.3d
120, 128 (2d Cir. 1998) ("The fact that the evidence involved a subsequent rather than prior act is
of no moment.  'Subsequent act' evidence may be admitted under Rule 404(b)."); United States v.
Ramirez, 894 F.2d 565, 569 (2d Cir. 1990) ("Relevancy cannot be reduced to mere chronology;

whether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility.").

B.     The Proffered Enterprise Evidence

Count One of the S-8 Indictment charges defendants Harrell, Ayers, Gillespie, and Kennedy (as well as other members and associates of the Bully Gang) with racketeering, in violation of 18 U.S.C. § 1962(c).  Each of those five defendants is charged, variously, with multiple racketeering acts, including narcotics trafficking conspiracy, money laundering conspiracy, bribery, murder conspiracy, and murder, among other things.  Harrell and Ayers are also charged with committing violent crimes in-aid-of racketeering, including murder conspiracy (Counts Nine and Ten) and assault in-aid-of racketeering (Counts Eleven and Fifteen).

As set forth above, to prove each of those counts, the government must establish the existence of the charged racketeering enterprise: the Bully Gang.  The government intends to prove the existence of the charged enterprise, and the defendants' membership in that enterprise, in several ways.

1.     Cooperating Witnesses

First, the government expects that multiple cooperating witnesses will discuss, among other things, the history, leadership, and operations of the gang.  Witnesses will name Harrell as the gang's leader, and will identify Ayers, Gillespie, Kennedy, and others as members of the gang.  Trial testimony will also discuss the gang's rules, and methods of enforcing those rules; the clothing and jewelry emblazoned with "Bully Gang" or "BG" worn by members of the gang; the gang's handshake; and members' use of common vernacular, signs, symbols and hashtags to reflect their membership in the gang.  Cooperating witnesses will testify, for instance, that many Bully Gang members self-identified on social media, including through the use of hashtags like "#BG" and "#27"—a reference to the second and seventh letters of the alphabet ("B"

and "G").  Testimony at trial will also note the Bully Gang's de facto headquarters, located at 1625 Fulton Street in Brooklyn, where members would convene to discuss gang business, and stash guns and drugs used or sold by members of the gang.  Cooperating witnesses will also discuss the gang's involvement in racketeering activity, including the racketeering acts specified in the S-8 Indictment.

        2.    <u>Photographs, Videos & Social Media</u>

The government also expect to offer photographs and videos, including from cell phone evidence and social media records, demonstrating the defendants' membership in and/or association with the Bully Gang.  Among other things, the government intends to introduce a May 11, 2017 video posted to YouTube that includes an interview with multiple individuals, including co-defendants Rashaad Craig, Ronald David, and Latrell Johnson, as well as James Whitaker.  The video, which is filmed in front of 1625 Fulton Street, expressly promotes the gang, spells out its history, and references prominent members.  For instance, the video includes the following exchange:

| | |
|---|---|
| OFF CAMERA: | Bully Gang, n****. |
| JOHNSON: | N****s already know.  My n****s made history.  Bully Gang. My n****s made history.  Two n****s, n****.  Took over Brooklyn.  N****s came home.  Came home from up top—from the Feds, n****.  Six years.  Eight years.  N**** came home and took over, n****.  Two n****s, n****.  Chains.  Whips.  Fucking n****s' bitches.  Taking n****s' lives.  All that, n****.  All that, n****a.  N****s know what's up.  Taking n****s' chains—all that.  Wearing it.  All that.  N****s know what's up.  Wearing them shits, n****a.  N****s know what's up, my n****.  Bully Gang.  N****s know what's up.  N****s say that Bully Gang shit from the Stuy, n****s know what's up.  N****s know "Oh, all right.  Yeah." |
| DAVIS: | Not that Brownsville shit.  Not none of that other shit.  Nothing towards ya'll n****s, but we Bully Gang from the Stuy, you heard. |
| JOHNSON: | But we Bully Gang from the real shit.  01's, n****.  2000s, n****. 2002, n****s was out here. |

| | |
|---|---|
| OFF CAMERA: | [inaudible] |
| JOHNSON: | N****s already know what's up. |
| | *      *      * |
| JOHNSON: | Google my man, Moe.  Google my man, YB, n****.  Charles, n****.  Google my man, Marly G, n****. |
| OFF CAMERA: | Free my man, Moe.  Free Jae O. |
| JOHNSON: | Yeah, n****.  Google my man Jae O.  N****'s in the feds, man. |
| OFF CAMERA: | RIP YB, n****. |
| DAVIS: | Free Buzzin. |
| JOHNSON: | N****s down for bodies.  Beat bodies.  All that.  Google my n****s, man. |
| OFF CAMERA: | That's a fact. |
| JOHNSON: | Yeah that's a fact.  Bully Gang.  N****s know what's up. |

In that excerpt, Johnson details the gang's history, explaining that two founding members "took over Brooklyn" after serving federal prison time—references to Harrell and Charles Williams (also known as "YB"), founders of the Bully Gang who both served prior federal sentences.  Johnson highlights several notable gang leaders and members, including Harrell ("Google my man Moe"), Williams ("Google my man YB"), and Jamaal Anderson ("Google my man Marly G"), and also references incarcerated Bully Gang member Joell Joyce, also known as "Jae O," who was incarcerated "in the feds."  In the video, Johnson also boasts that Bully Gang members have engaged in numerous crimes, including robbery ("taking . . . chains"), carjacking ("taking . . . whips," a slang term for cars), and murder ("taking . . . lives," "down for bodies").

Members of the gang also used social media platforms such as Facebook and Instagram to promote the Bully Gang, including by identifying themselves as members.  Examples of the defendants' brazen and public promotion of the gang are included below:




 **27_spazz** We da bullies dat bully da bullies

3w

**1625dee** I knew from a youngin you would always stand tall and we grew from the dirt happy birthday buzzing I love you forever 👤 #bullyseason in full effect @bg.mo3mon3y

236w

23



As exemplified in the posts above, Bully Gang members used common identifiers and hashtags—including "BullyGang," "#bullyseason," "BG," "27," and "TwoSev"—to publicize their membership in the gang.

Gang members also used social media to glorify violence, display their access to guns, and flaunt the fruits of the gang's criminal activities:











The gang also used social media to memorialize deceased members—including Charles Williams (also known as "YB"), Javon Craig (also known as "Fifth"), Jamaal Anderson (also known as "Marly G"), and Rashad Brown (also known as "Styx")—and to call out to "free" those members who were incarcerated:







3.   Tattoos

The defendants' membership in the gang is will also be proven through photographs of their tattoos.   Indeed, many gang members, including Harrell, Gillespie, and co-defendant Ronald Davis, have tattoos honoring the gang, including "Bully Gang," "BG," "27," and references to (and/or depictions of) deceased Bully Gang members:

 





Several tattoos also capture the defendants' affinity for guns and violence, as well as their disdain for law enforcement (and federal law enforcement, in particular), such as Gillespie's "922g" tattoo and Harrell's "Fuck Tha Fedz" tattoo:

 

4.   <u>Music</u>

Audio recordings and related records, including accounts and songs publicly posted to SoundCloud, further confirm the existence of the enterprise, and contain admissions about the gang's criminal activity.  For instance, "Who Real As My Gang," a song posted to SoundCloud by "BG Styx" (deceased Bully Gang member Rashad Brown) contains the following lyrics:

> It's Bully Gang
> Yeah.  There's a lot of gangs.
> There's only one Bully Gang, right.
>
> *       *       *
>
> Moe jammed up and I got him
> Jae O jammed up and I got him
> YB's killer I'mma drop him
>
> *       *       *
>
> Tell them to kill and they do it
> These n****s is bitches, I know it
> I'm not for that talk; and I really be on it
>
> *       *       *
>
> Bully Gang that's us, n****
> In Bully Gang I trust, n****
> We get the drop and we rush, n****
> That .40 cal gonna slump a n****

Not only do those lyrics explicitly promote the gang and the loyalty of its members ("There's only one Bully Gang," "In Bully Gang I trust"), they also provide proof of motive ("YB's killer I'mma

29

drop him") and admissions regarding the defendants' efforts to hunt down (or "get the drop") on

their rivals, and violently assault them ("That .40 cal gonna slump a n****").

Members also promote the gang in the banners and images associated with their

music and SoundCloud accounts:

 



 



5.      Jail Calls

The  government  also  expects  to  introduce  jail  calls,  including  calls  containing

conversations among members of the gang, as evidence of the existence of the enterprise, its rules,

and its methods of enforcement.  For example, in a June 5, 2018 recorded jail call with Joell Joyce,

Harrell recounted a beating of Bully Gang member Tyquan Lane (also known as "Tah Tah") that

Harrell authorized after Lane "violated" while operating a stash house in Maine:

> JOYCE:       [. . .] Ave told me money was missing out of Berm's wallet and all this.
> And he was talking crazy about Dee in front of Ave and [unintelligible]. I
> already knew.
>
> HARRELL:   Nah it wasn't even—Nah it wasn't even about that. Fuck all that. Fuck all
> that. Your man goes to the tizzy right, he doing bullshit. Now you know I
> got these little n****s getting ambitious. Yo, the dumb shit these n****s
> do no, Buzzin, Bro you would never see it before. Bro—I don't got
> nothing to do with that situation. Your man is out there eating. Your man
> asked me, I'm like, "Yo bro why would I give you something to go put?"

31

"Nah Dee said this." I call Dee. Dee, "Nah, I ain't say that.' N****, Tah Tah, I said listen, I find it funny cause I see through all this bullshit you doing, yo. Fall back, Bro Bro. Dee will hurt you, Bro Bro." Think that—

JOYCE:      [Crosstalk] I told bro. I told bro.

HARRELL:    Situation bro.  Yo, that n**** is not sweet bro like..

JOYCE:      I told him that.

HARRELL:    You know what he do? Bong. He go—he got Kwame and them sitting in the twizz and all that on the gram.

JOYCE:      You lying.

In that exchange, Harrell explained to Joyce that the problem with Lane was not related to taking money from Ayers ("Dee"), but rather from having other individuals inside a trap house (the "tizzy") that were posted to Instagram ("on the Gram").  Harrell went on to describe how he intended to resolve the issue:

HARRELL:    [. . .] Dee call me and 'Yo I'm violating that n**** dah dah dah.' I'm like, 'yo chill.  Dub that. Yo stop doing business with all them n**** do it through me right now. He ain't going to the town no more, that's how we going to dub that.'

JOYCE:      Yah.

HARRELL:    Dee like 'aight whatever.' Yo how your mans tell Tah Tah he goes 'Tah Tah that's a dub fall back them situations you brought down n**** when I come back down you giving me those or I'm violating you.  Feel me? Point blank. I ain't even gon keep talking like you violating, n****.  They got you out there because of me n****.' You understand what I'm trying to say?

In that exchange, Harrell recounted how Ayers notified Harrell that Lane needed to be "violat[ed]," and Harrell explained that the proper solution would be to stop Lane from traveling to Maine and operating trap houses ("He ain't going to the town no more, that's how we going to dub that").

Harrell thereafter described the Bully Gang members' confrontation of Lane at "Fulton Street"—a reference to 1625 Fulton Street—and the subsequent beating of Lane.  Harrell set the terms of the assault, noting that he would not permit Ayers and Clarke to burn Lane, hit him too much in the face, or kick and stomp him:

32

HARRELL:     [. . .] [Lane] tried to flex in front of them. 'Yo you ain't, you, you ain't coming upstairs? Hey, yo Dee, crunch this n****.' N**** Dee like—he ain't just crunch him. I smack the shit out of him, shabonga, n****. From there, n****, Dee just hold him up, but chill though, it's not even the funny part yo, it get funnier. Dee washed him. I already tell Dee and them, 'Yo do not be punching that n**** all in his face all crazy and do not try to kick him or stomp him in his head. That's a dub.'

JOYCE:        Yeah.

HARRELL:     'Somebody gonna burn him.' 'N**** you not burning my little bro I don't give a fuck about nothing.'

JOYCE:        Yeah. Facts.

HARRELL:     I can see he in violation and all that, but he ain't—he ain't—nah you ain't doing that though, but bro.  So Berm come in.  Berm hook on him—boom boom—n****s washed out and I grabbed him 'Nah, you wearing this. Come here.' Throw him back to Dee and them. Dee and them out there talking, I go in his pockets, he got the chop on him. Take the chop bro, take the chop from him.

JOYCE:        [Unintelligible].

HARRELL:     Yeah right, take that from him and all that blasé bla. Telling Dee 'Yo, I want my phone and all that.' Long story short, how the n**** spin and knock Berm out?

JOYCE:        Word? Get the fuck out of here.

HARRELL:     Yo, he hit him on the button when he hit him.

JOYCE:        Get the fuck out of here.

HARRELL:     He violated. He in violation.

*     *     *

HARRELL:     You're lucky I allowed you to even hit Berm back.  Like that's super violation.  And I made Berm stand down after that, like—Cause n****s washed him though bro bro. Strong though, n****s washed him though. And the little bros, see, they don't even know that I make the little bros flip on you. Everybody who think you doing greasy shit, nah, I make them fuck you up

JOYCE:        Right, right, right, right.

HARRELL:     I tell, 'When I tell n****s, stand down, you stand down n****. You wrong Tah Tah. You and,' And n****s so much a real n****s, n****s is feeling wicked after that, like, I told Dee, "Just smack him up, Bro.  Do not start punching him and doing all that." Now he see Tah Tah's face he feel bad, 'Yo, I'm about to give that n**** some bread.' I said, 'No, don't give that n**** no fucking bread.' I feel bad for him too, you know? Tah Tah the little bro but he's wrong bro, like, don't even talk to him. Let me

33

> explain to him. Don't even act like you even feel bad for the n****, Bro, cause he's wrong bro, he shouldn't be playing with ya'll like that.

In that exchange, Harrell detailed the assault of Lane, and how he, Ayers ("Dee"), and Clarke ("Berm") beat him ("washed him").  Harrell further explained that Lane hit Clarke during the assault, which was another "violation" by Lane.  Harrell explained that he could have further punished Lane for hitting Clarke, i.e., for that "super violation," and that Harrell made Clarke "stand down" after that.  Harrell underscored that it was important for younger Bully Gang members to see that Harrell could direct other members "flip" on them and punish them for misconduct ("[T]he little bros, see, they don't even know that I make the little bros flip on you. Everybody who think you doing greasy shit, nah, I make them fuck you up.").

Jail calls also make clear that Harrell called many of the shots in the gang, referring to decisions that "ran through me" or that people "run by me."  Harrell also informed other members over the phone about how "official" others were as Bully Gang members.  For instance, in advance of the August 25, 2020 armed robbery committed by Gillespie (together with co-defendant Latrell Johnson), Gillespie asked Harrell about Harrell's opinion of Johnson.   Harrell confirmed that Johnson was "official" and "one of us," and that Gillespie could depend on him.

6.    Legal Tactics

The government also expects to introduce evidence demonstrating the defendants' use of the justice system to preserve and protect the gang and its members.  For instance, the government expects to offer evidence that, when a participant in one of the gang's criminal rackets—namely, its drug trafficking schemes—was arrested or otherwise had contact with law enforcement, gang members would swiftly intervene.  Among other things, members of the gang would post bail when co-conspirators were arrested to ensure that they would not "snitch," or cooperate with law enforcement.  Gang members also facilitated or arranged for co-conspirators

to reclaim seized property, including vehicles, used in connection with the gang's criminal schemes.

In addition, gang leaders routinely arranged for and funded legal representation for their co-conspirators, including by using proceeds of the gang's criminal schemes.  Among other things, the government expects to introduce evidence at trial that multiple members and associates of the gang consulted, were represented by, or were contacted by an attorney who represented Harrell ("Attorney-1").[3]  For instance, in a recorded jail call, an incarcerated Bully Gang member ("Member-1") spoke to Harrell about a conversation between Member-1 and Attorney-1.  In that call, Member-1 relayed to Harrell that he sought legal advice from Attorney-1 about a state case, and Harrell commented on the advice Attorney-1 provided to Member-1.  Cooperating witnesses will also discuss their knowledge of, and contact with, Attorney-1, including their understanding that Attorney-1 was "the Bully Gang lawyer."

The government further expects to demonstrate at trial that Attorney-1 received payments via CashApp from Bully Gang members and associates, including participants in the Bully Gang's drug trafficking conspiracies.  Comments associated with certain payments to Attorney-1 include "for Moeleek Harrell" and "for Moe," suggesting that Bully Gang members and associates contributed to Harrell's legal fees, including when Harrell faced state charges, including murder.  The evidence at trial will demonstrate that funds for these payments were derived, at least in part, from proceeds of the gang's Rikers trafficking scheme.

---

[3]     With the defendants' consent, and subject to the Court's <u>in limine</u> rulings, the government does not object to anonymizing the attorney.

C.    <u>Discussion</u>

The classic enterprise evidence catalogued above (which reflect examples, but not a complete accounting, of the kinds of enterprise evidence the government may seek to admit at trial) is admissible to prove the required elements of racketeering, the crime charged in Count One of the S-8 Indictment, along with the VICAR charges in Counts Nine, Ten, Eleven, and Fifteen. Specifically, all of the above evidence is admissible to demonstrate the existence of, and the defendants' membership in, the Bully Gang, the charged racketeering enterprise.  <u>See, e.g.</u>, <u>United States v. Pierce</u>, 785 F.3d 832, 841 (2d Cir. 2015) (affirming admission of rap videos and tattoos as probative of association with the enterprise and motive for violent crimes); <u>United States v. White</u>, No. 19-3313, 2021 WL 3355166, at *3 (2d Cir. Aug. 3, 2021) (concluding there was sufficient evidence from which the jury could find the existence of the enterprise, including "photographs showing that MBG members had tattoos signifying their membership in MBG and affirmed their membership in MBG through posts on social media"); <u>United States v. Smothers</u>, No. 20-CR-213 (KAM), 2023 WL 348870, at *21 (E.D.N.Y. Jan. 20, 2023) ("[O]ther E.A.M. members' discussions regarding E.A.M.; their own affiliations with the E.A.M. enterprise; and in particular their knowledge of and affiliation with [the defendant], clearly have significant probative value in proving the existence of E.A.M. itself and of [the defendant's] association with the enterprise.").[4]  Evidence of the defendants' crimes, including the defendants' drug trafficking,

---

[4]    The Second Circuit has repeatedly approved admitting evidence of music lyrics in these circumstances, including to establish the existence of, and a defendant's participation in, a charged racketeering enterprise.  <u>See</u> <u>Pierce</u>, 785 F.3d at 841 (music videos properly admitted under Rule 403 where "government proffered the rap video to show [the defendant's] animosity toward the Young Gunnaz, as well as his association with" the enterprise); <u>see also</u> <u>United States v. Herron</u>, 762 F. App'x 25, 30 (2d Cir. 2019) (rap videos properly admitted where "used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise"); <u>United States v. Barrett</u>, 750 F. App'x 19, 22 (2d Cir. 2018) (music videos admissible to show association with co-conspirators and use of vehicle used in charged crimes).

access to guns, use of intimidation and threats, and acts of violence, among other things, also supplies proof of the gang's racketeering activity as well as proof of other crimes charged in the S-8 Indictment, including Counts Two and Nineteen (narcotics conspiracy), Counts Four and Twenty (money laundering conspiracy), and Counts Three and Thirty-Six (unlawful possession, brandishing and discharge of firearms).

All of this evidence is also probative of the illicit relationships among the co-conspirators, including members and associates of the gang who are engaged in these activities together.  See Diaz, 176 F.3d at 79-80 (upholding district court's decision to admit evidence of prior bad acts committed by defendants and government witnesses because it was relevant to proving the existence, nature, and operations of the RICO enterprise, as well as informing the jury "how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed coconspirators"); United States v. Ashburn, No. 11-CR-303 (NGG), 2015 WL 588704, at *12 (E.D.N.Y. Feb. 11, 2015) (finding that "[e]vidence regarding the founding of Six Tre is classic enterprise evidence, and is relevant and admissible to prove the existence of the alleged conspiracy as well as to show its background and history"); Guerrero, 882 F. Supp. 2d at 492-93 (evidence related to the defendants' prior illicit transactions with their co-conspirators, including their commission of robberies, shootings, and possession of guns, was "plainly admissible to explain the development of the illegal relationship between the defendants and their co-conspirators and explain [t]he mutual trust that existed between the coconspirators (including the cooperating Government Witnesses)").

In addition to providing direct evidence of charged crimes, much of this evidence provides critical proof of motive and identity, and serves to complete the story of the crimes on trial.  Indeed, the murder conspiracy and the October 1, 2017 shooting charged in Counts Nine and

Eleven of the S-8 Indictment targeted John Doe #3, who, as set forth above, murdered Bully Gang member Charles Williams (also known as "YB"). Williams is routinely memorialized by members of the gang, including in tattoos and social media posts, and several of the crimes charged were motivated by a desire to avenge Williams' death. In addition, evidence of the defendants' tattoos is admissible not only to demonstrate the depth of the defendants' allegiance to the Bully Gang, but also to establish identity—for instance, to prove the defendants' aliases, or to show that their tattoos match those of the perpetrators.

With regard to the defendants' exploitation of the legal system, as well as similar evidence of the defendants' efforts to obstruct justice,[5] courts routinely admit evidence that defendants or their co-conspirators sought to cover up their crimes, keep evidence away from law enforcement, and track a developing criminal investigation. See, e.g., United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) (noting that the Second Circuit has "upheld the admission of various kinds of evidence on the ground that it demonstrated consciousness of guilt"); Mickens, 926 F.2d at 1329 (holding that evidence regarding defendant's "effort to intimidate a key prosecution witness was probative of [defendant's] state of mind"); United States v. Ochs, 595 F.2d 1247, 1260 (2d Cir. 1979) (holding that evidence of defendant's attempt to bribe a witness "was admissible as showing consciousness of guilt"); United States v. Triumph Cap. Grp., Inc., 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant]'s efforts to obstruct the investigation evidence a consciousness of guilt .

---

[5]     The government's anticipated evidence of obstructive conduct is set forth in more detail in Section II below. The government expects that additional acts of obstruction, and additional detail regarding certain "other acts" evidence described below, will be reflected in material to be produced pursuant to 18 U.S.C. § 3500. At the Court's request, the government can provide additional details concerning the expected testimony of cooperating witnesses in an ex parte submission.

. . .").  That proof is admissible as direct evidence of the story of the crime on trial as well as proof that is probative of consciousness of guilt.

Additionally, it is well established that "proof of house counsel can be used by the government to help establish the existence of the criminal enterprise under RICO, by showing the connections among the participants."  United States v. Locascio, 6 F.3d 924, 932-33 (2d Cir. 1993).  More specifically, evidence of "benefactor payments"—i.e., payments for legal services rendered to others—constitutes "highly relevant" proof of a criminal enterprise for purposes of the RICO statute.  United States v. Gotti, 771 F. Supp. 552, 560 (E.D.N.Y. 1991) (citation omitted) (noting that evidence that the defendant "paid significant sums of money for legal services rendered to others" will "materially aid in establishing the existence of an enterprise"); see also United States v. Simmons, 923 F.2d 934, 949 (2d Cir. 1991) (holding that government can use evidence of benefactor payments to prove existence of enterprise); United States v. Castellano, 610 F. Supp. 1151 (S.D.N.Y. 1985) (disqualifying attorney because attorney's acceptance of benefactor payments could be used to prove existence of enterprise).  Payment for legal representation may also be "a form of compensation to members of a crime 'crew.'"  In re Grand Jury Subpoena Served Upon John Doe, 781 F.2d 238, 251 (2d Cir. 1986).  Similarly, here, the gang's practice of making benefactor payments, or otherwise intervening in co-conspirators' criminal matters, demonstrates the existence of the charged enterprise and the methods employed by its members to protect the gang.

For these reasons, the evidence set forth above should be admitted at trial in full.

## II.    "Other Acts" Evidence

As explained above, uncharged criminal acts are admissible as both direct evidence of the crimes charged in the S-8 Indictment as well as under Federal Rule of Evidence 404(b).  At trial in this case, the government expects to introduce evidence related to the following "bad acts,"

among others: (1) use of sex workers, sexual abuse, and violence against women in connection with the charged racketeering enterprise and the Maine drug trafficking scheme; (2) other money making schemes perpetrated by members of the Bully Gang, including committing fraud and dealing marijuana; (3) attempts to obstruct the investigation and prosecution of crimes committed by members of the Bully Gang; (4) evidence of prior arrests, convictions, and incarcerations of the charged defendants; and (5) violence targeting the Bully Gang and its members.

Each of these categories of evidence is admissible as direct evidence of the crimes charged.  This evidence shows, among other things, the existence of the Bully Gang, the Bully Gang's pattern of racketeering, the defendants' membership in the Bully Gang, the defendants' relationships to one another, the defendants' participation in the charged narcotics trafficking, and the defendants' possession of firearms in connection with their gang activity as charged in Counts Three and Thirty-Six of the S-8 Indictment.  See Carboni, 204 F.3d at 44 (explaining that direct evidence includes evidence that "arose out of the same transaction or series of transactions as the charged offense," evidence that "is inextricably intertwined with the evidence regarding the charged offense," and evidence that "is necessary to complete the story of the crime on trial").  The government will address the admissibility of each category of evidence in turn below.

   A.   Violence Against Women

       1.   Relevant Background

The government expects to elicit evidence that, in connection with the racketeering enterprise and the Maine drug trafficking conspiracy, the defendants and other Bully Gang members abused women who participated in the conspiracy.  In particular, Bully Gang members intentionally recruited sex workers (who were often drug addicts) to participate in the Maine drug trafficking conspiracy.  When these and other women became part of the conspiracy, the Bully Gang members often subjected them to physical violence, including non-consensual sex.  The

Bully Gang members who participated in the violence toward women included Ayers, Bermon Clarke, and Robert Holt.

The evidence the government intends to introduce at trial includes, among other things, evidence from phones seized from Bully Gang members.  For example, both Ayers and Clarke used their phones to access "Backpage," a website for marketing and obtaining the services of sex workers.  They also communicated and strategized with each other about recruiting sex workers to participate in the Maine drug dealing, and sought women with access to houses or apartments in Maine where they could sell drugs.  The phones also contain evidence of abusive behavior toward women involved in the drug trafficking.  For example, a video sent to Ayers' phone shows Ayers using a taser on a woman who participated in the Maine drug trafficking.  The video depicts Ayers tasing this woman multiple times while she begs him to stop.  Evidence recovered from cell phones also shows that the conspiracy's leaders electronically tracked some of their female workers.

The government expects cooperating witnesses to also testify regarding the Bully Gang's recruitment and abuse of women.  The government expects its cooperating witnesses will explain that multiple sex workers were recruited to the conspiracy and that these women provided homes from which the gang sold drugs.  The government also expects its cooperators to describe the methods of punishment and control used by Bully Gang members to ensure that the women in the conspiracy continued to obey them.  These methods include both physical, psychological, and sexual abuse.  The government further expects its witnesses to testify that the Bully Gang members engaged in both consensual and non-consensual sex with female members of the conspiracy.

2.   Discussion

The gang's violent and coercive behavior toward women is direct evidence of how the gang ran its Maine drug dealing operation.  Critical to that drug dealing operation was the

participation of people willing to provide trap houses that the gang could use to sell drugs.  How the gang recruited these people, often by targeting drug-addicted sex workers, is a necessary part of the evidence against the defendants.  Similarly, evidence regarding the violence used to coerce women to continue their participation in the conspiracy and obey Bully Gang members is important to explain the continuing participation of these women in the conspiracy.  The sexual relationship between the Bully Gang members and the women in the conspiracy is also necessary to explain the origins of the relationship between these various co-conspirators.  See United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009) (evidence of bad acts is admissible "to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators").  All of these are non-propensity uses of this other act evidence and, under the Second Circuit's inclusionary approach, should be admitted.

Turning to the Rule 403 balancing, that balance weighs in favor of admitting this evidence, as it is not unduly prejudicial.  Given the severity of the charged crimes, which include multiple murders and attempted murders, the defendants are less likely to be prejudiced by the introduction of evidence related to these acts involving violence against women.  See United States v. Rosemond, 958 F.3d 111, 125 (2d Cir. 2020) ("The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not "any more sensational or disturbing" than the charged crime.").  Even if the "bad acts" were as serious as the charged crimes, they still have critical probative value, as explained above.  And this value outweighs the potential for unfair prejudice.  See Matera, 489 F.3d at 121 ("When a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise.").

B.     Money-Making Schemes

1.     Relevant Background

In addition to the specific racketeering acts alleged in the S-8 Indictment, Bully Gang members also engaged in other criminal activities in connection with the gang.  These activities included additional criminal money-making schemes.  For example, members of the gang committed fraud by making purchases using stolen identities and fake credit cards.  Members of the gang also engaged in additional drug trafficking activity, including selling marijuana.

With respect to the fraud, the government expects to show that Bully Gang members, including Avery Goodluck, used credit cards in other people's names to make purchases. Indeed, Goodluck has three convictions for this behavior: one in New Jersey, one in New York, and one in Virginia.  Like the Bully Gang's other money-making schemes, money from this fraud went to members of the gang and was used to further the gang's activities.

Similarly, members of the gang sold marijuana to make money.  The government intends to introduce evidence of this marijuana dealing, including text messages and photographs depicting marijuana being sold by gang members.  For example, there are numerous text messages in phones seized from Harrell in which he discusses selling marijuana.  Among other things, Harrell discusses the price of the marijuana which he intends to sell.  Harrell's phones also contain numerous photographs of marijuana, including the photographs below:




2.      Discussion

Evidence of the gang's fraud and marijuana dealing is direct evidence of the racketeering enterprise charged in the indictment and the pattern of racketeering.  These crimes demonstrate that the gang was engaged in criminal money-making pursuits affecting interstate commerce and help identify the common participants in the affairs of the enterprise.  They further demonstrate that members and associates of the gang committed additional crimes with one another, showing the relationship between these individuals.  In addition, to the extent that cooperating witnesses participated in these additional crimes, discussion of these crimes will be necessary to explain the relationship between the cooperating witnesses and the members of the gang.

C.      Obstruction of Justice

1.      Relevant Background

The government expects to introduce evidence of obstructive conduct targeted at potential government witnesses.  This conduct includes using court documents, including documents produced in discovery in other criminal cases, to intimidate witnesses.  For example, Harrell attempted to determine the identity of a person whose name was redacted in materials provided to him as part of his state murder case.  The materials showed that the individual provided

information to law enforcement.  Harrell forwarded the materials to another individual and said "This not your name that's blanked out gangsta??," implying that Harrell believed this individual was providing information to the government.  Harrell also obtained access to materials relating to a cooperating witness in a case against another Bully Gang member and distributed those materials to others.

On another occasion, in the YouTube video described above, Bully Gang members and associates, including co-defendant Latrell Johnson, displayed and read from the court transcript of the testimony of a witness who they deemed a "rat."  After reading the name of the witness, they stated "real n****s stay silent" and derided people who talk to law enforcement as "snitches."  The defendants' obstructive behavior has continued during this case with defendants reaching out to potential witnesses, including while incarcerated at the Metropolitan Detention Center ("MDC").  For example, incarcerated defendants at the MDC used contraband phones to contact potential witnesses while attempting to determine if these potential witnesses were cooperating with the government.

2.   Discussion

Evidence of Bully Gang members' efforts to obstruct justice is admissible as direct evidence for several reasons.  First, this evidence establishes that individuals who cooperate with law enforcement violate the gang's rules, further showing the existence and nature of the gang. This is particularly apparent in the YouTube video where members and associates of the gang discuss the rules against "snitching."  In addition, this evidence is relevant to show how Bully Gang members and associates prevent each other from suffering the consequences of their illegal behavior.  For example, Harrell's dissemination of information related to a cooperating witness in another Bully Gang member's case shows his motivation to protect this Bully Gang member due to their connection as members of the same racketeering enterprise—much like the evidence

45

described above regarding the Bully Gang's payments for lawyers and bail for members and associates. This evidence also shows consciousness of guilt. This is particularly so for the defendants' efforts to intimidate potential witnesses who may testify in this case. See Perez, 387 F.3d at 209 (explaining that the Second Circuit has "upheld the admission of evidence of attempted witness or jury tampering as probative of a defendant's consciousness of guilt").

D.      Prior Arrests, Convictions, and Incarceration History

1.      Relevant Background

The government seeks to offer evidence of prior arrests, convictions, and incarceration statuses of the charged defendants. In particular, the government seeks to offer evidence related to the following:

Harrell

- Harrell and deceased Bully Gang member Charles Williams' 2008 federal indictment and conviction in the Western District of Virginia for conspiracy to traffic cocaine base. United States v. Petro et al., No. 08-CR-17 (W.D. Va.).

- The timing and fact of Harrell's incarceration at Rikers Island from September 2015 to May 2017. Notably, Harrell was incarcerated when Charles Williams was killed in late September of 2015.

- Harrell and Ayers' 2017 arrest near 1625 Fulton Street, Brooklyn, New York—the de facto Brooklyn headquarters of the Bully Gang. Harrell discussed this arrest in a recorded jail call during which Harrell explains that his car was towed and, using coded language, admitted that there was a gun in a concealed "trap" compartment at the time and that Harrell had a third party retrieve the gun before police were able to get a search warrant.

- Harrell's September 2018 arrest in New York for possession of multiple firearms. These firearms were found during a search of a hidden "trap" compartment in Harrell's car.

- The timing and fact of Harrell's incarceration at Rikers Island beginning in January 2019 and his continued detention throughout the Rikers Island drug trafficking scheme.

- In the absence of a stipulation as to authenticity and chain of custody, evidence of Harrell's other arrests in 2018 and 2019, including the January 2019 arrest for murder, during which

cellular devices relevant to the charges in the instant racketeering indictment were first seized by law enforcement.[6]

Ayers

- Ayers' 2008 New York State felony conviction for armed robbery in the second degree.

- Ayers' 2017 arrest with Moeleek Harrell discussed above.

Gillespie

- Gillespie's 2008 New York State felony conviction for attempted robbery in the second degree.

- Gillespie's 2013 federal conviction in the Eastern District of New York for felon in possession of a firearm and his sentence to 41 months' imprisonment.  United States v. Gillespie, No. 11-CR-371 (KAM).

- Gillespie's 2016 federal conviction in the Eastern District of New York for felon in possession of a firearm; his sentence of 46 months' imprisonment; the fact of his incarceration following that sentence, and his release from federal custody on August 19, 2019.  United States v. Gillespie, No. 16-CR-252 (KAM).

- Gillespie's status on supervised release throughout 2020, including the dates of his assignment to location monitoring in 2020, and Gillespie's discussion of his supervision status on recorded jail calls.

Kennedy

- Kennedy's 2009 New York State felony conviction of criminal possession of a firearm.

- Evidence of Kennedy's incarceration between 2017 and 2019.

- Kennedy's status on pre-trial release in 2019 and 2020.

---

[6]     Although Harrell was also arrested for multiple other murders, the government does not presently intend to introduce evidence related to these murder or evidence that Harrell was arrested for murder.

2.     Discussion

    a.     Harrell

Each of Harrell's prior arrests and convictions is admissible as direct evidence of the charged crimes, as inextricably intertwined other-acts evidence, and as Rule 404(b) evidence relevant for a non-propensity purpose.

Harrell's 2008 arrest and conviction with Charles Williams in the Western District of Virginia is probative direct and background evidence of the charged racketeering enterprise. "It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." Baez, 349 F.3d at 93 (collecting cases); Miller, 116 F.3d at 682 (uncharged acts are admissible to prove the existence of an alleged RICO enterprise); Thai, 29 F.3d at 812-13 (uncharged acts can be probative of "the existence and structure of the [RICO] enterprise").

As discussed above concerning the government's broader enterprise proof to be offered at trial, it was a central part of the Bully Gang's history that Charles Williams and Moeleek Harrell had done time in federal prison together. Indeed, Latrell Johnson cites Harrell's federal conviction with Williams in his videotaped recounting of the oral history of the Bully Gang, stating "Bully Gang. My n****s made history. Two n****s, n****. Took over Brooklyn. N****s came home. Came home from up top—**from the Feds**, n****. Six years. Eight years. N**** came home and took over." Similarly, in a video posted to Charles Williams' Instagram, he and Harrell say "Bully Gang, yo" before saying that they are "home" and "fresh from the feds." The fact of Harrell's federal conviction with Williams is necessary to understand both the YouTube video and the video posted by Williams. This conviction also shows the longstanding criminal relationship between two central members of the Bully Gang enterprise. This relationship is especially important given that the instant charges against Harrell include the assault of and conspiracy to

murder John Doe #3, the person Harrell and other members of the charged enterprise believed was responsible for killing Williams.

Harrell's incarceration from September 2015 to May 2017 is relevant to explain why Harrell waited two years after the death of Charles Williams before targeting John Doe #3 who he believed killed Williams.  Williams was killed on September 28, 2015 and Harrell learned of his death during a recorded jail call while he was at Rikers.  But the conspiracy to murder John Doe #3 and the assault of John Doe #3 both took place in 2017.  The government plans to present evidence that Harrell's motive for targeting John Doe #3 was to avenge Williams' death, yet the jury will likely question this motive if they believe Harrell waited two years before assaulting John Doe #3.  If the jury knows Harrell was in custody during this time, they will understand why he had to wait before targeting John Doe #3.  Similarly, Harrell's incarceration during this time explains why Ayers, not Harrell, was running the day-to-day operations of the Maine drug trafficking scheme during this time.  This is particularly important because the government intends to introduce evidence that Harrell was the leader of the Bully Gang, which the jury may find hard to believe if Harrell had a long unexplained absence from the Maine drug trafficking scheme.  See, e.g., United States v. Alaga, 995 F.2d 380, 382 (2d Cir. 1993) ("Admission of the evidence of [a defendant's] incarceration was necessary to explain the nature of his role [in the conspiracy] and was not error."); United States v. Cummings, 60 F. Supp. 3d 434, 440 (S.D.N.Y. 2014) ("[T]he Government should be allowed to present the evidence necessary for the jury to understand why Munoz could not have participated in any conspiracy-related activity during the time he was incarcerated."), rev'd on other grounds, 858 F.3d 763 (2d Cir. 2017).

Harrell's 2017 arrest with Ayers and their efforts to obstruct the discovery of evidence during that arrest are admissible as direct evidence of the charged racketeering activity.

The fact of Harrell and Ayers' arrest together in 2017 is probative of their criminal relationship in 2017—a year in which they also conspired to kill Bully Gang's rivals and John Doe #3.  The location of this arrest at 1625 Fulton Street is also direct evidence of the charged crimes.  The government will establish at trial that this location in Bedford-Stuyvesant served as a central point of operation for the gang's activities in Brooklyn through the relevant time period in the indictment.  In addition, the fact that Harrell admitted in a recorded jail call that he had a gun in the car at the time of his arrest is direct proof of his possession of a firearm in connection with the racketeering activity, as charged in Count Three of the S-8 Indictment

Evidence of Harrell's September 2018 arrest is also admissible as direct evidence of the charged crimes.  In particular, Harrell is charged with possessing a firearm in connection with racketeering activity in Count Three of the S-8 Indictment.  Because Harrell's September 2018 arrest was for possessing firearms found in a "trap" compartment in Harrell's car during the time period of the racketeering activity, it is directly relevant to showing that Harrell possessed guns in connection with the racketeering.  But more specifically, the vehicle searched in September 2018 was also the vehicle Harrell used during the charged June 2018 attempted murders of rival Stukes Crew members.  Also, the use of the trap compartment is relevant to show the gang's modus operandi.  Throughout this case, the government plans to introduce evidence that numerous cars used by the gang contained hidden trap compartments where guns and drugs were stored.  This evidence includes searches of vehicles conducted pursuant to search warrants where law enforcement opened hidden trapped compartments.  Harrell's use of the trap compartment in his car also shows his knowledge of this method of concealing contraband.

Evidence of Harrell's incarceration from 2019 on is admissible as direct evidence of the charged offenses, in particular the Rikers trafficking scheme, which Harrell led while

incarcerated.  As part of the Rikers Drug Trafficking Scheme, Harrell had drugs mailed to him at Rikers, delivered to him by guards at Rikers, and brought to him by visitors to Rikers.  The government's evidence of this scheme includes, among other things, drugs seized from Harrell's prison cell, drugs seized from mail sent to Harrell in prison, drugs seized from an individual visiting Harrell in prison, recorded calls made by Harrell from prison, and videos of a guard delivering drugs to Harrell in prison.  The details related to Harrell's incarceration at this time are therefore critical to proving his role in the Rikers Drug Trafficking Scheme.  Accordingly, evidence and testimony about Harrell's incarceration must be admitted in its entirety.

Turning to the Rule 403 balancing, the probative value of Harrell's arrests, conviction, and incarceration outweighs any risk of undue prejudice.  Indeed, because Harrell is charged with participating in multiple attempted murders, multiple drug trafficking schemes, bribery, and money laundering offenses, the facts of these prior arrests and conviction for drug trafficking "are not especially worse or shocking than the transactions charged."  Mercado, 573 F.3d at 142.

      b.    <u>Ayers</u>

The Court should admit evidence of Ayers' prior felony conviction, as it is direct evidence of the predicate felony required for the felon-in-possession count against Ayers.  The defendants have not indicated whether they will stipulate to any fact in this trial; as such, the government asks the Court for an <u>in limine</u> ruling admitting evidence of the felony offense necessary to establish Ayers' status as a convicted felon.

For the same reasons set out above, the Court should admit evidence of the 2017 arrest of Ayers and Harrell.

c.     Gillespie

Evidence of Gillespie's prior convictions, federal incarceration, dates of release, and status on supervised release in 2020 are both inextricably intertwined with the charged offenses and relevant to Gillespie's motive to murder Mike Hawley in 2020.  As to direct evidence, the government will offer multiple jail calls that Gillespie made in federal custody to Harrell and Ayers during which Gillespie learns of, and celebrates, the ongoing efforts to locate and kill Bully Gang rivals, including members of the Stukes Crew.  Gillespie's incarceration at the time is evidence of the charged offenses, their ties to the Bully Gang enterprise, and Gillespie's membership in the enterprise.  The fact that an incarcerated Bully Gang member was receiving updates on ongoing efforts by non-incarcerated members to kill Bully Gang's rivals is powerful evidence of how that dispute was with the broader Bully Gang enterprise itself—not simply a personal vendetta of a single member.  Gillespie was told about the ongoing efforts because, as a fellow member, it was Gillespie's business to know.

For the same reasons set out above as to defendant Ayers, the fact of Gillespie's prior convictions is itself an element of his current felon-in-possession charges.  But Gillespie's prior felon-in-possession convictions under 18 U.S.C. § 922(g) are especially relevant for Gillespie: they serve to explain the tattoo of "922g" emblazoned on Gillespie's arm.  As set forth above, Gillespie's tattoo demonstrates his affinity for guns and served as a sign of intimidation—and was backed up by the fact that he had, in fact, been convicted of that offense on multiple occasions.

The Court should admit evidence—including through Federal Bureau of Prisons ("BOP") records, testimony from U.S. Probation ("Probation") officers, and jail calls—concerning Gillespie's release from federal custody on August 19, 2019 and his status on federal supervised release from 2019 until his arrest in this case in September 2020.  Gillespie's status on supervised

release is relevant here because it was a factor in how Gillespie chose to undertake the charged offenses and illuminates his state of mind at the time.  Specifically, in multiple recorded jail calls in early 2020, Gillespie discussed his desire to end location monitoring and expressed that his status on supervision interfered with his ability to meet with Harrell in person at Rikers Island.  For example, on a December 25, 2019 call, Harrell and Gillespie discussed Gillespie's supervision and the countdown to Gillespie being "off the bracelet"—referring to Gillespie's location monitoring bracelet—and Gillespie explained to Harrell that his "PO [Probation Officer] don't even be on [him]."  Similarly, the next day, Gillespie told Harrell that he had "wild shit" to discuss with Harrell that he could not say over the recorded jail telephone, and they thereafter discussed ways to get Gillespie in to visit Harrell in at Rikers Island while wearing Gillespie's location monitoring ankle bracelet, which they believed prohibited him from visiting Harrell.

These discussions, and Gillespie's awareness and sensitivity to his supervision by U.S. Probation more generally, is relevant to his state of mind during the charged offenses in 2020.  Other evidence at trial will show that, after his release from custody in August 2019, Gillespie started maintaining multiple cellular telephones distinct from the device subscribed in his name and known to the U.S. Probation Department.  These devices were used to further criminal activity and helped Gillespie avoid detection.  Evidence of Gillespie's supervision status, and his awareness of it, will help explain to the jury why Gillespie would maintain a separate telephone.

Finally, evidence of Gillespie's prior incarceration, his release from custody on August 19, 2019, and his supervision by Probation in 2020 is also probative of a motive for his murder of Mike Hawley in April 2020.  As the government will prove at trial, on April 14, 2020— three days after Gillespie killed Paul Hoilett and fled in Hawley's car—a third party alerted Hawley that law enforcement was looking for him.  Hawley thereafter contacted Gillespie, and after a

series of calls between Gillespie and Hawley, Gillespie called Ayers using their "trap" phones. The next day, Gillespie and Kennedy left from Ayers' apartment and traveled to Far Rockaway, Queens where Gillespie shot and killed Hawley.

This sequence suggests a clear motive for Hawley's killing: Gillespie's belief that Hawley was wanted by law enforcement in connection with their Hoilett murder; that Hawley was likely to be arrested; and, in turn, that Hawley's arrest would lead to Gillespie's arrest and re-incarceration. The stakes were high for Gillespie who had spent significant time in federal custody, had been released from custody less than 8 months prior, and was still on supervised release. Taken together, Gillespie's desire to avoid a return to federal prison is probative of a motive to kill Hawley and therefore highly relevant.

Turning to the Rule 403 balancing, none of the evidence concerning Gillespie's prior convictions, federal incarceration, dates of release, and status on supervised release in 2020 is unduly prejudicial. As set out above, all of these facts relate to his conviction for gun possession and information about that conviction is far less shocking than the multiple murders, armed robberies, and drug trafficking with which Gillespie is currently charged. In addition, the scope of the evidence to be admitted on these points is narrow: Gillespie's own words together with BOP documents, judicial documents, Probation documents and, if necessary, Probation testimony. Any potential for prejudice can be cured by an adequate limiting instruction. Because the probative value of these facts is clear, there is no risk that the jury will use this evidence for an improper purpose in considering the evidence against Gillespie for the charged offenses. Accordingly, because the probative value of this evidence is not outweighed by a risk of undue prejudice, the Court should admit this evidence against Gillespie at trial.

d.      Kennedy

The Court should admit evidence of Kennedy's prior felony convictions, as they are direct evidence of the predicate felony required for the felon-in-possession count against him. As noted above, the defendants have not indicated whether they will stipulate to any fact in this trial; as such, the government asks the Court for an in limine ruling admitting evidence of the felony offense necessary to establish Kennedy's status as a felon.

Kennedy's prior incarceration and status on pre-trial release in 2020 are separately relevant for many of the same reasons outlined above concerning Gillespie.  At the time of the charged offenses in 2020, Kennedy was pending re-trial for a vacated New York State conviction and was on bond.  During this time, Kennedy, like Gillespie, used multiple cellular telephones to avoid detection—a risk that was heightened given his status on bond.  But more critically in the Rikers trafficking scheme, Kennedy's status on bond would have put him at heighted risk of increased scrutiny at any potential Rikers Island visit.  Accordingly, during that scheme, Kennedy relied on intermediaries less likely to be detected to smuggle the drugs into Rikers Island on their own visits to the facility.  Accordingly, Kennedy's status on bond is directly relevant to issues of his state of mind at the time of the charged crimes, and the methods and manner of the charged crimes' execution.  Like Gillespie, the Rule 403 balancing weighs in favor of admission given that this evidence is far less shocking that the crimes charged against Kennedy, which include murder.

E.      Violence Targeting the Bully Gang

1.      Relevant Background

The government expects to introduce evidence that members of the Bully Gang, including Harrell and Charles Williams (also known as YB), were the targets of gang-related violence.  This violence was part of the back-and-forth retaliation between members of the Bully Gang and the gang's enemies.

With respect to Williams, the government intends to introduce evidence that Williams was a Bully Gang member who was shot to death by John Doe #3, prompting the gang to retaliate against John Doe #3, as charged in the S-8 Indictment.  To establish Williams' role in the Bully Gang, the government intends to introduce, among other things, social media and phone evidence, including photographs showing Williams and Harrell together wearing Bully Gang chains.  One such photograph is shown below:



The government also intends to introduce evidence that Williams was killed, and that members of the Bully Gang believed that John Doe #3 killed him.  To establish the Bully Gang members' belief that John Doe #3 killed Williams, the government intends to introduce text messages from the defendants' phones as well as newspaper articles reporting the death (one such newspaper article is saved as an image in Harrell's phone).  The government also intends to introduce evidence that, after Williams was killed, Harrell and Ayers targeted John Doe #3 by, among other things, tracking John Doe #3's court appearances and driving to John Doe #3's residence.  Then, as charged in the S-8 Indictment, Harrell and Ayers conspired to murder, and ultimately assaulted, John Doe #3.

The government also intends to introduce evidence that Harrell was targeted in shootings by members of the rival Stukes Crew.  One such shooting occurred in February 2018, when Harrell was traveling with his girlfriend and with Bully Gang member Ronald Davis in New

Jersey.   Law enforcement responded to this shooting and spoke with Harrell.   Harrell also discussed the shooting in text messages.  This shooting in New Jersey was part of an ongoing gang war between the Bully Gang and the Stukes Crew.   Prior to this shooting, at least as early as September 2017, Bully Gang members tracked members of the Stukes Crew and targeted them for violence.  For example, Harrell and Ayers discovered the license plate of a car used by the Stukes Crew and learned where the car had been ticketed.   They then fired shots near the home of the same member of the Stukes Crew.  In November 2017, members of the Stukes Crew shot at Ayers while he was driving.   In March 2018, a month after the shooting in New Jersey targeting Harrell, members of the Stukes Crew shot at Bully Gang members while they were leaving Harrell's gender reveal party.   On the night of this party, following an exchange of gunfire, Ayers murdered Jonathan Jackson, a member of the Stukes Crew, as charged in Count Fourteen of the S-8 Indictment.   After this murder, members of the Bully Gang continued to target the Stukes Crew for violence.  In June 2018, Harrell and Ayers assaulted a member of the Stukes Crew, as charged in Count Fifteen of the S-8 Indictment.  Harrell's phone shows he continued to stalk a member of the Stukes Crew after this assault by, among other things, learning this person's social security number.

   2. <u>Discussion</u>

   The violence targeting members of the Bully Gang is direct evidence of the charged crimes related to John Doe #3 and to the Stukes Crew (Counts Nine through Sixteen of the S-8 Indictment).   The government has charged multiple violent acts in-aid-of racketeering, which require that the government prove that the defendants were motivated at least in part by a desire to maintain or increase their position in Bully Gang.   <u>See</u> <u>Payne</u>, 591 F.3d at 63 ("'[T]he motive requirement [for VICAR crimes] is satisfied if the jury could properly infer that the defendant

committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'").

With respect to John Doe #3, Harrell and Ayers are charged with conspiring to murder John Doe #3 and assaulting John Doe #3. As part of the proof of these crimes, the government will show that Harrell and Ayers targeted John Doe #3 as revenge for John Doe #3's killing of Bully Gang member Charles Williams. Therefore, the government needs to introduce evidence of Williams' death and evidence that Bully Gang members believed John Doe #3 murdered Williams.

The crimes committed by the Stukes Crew targeting the Bully Gang are similarly necessary to show the defendants' motive for targeting members of the Stukes Crew. Harrell and Ayers are charged with conspiring to murder members of the Stukes Crew and assaulting John Doe #2, who was a member of the Stukes Crew. Ayers is also charged with murdering Jonathan Jackson, another member of the Stukes Crew. To explain the motivations for these acts of violence, the government needs to introduce evidence that the Bully Gang and the Stukes Crew were engaged in a back-and-forth gang war with retaliatory violence. Evidence regarding the shooting targeting Harrell in New Jersey and the prior shooting targeting Ayers is an important part of this story and provides the context for the charged crimes.

Furthermore, the actions of the Stukes Crew do not constitute other-acts evidence under the Federal Rules of Evidence. The Second Circuit has never held that a defendant may claim a third party's acts as his or her own for purposes of Rule 404(b). The Second Circuit has held the opposite. See United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994) (holding Rule 404(b) inapplicable to relevant evidence of murders that the defendants did not themselves commit); United States v. Diaz, 878 F.2d 608, 616 (2d Cir. 1989) (noting that proof of acts by co-

conspirators "ordinarily does not raise any Rule 404(b) question" as to defendant); accord, e.g., United States v. Bailey, 840 F.3d 99, 124-25 (3d Cir. 2016).

As for the Rule 403 balancing, this evidence is more probative than prejudicial. The crimes at issue here were not committed by the defendants but rather involved the defendants as targets. Therefore these crimes are unlikely to prejudice the jury against the defendants.

III.   Statements by the Defendants and Their Co-Conspirators Are Admissible

The government expects that, at trial, multiple cooperating witnesses will testify about statements made to them by members and associates of the Bully Gang and the charged conspiracies, while the cooperating witnesses themselves were members and associates of the Bully Gang and charged conspiracies. The government also intends to introduce statements made by members of the Bully Gang and charged conspiracies, including the defendants, on social media, such as Facebook, Instagram, and Soundcloud, as well as in recorded jail calls, during and in furtherance of the charged crimes.

In particular, the government expects to elicit testimony falling into the following categories, which are admissible as co-conspirator statements and, for many, as statements against interest: (a) statements made by members or associates of Bully Gang in the lead-up to acts committed in relation to the charged enterprise, or while those acts were being committed; (b) certain statements made by members or associates of the Bully Gang about acts committed as part of the enterprise, where the statements were made during the charged conspiracies, but after the acts in question had occurred; (c) statements made by members or associates of the Bully Gang about the status of other members of the enterprise, its rivals, statements about the history, structure, and practices of the Bully Gang, and its leadership; and (c) specific statements identified below related to the April 15, 2020 murder of Mike Hawley.

A.     Applicable Law

1.     Relevance

Under Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  "Relevant evidence is admissible" unless specifically excluded by law or the rules. Fed. R. Evid. 402.  In analyzing relevancy, the Second Circuit has explained that "evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  Gonzalez, 110 F.3d at 941.  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).  In sum, the Federal Rules of Evidence establish a liberal standard of admissibility.

2.     Hearsay

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."  Id. 802.

a.     Non-Hearsay

Not all out-of-court statements are hearsay.  First, out-of-court statements made by the defendant are not hearsay when introduced by the government in a criminal trial to prove the truth of the facts stated therein because they are admissions of an adverse party.  See Fed. R. Evid. 801(d)(2)(A).

Second, Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." A co-conspirator statement is admissible if the court finds by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was made; (2) both the declarant and the non-offering party were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175-81 (1987); see also United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1998). While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." Gigante, 166 F.3d at 82 (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

With respect to the first requirement, the conspiracy in which the defendant and the declarant are engaged "need not be the crime charged in the indictment" for the statements to be admissible. United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002). It is sufficient that the defendant and the declarant were in a conspiracy together. Id.

"As to the second requirement, statements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82. "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id.; see also Russo, 302 F.3d at 46 (statements that "inform . . . [co-conspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)"). Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). United States v. Amato, 15 F.3d 230, 234

(2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Mulder, 273 F.3d 91, 103 (2d Cir. 2001); see also United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005).

Third, statements that are not being offered for their truth also are not hearsay. For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind, rather than for their truth. United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988); United States v. Dunloy, 584 F.2d 6, 11 (2d Cir. 1978). Similarly, questions or commands do not generally constitute hearsay. See United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999); United States v. Dominguez-Gabriel, 511 F. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999). Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context. See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989).

b.      Statements Against Interest – Rule 804(b)(3)

Rule 804(b)(3) provides for the admissibility of a hearsay statement if the declarant is unavailable and his statement is against his interest such that it may expose him to criminal liability. To fall within this exception to the rule against hearsay, the statement must be one that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Admission of such a statement "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (quoting Williamson v. United States, 512 U.S. 594, 603-04 (1994)). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context," and "[t]hus, this determination must be made on a case-by-case basis." Id. (citations omitted). A statement against penal interest is not considered "testimonial" for Confrontation Clause purposes. United States v. Saget, 377 F.3d 223, 224-25 (2d Cir. 2004) (distinguishing Crawford v. Washington, 541 U.S. 36 (2004)).

c.    Present Sense Impression

Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted).

By the plain terms of Rule 803(1), a statement may qualify as a present sense impression even if the declarant is not describing an event as it unfolds. As the Second Circuit has noted, "For statements to qualify as present sense impressions, precise contemporaneity is not required." United States v. Ibanez, 328 F. App'x 673, 675 (2d Cir. 2009). Because "in many, if not most, instances precise contemporaneity is not possible, . . . a slight lapse is allowable between

63

the event perceived and the declarant's statement." Mejia-Valez, 855 F. Supp. at 613 (internal

citation and quotation marks omitted omitted); accord Fed. R. Evid. 803(1) advisory committee

notes. "[T]here is no per se rule indicating what time interval is too long." Mejia-Valez, 855 F.

Supp. at 613 (citation and internal quotation marks omitted).

The reason for this exception is twofold. First, the immediacy requirement reduces

the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the

part of the declarant. Second, immediacy also reduces the likelihood that the declarant will have

inaccurately remembered the event in question. See United States v. Jones, 299 F.3d 103, 112 (2d

Cir. 2002) ("Such statements are considered to be trustworthy because the contemporaneity of the

event and its description limits the possibility for intentional deception or failure of memory.").

Courts in this Circuit have regularly upheld the admission of statements as present

sense impressions where the declarant relates his or her personal observations soon, though not

necessarily immediately, after the events occurred, including in the context of 911 calls and

statements to police officers. See, e.g., Jones, 299 F.3d at 113 (affirming admission of statements

to police officer that were "nearly contemporaneous with the event described"); Ibanez, 328 F.

App'x at 675 (2d Cir. 2009) (upholding admission of statement where "maybe 5 minutes" lapsed

between the event and the statement");  United States v. Thomas, No. 3:13-CR-00141 VLB, 2014

WL 2168468, at *5 (D. Conn. May 23, 2014) (finding the elapsed time irrelevant where the

statements discussed ongoing events); United States v. Obayagbona, 627 F. Supp. 329, 340

(E.D.N.Y. 1985) (admitting remarks of a law enforcement agent made fewer than fifteen minutes

after the delivery of a narcotics sample where the agent could not have made the statement any

earlier given the circumstances); United States v. Marcial, 22 Cr. 208 (AT), 2023 WL 1818548

(S.D.N.Y. Feb. 8, 2023) (admitting statements describing events that occurred approximately fifteen minutes prior).

B.     Discussion

At trial, the government intends to introduce a number of out-of-court statements made by the defendants and their co-conspirators that are relevant and either (i) do not constitute hearsay under the Federal Rules of Evidence, or (ii) are admissible as statements against penal interest.   Specifically, among other things, the government intends to introduce the following evidence at trial.[7]

1.     Statements Made by Bully Gang Members, Associates, And Co-Conspirators Leading Up to and During the Charged Offenses Are Admissible

a.     Statements by Members and Associates of the Bully Gang Leading Up to, and During, Criminal Acts

At trial, the government intends to introduce, through cooperating witnesses who were members or associates of the Bully Gang at the time, statements made by its members or associates and co-conspirators, including the defendants, during the lead up to acts taken on behalf of the Enterprise, or while those acts were being committed.  These statements were, among other things, "designed to promote or facilitate achievement of the goals of the conspiracy" and thus should be admitted under Rule 801(d)(2)(E).  See Rivera, 22 F.4d at 436.

As to the acts of violence in particular, the government will offer testimony recorded calls, and social media posts that provide background on the various disputes between Bully Gang and their rivals.  These include discussion between Harrell, Ayers, and other members

---

[7]        The statements outlined herein are representative of those the government intends to introduce at trial as direct evidence; this list is not exhaustive, and the government reserves the right to introduce as evidence statements of a similar nature that are not outlined here.

concerning that status and location of members of the Stukes Crew and of John Doe #3, who they held responsible for the killing of Bully Gang member Charles Williams, also known as "YB." The discussions among the defendants and other Bully Gang members include their mocking members of the Stukes Crew to each other and publicly, are all co-conspirators' statements in furtherance of the conspiracy, as they "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy." Simmons, 923 F.2d at 945.

### b.   Statements by Members and Associates of the Bully Gang after Criminal Acts

Statements about events that took place after crimes were committed, when made by one Bully Gang member or associate to another during the course of the various conspiracies, including the overarching racketeering conspiracy, are also admissible as co-conspirator statements, as they are designed to "apprise a co-conspirator of the progress of the conspiracy," Rahme, 813 F.2d at 36.

The government will introduce evidence of the Bully Gang's commission of multiple acts of violence, including their efforts to kill members of the rival Stukes Crew on back-to-back days in June 2018. Many of the Enterprise's criminal efforts were reported back to multiple members of the Bully Gang, including over recorded jail calls. One such call involved defendant Franklin Gillespie who was incarcerated but spoke with both Ayers and Harrell concerning Harrell's successful shooting of a Stukes Crew member on June 27, 2018. Ayers reported to Gillespie the next day: "Hey, yo. Bro Bro ran into Long—Bro Bro ran into Longhead, you heard," referring to Harrell as "Bro Bro" and the Stukes Crew member Harrell shot at as "Longhead." Gillespie celebrated news of the incident with Harrell the next day in the following exchange:

HARRELL:    [S]omebody got next to your man Longhead, though.

> GILLESPIE:   Oh yeah?
>
> HARRELL:   Huh?
>
> GILLESPIE:   Yeah?
>
> HARRELL:   [Laughing] Yeah.
>
> GILLESPIE:      [Laughing] Haha!

The Enterprise update was also given to incarcerated member Joell Joyce the same day when Ayers told Joyce over a recorded jail call that "n**** touched Longhead" referring to Harrell shooting the Stukes Crew member. After learning the news, Joyce celebrated with Harrell, as reflected in the following recorded exchange:

> JOYCE:   Thought you'd be popping champagne or something right now. [Laughing]
>
> ***
>
> HARRELL:   [U/I] I already know Dee told you I got next to your man.
>
> JOYCE:   Yeah, Yeah.  That's why—That's why I was talking about the champagne.

Bully Gang members made similar calls related to the other charged acts of violence; updating members about the incidents, and celebrating their success.  Another example came shortly after the murders of Paul Hoilett and Mike Hawley.  On May 10, 2020, Kennedy and Harrell discuss the status of numerous members in the Enterprise, with Kennedy describing them as "sturdy" and "levelled up." Notably, Kennedy discussed Gillespie specifically, and, referring to Gillespie as Little Bro, reported that "Little Bro is fucking n****s up right now. . . .He fucking n****s up right now!"  These statements are reports back to the leader of the Enterprise concerning the performance of their fellow members.  Kennedy's praise of Gillespie was related to the violent acts he was perpetrating at the time; acts that, in the view of the gang, deserved praise.  They too are co-conspirators statements in furtherance of the ongoing conspiracies. United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in

furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current development and problems facing the group" (internal quotations omitted)).

2.     Recorded Calls Between Harrell and Ayers on April 15, 2020 Are
        Admissible in Their Entirety

a.     Relevant Background

Defendants Franklin Gillespie and Anthony Kennedy are charged with conspiring to murder Mike Hawley, and with murdering Mike Hawley on April 15, 2020.  The government intends to offer evidence establishing that in April 2020 and at the time of the Hawley Homicide, Gillespie and Kennedy used multiple cellular telephones to communicate with each other and with other members of the Bully Gang and the charged conspiracies.  Relevant to the Hawley Homicide, the government will show that among those phones included the following:

Gillespie

- A cellular telephone subscribed in the name "Franklin Gillespie" assigned telephone number (929) 519-9607 and used by Gillespie to communicate with, among others, his co-conspirators, his assigned U.S. Probation Officer and inmates at Rikers Island (the "Gillespie -9607 Phone")

- A cellular phone assigned Maine telephone number (207) 653-7797 (the "Gillespie -7797 Phone")

Kennedy

- A cellular telephone assigned telephone number (929) 257-7837 and used by Kennedy to communicate with, among others, his co-conspirators and inmates on Rikers Island (the "Kennedy -7837 Phone").

- A cellular telephone assigned telephone number (310) 933-7038 and used by Kennedy to communicate with, among others, his co-conspirators and inmates on Rikers Island (the "Kennedy -7038 Phone").

The evidence will show that Gillespie and Kennedy traveled to and from the Hawley Homicide in a black Subaru Outback with a concealed "trap" compartment.  Cell site location data will show that at least two cellular telephones used by Gillespie and Kennedy traveled

to and from the homicide with the Subaru Outback—specifically, location data for the Gillespie -7797 Phone and the Kennedy -7038 Phone.  The evidence will also show that, although Gillespie and Kennedy carried those cellular devices to Hawley's murder, they left behind two other cellular telephones at Ayers' apartment in Rahway, New Jersey—the location from which they left to committing the murder.

Shortly before Gillespie and Kennedy drove from New Jersey to the Hawley Homicide, they were at Ayers' apartment complex in Rahway, New Jersey.  At approximately 10:39 a.m., Kennedy received a jail call to Kennedy -7837 Phone from an inmate named "Bucky." (Gov't Ex. 1).  Kennedy answered the call, and "Bucky" told Kennedy that he had "sent something to Moe" (defendant Harrell) and wanted to know if "the shit had touched down."  Kennedy responded that Harrell had not called Kennedy yet, so he did not know.  The evidence will show that this call, like many others, was an inquiry from a drug purchaser in the Rikers trafficking scheme that Harrell was leading inside of Rikers Island, through which inmates received deliveries of drugs smuggled into Rikers Island with the assistance of Kennedy and others on the outside.

Minutes after that call, the Subaru Outback left Ayers' apartment complex together with the Gillespie -7797 Phone and the Kennedy -7038 Phone and traveled to the location of Hawley's murder in Queens.  The Kennedy -7837 Phone and the Gillespie -9607 Phone were each left behind in New Jersey.  At approximately 11:01 a.m.—approximately 15 minutes after Kennedy and Gillespie departed in the Subaru Outback—the Kennedy -7837 Phone received a call from Moeleek Harrell over a recorded telephone at Rikers Island.  (Gov't Ex. 2).  Defendant Ayers

answered the Kennedy -7837 Phone, which was located in New Jersey at the time.  Using that

device, Ayers spoke with Harrell, during which they had the following exchange:[8]

> HARRELL:   What up?  Everything straight?
>
> AYERS:   Yeah. Yeah. Yeah.  Some n**** just called saying that some change should have went.
>
> HARRELL:   Who was it?
>
> AYERS:   Buzzin spoke to him. Buzzin ran to the store.  I got his, um—tell you right now.  Damn.
>
> HARRELL:   What, Bucky?
>
> AYERS:   Yeah, I think it is.  That's his name.
>
> HARRELL:   How long ago he called?
>
> AYERS:   Probably like a half-hour ago.
>
> HARRELL:   Half hour ago?
>
> AYERS:   Yeah.
>
> HARRELL:   Ain't nothing touch.  Ain't nothing touch.  Everything Gucci?

In that call, Ayers updated Harrell on an ongoing aspect of the Rikers trafficking scheme and the

recent call with "Bucky."  Using code employed throughout the Rikers trafficking scheme, Harrell

told Ayers that no narcotics had been received related to Bucky, stating "Ain't nothing touch.

Ain't nothing touch."  During that exchange, Ayers also informed Harrell that Kennedy ("Buzzin")

was not with Ayers, as he had "ran to the store."

Thereafter, Ayers informed Harrell that Kennedy had taken a "screenshot" on his

phone related to Bucky.  After Harrell asked what the screenshot said, Ayers is heard on the call

attempting to apparently access the screenshot, and then Ayers stated, "Yeah, ask this n****

what's the code. [Pause] Damn.  Alright."  Immediately thereafter, the ringtone for an outgoing

---

[8]   Copies of the calls referenced herein will be provided to the Court under separate cover.

FaceTime call can be heard in the background of the recorded call. Evidence forensically recovered from Kennedy's -7837 Phone—a device that, at that time, was traveling to the Hawley Homicide—will show that, at the same approximate time the FaceTime ringtone is heard, the Kennedy -7837 Phone received an inbound FaceTime call from Ayers.

Thereafter, at approximately 11:19 a.m., Harrell called Ayers' -4757 Phone and spoke with Ayers. (Gov't Ex. 3). During that call, Ayers can be heard answering a call on another telephone and speaking to someone in the background, stating, "I got the phone, he went to the store" and "as soon as he get back I'mma tell him to call you." In that call, Ayers was telling the unidentified caller that Kennedy had left his phone with Ayers ("I got the phone") and that Ayers would tell Kennedy to call the unidentified caller back when Kennedy returned.

Thereafter, Ayers and Harrell had the following exchange:

HARRELL:   So, where he at?

AYERS:   He ran out real fast. He coming right back though.

*     *     *

HARRELL:   What's up with Lil Bro?

AYERS:   Oh he good. <u>He with Biggie right now</u>. They went to what's his name? [U/I] They about to pull back up.

In that call, Ayers and Harrell discussed the whereabouts of Kennedy and Gillespie. Specifically, Harrell asked Ayers where Kennedy was ("where he at?"), and Ayers repeated what he told Harrell and the unidentified caller earlier, stating that Kennedy went to the store. Later in the conversation, Harrell asked what Gillespie was doing ("What's up with Lil Bro"), referring to Gillespie using the nickname "Lil Bro." Ayers told Harrell that Gillespie was with Kennedy, referring to him by his nickname, "Biggie."

71

b.      Argument

The April 15, 2020 recorded Rikers Island calls are all admissible at trial because they are highly probative and not barred by the rule against hearsay.  As discussed below, each statement is expressly excluded from hearsay under Rule 801 as a co-conspirator's statement in furtherance of multiple ongoing conspiracies, and as an opposing party's statement.  Fed. R. Evid. 801(d)(2).  In addition, the statements also qualify as statements against interest and are exceptions to the rule against hearsay.  Id. 802(b)(3).  Finally, the statements by Ayers regarding Kennedy and Gillespie's whereabouts qualify as present sense impressions of their departure from Ayers' apartment shortly before the calls with Harrell.  Id. 803(1).

As to relevance, the statements on the April 15, 2020 calls are probative of, among other things, the charged enterprise and the defendants' membership in that enterprise; the operation of the ongoing Rikers trafficking scheme and roles of the co-conspirators in that scheme; and the then-ongoing scheme to murder Mike Hawley, as it reveals the locations of the members of that murder conspiracy on April 15, 2020 and in the time frame of the murder.  As discussed below, this probative evidence is not barred by the rule against hearsay.

i.      Co-Conspirator Statements

Ayers and Harrell's statements on the April 15, 2020 calls are not hearsay, as they are co-conspirator statements in furtherance of multiple ongoing conspiracies in which Ayers, Harrell, Kennedy, and Gillespie are members.   The relevant conspiracies include: (1) the overarching racketeering conspiracy; (2) the Rikers drug conspiracy; (3) the Maine drug conspiracy; and (4) the money laundering conspiracy related to the Rikers trafficking scheme.

Although Ayers, Harrell, Gillespie, and Kennedy are each charged with substantive racketeering offenses—and variously charged with multiple drug and murder conspiracies—the evidence establishes that they were also in a racketeering conspiracy together as members and

72

associates of the Bully Gang and managers of the Bully Gang's numerous rackets.  Because the underlying conspiracy for purposes of Rule 801(d)(2)(E) need not be charged, the overarching Bully Gang racketeering conspiracy may form the basis on which statements in furtherance of that conspiracy are admitted.  See Gigante, 166 F.3d at 82 ("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged."); Lyles, 593 F.2d at 194 ("[T]he conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment.").

Here, each of the April 15, 2020 calls is a statement made to further the ongoing Bully Gang racketeering conspiracy.  In each, Harrell—the incarcerated founder and leader of the Bully Gang—is purposefully gathering information about the ongoing activities of the other members of the racketeering conspiracy and their ongoing criminal rackets. As reflected in the calls, Harrell probes Ayers for information about calls from inmates and discussion with Kennedy about the Rikers trafficking scheme, all of which are statements "designed to promote or facilitate achievement of the goals of the conspiracy." United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994).

The information Harrell gathers concerning other members of the racketeering conspiracy, including Gillespie, are also admissible.  On the April 15, 2020 calls, Harrell and Ayers discuss the current status of multiple members and associates of the racketeering conspiracy.  They specifically discussed Gillespie, a member of the racketeering conspiracy who, like Kennedy, assisted in the Rikers trafficking scheme.  When Harrell asked how Gillespie ("Lil Bro") was doing, Ayers updated Harrell that he was okay ("chilling") and together with Kennedy ("with Buzzin") at that very moment.  These discussions concerning the status of other members of the same conspiracy are not hearsay; they are co-conspirator statements that "provide[d] reassurance"

to Harrell, "serve[d] to maintain trust and cohesiveness among [the conspirators]," and "inform[ed] [them] of the current status of the conspiracy." <u>Simmons</u>, 923 F.2d at 945.

The discussions on the April 15, 2020 calls were also intended to further the Rikers trafficking scheme in multiple respects.  On April 15, 2020, Ayers was left as the caretaker of Kennedy's -7837 phone after Kennedy left with Gillespie for the Hawley Homicide.  While in that position, Ayers passed updates on the trafficking scheme to Harrell, the incarcerated leader of the enterprise and the Rikers trafficking scheme.  Ayers' expressly updates Harrell regarding inmate "Bucky's" conversation with Kennedy; the status of a delivery ("touchdown") related to Bucky; the timing of "Bucky's" reach out; and the information obtained by Kennedy.  The April 15, 2020 calls alone establish that Ayers is an unindicted co-conspirator in the Rikers trafficking scheme and his reports to Harrell were intended to further that scheme.  Part and parcel to the updates from Ayers was the specific location of Kennedy and Gillespie, two of Harrell's co-conspirators who had helped facilitate the Rikers trafficking scheme.  Accordingly, these statements fall within Rule 801(d)(2)(E) and are not hearsay.

The fact that Kennedy and Gillespie were not a party to these calls is irrelevant. The Second Circuit has made clear that the party against whom the statement is offered need not even have been part of the conspiracy at the time his co-conspirator made the statement now being admitted against him.  See <u>Farhane</u>, 634 F.3d at 161 n.35; <u>see also</u> <u>United States v. Arrellano</u>, 757 F.3d 623, 634 (7th Cir. 2014) ("A defendant who joins a conspiracy '[takes] the conspiracy as he found it.  When he joined and actively participated in it he adopted the previous acts <u>and</u> <u>declarations</u> of his fellow co-conspirators." (citation and internal quotation marks omitted, emphasis in original)).

     ii.  <u>Opposing Party Statements and Statements Against Interest</u>

The April 15, 2020 calls are also excluded from the rule against hearsay because they qualify as opposing party statements of Ayers and Harrell.  They are also statements of Kennedy under Rule 801(d)(2)(D) because Ayers was acting as Kennedy's "agent . . . on a matter within the scope of that relationship,"—specifically, the coordination of the Rikers trafficking scheme.  By its nature, that scheme required numerous intermediaries and agents to coordinate drug orders from incarcerated inmates, payments to non-incarcerated participants, and deliveries of drugs into Rikers Island facilities.

At the time of the April 15, 2020 calls, Ayers was expressly standing in for Kennedy in the scheme, fielding inmate calls, relaying messages, and coordinating with Harrell concerning the scheme.  Ayers' statements concerning Kennedy's presence with Gillespie and the information obtained from Bucky, among others, were all "within the scope of the agency" given to him by Kennedy in the scheme.  See United States v. Lauersen, 348 F.3d 329, 340 (2d Cir. 2003), vacated on other grounds, 543 U.S. 1097 (2005) (affirming admission of statements made by agent regarding issues on which she "had 'authority to take action'" (citations omitted)); United States v. Pilarinos, 864 F.2d 253, 257 (2d Cir. 1988) (affirming admission of agent statements where defendant was acting through the declarant to attend meetings and discuss the transactions).

Harrell and Ayers' coordination of the Rikers trafficking scheme, discussing of the status of "Bucky's" delivery are "sufficiently self-inculpatory" on their own to be admitted statements against interest. Each requirement is satisfied here—Ayers and Harrell are unavailable given their privilege against self-incrimination; the recorded statements are reliable; and their content is corroborated by the surrounding context, related calls, and independent evidence.  See United States v. Malka, 602 F. Supp. 3d 510, 535 (S.D.N.Y. 2022) ("Statements made to co-conspirators, not in response to questioning and not made in coercive atmospheres, are sufficiently

75

reliable for purposes of this Rule."  (citing United States v. Matthews, 20 F.3d 538, 546 (2d Cir. 1994))).

iii. <u>Present Sense Impression</u>

Ayers' statements as to Kennedy and Gillespie's location at the time of his calls with Harrell on April 15, 2020 are also admissible as present sense impressions under Rule 803(1). As set out above, the evidence shows that Kennedy and Gillespie departed from Ayers' apartment at about 10:45 a.m.—approximately 15 minutes before Ayers' first recorded call with Harrell.  It was during that first call that Ayers reported that Kennedy had "run to the store."  Ayers stated the same to Harrell again during his 11:19 a.m. call with Harrell and added that Gillespie was with Kennedy "right now" and that they were "about to pull back up."

These statements fit the requirements of Rule 803(1).  First, Ayers was describing at least two events about which he had personal knowledge: Kennedy and Gillespie's departure from Ayers' apartment and Kennedy and Gillespie's current location (together).  See United States v. Chen Kuo, No. 10-CR-671 S-1 KAM, 2011 WL 145471, at *7 (E.D.N.Y. Jan. 18, 2011) (admitting statements about the location of a person as a present sense impression where the declarant had personal knowledge of that fact).  Second, Ayers had personal knowledge of these facts, as he personally observed them.  Ayers was physically present with Kennedy and Gillespie at the apartment and knew exactly when they departed.  The accuracy of his timing is reflected in Ayers' statements to Harrell wherein he correctly notes that inmate "Bucky" called Kennedy 30 minutes before Ayers' call with Harrell, a call that Ayers overheard and recounted to Harrell in detail.  Ayers' observations are also entirely corroborated, as Kennedy and Gillespie's cellular telephones put them together at the very moment Ayers is relaying that they are together.  Third, and finally, Ayers' statements to Harrell were substantially contemporaneous with the event he was describing.  Ayers reported Kennedy's location within 15 minutes of Kennedy's departure,

76

and only 15 minutes later repeated that fact and stated that Gillespie was with Kennedy at that very moment ("he with Biggie right now").

Accordingly, in addition to the multiple other bases outlined above for admission of these statements, the Court can also admit them under Rule 803(1).

IV.     News Reports

The government intends to introduce at trial news reports accessed and sent by the defendants on their phones about the crimes charged in the S-8 Indictment, including stories related to the drug trafficking and violent crimes the Enterprise was undertaking.  The government also intends to introduce news articles related to the death of Bully Gang member Charles Williams. The reports accessed by the defendants about the charged crimes are admissible as proof that they were concerned about being connected to the crimes.  The articles about the death of Williams are admissible because they explain why the defendants believed John Doe #3 was responsible for Williams' death and why they subsequently targeted John Doe #3.  None of these articles are hearsay because the government is not using them to prove the truth of the matters reported in the articles.  Rather, the government is using the articles to demonstrate the defendants' state of mind.

A.     Evidence

After committing several of the crimes charged in the S-8 Indictment, the defendants accessed and shared news articles about those crimes.  For example, on October 1, 2017, Harrell and Ayers targeted a member of the Stukes Crew in a shooting.  A few days later, Harrell sent Ayers a video of a news report covering this shooting.  Ayers responded to the video by telling Harrell to "be careful," presumably because authorities would be looking for him in connection with this shooting.  Ayers then forwarded the video of the news report to co-defendant Bermon Clarke and told Clarke, "it's over for my car."  The government expects to introduce evidence that a Kia registered to Ayers was used in the shooting, and this comment by Ayers

demonstrates that he knew his car would be identified in connection with the shooting. In another instance of defendants accessing news articles about their crimes, Kennedy's phone shows that he had a photograph of the crime scene of the Hoilett murder charged in the S-8 Indictment—a murder committed by Gillespie and facilitated by Kennedy. The photograph saved on Kennedy's phone matches a photograph published in the New York Post about the Hoilett murder.[9]

Similarly, the defendants used their phones to view "Citizen App" reports about the crimes they committed. Citizen App is a cell phone application that allows people to get alerts about crimes in their area. Soon after the Jackson murder, which Ayers is charged with in Count Fourteen of the S-8 Indictment, another person sent Ayers several screenshots from Citizen App. These screenshots depicted comments and updates concerning the murder. A few hours later, Ayers responded that he could not leave his car out on the street, presumably because his car had been used in the murder. Harrell also accessed Citizen App to view a report about a crime he was charged with in the S-8 Indictment. Specifically, Harrell took a screenshot of a Citizen App report about his June 2018 assault of John Doe #2, charged in Count Fifteen.

Harrell also used his phone to learn more information about the death of Bully Gang member Charles Williams and to stalk John Doe #3. As described above, Harrell and Ayers are charged with conspiring to murder John Doe #3 and assaulting John Doe #3, and the motive for this murder conspiracy and assault was revenge for the death of Williams. Harrell's phone shows that he took a screenshot of an article about Williams' death. Social media posts by Harrell and other Bully Gang members also refer to Williams' death and the need to seek revenge. Harrell's phone also shows that he took screenshots of information related to John Doe #3. For example,

---

[9]     The defendants also circulated links to news stories concerning co-conspirators arrests in Maine related to the Maine drug trafficking conspiracy alleged in the indictment.

Harrell used the New York Supreme Court's website to look up John Doe #3's court appearances and took screenshots depicting the dates of these appearances. Harrell also turned this research into action by taking a photograph of John Doe #3 when John Doe #3 was in court in Queens County for one of his court appearances. (The government intends to introduce court records showing that John Doe #3 had a court appearance on the same day that this photograph was taken.) In addition to the materials found on Harrell's phone, the government intends to introduce a New York Times article reporting on Williams' death. This article identifies John Doe #3 as Williams' killer, and says that the killing would not be prosecuted as a murder because it was done in self-defense. This article shows that Bully Gang members, who were following news about Williams' death, would have believed that John Doe #3 killed Williams and would have believed that John Doe #3 would not be punished for this killing by local authorities.

B.    <u>Discussion</u>[10]

Each of the news articles described above is relevant to show the defendants' states of mind with respect to crimes charged in the indictment.

The articles the defendants accessed and sent to one another after committing crimes, or after the publicity around the arrests of their co-conspirators, show that the defendants monitored that coverage, were sensitive to that coverage, and eager to cover their tracks. For example, on two separate occasions, Ayers responded to news articles about his crimes by stating that police would be looking for his car (on each occasion, he was referring to a different car). And Ayers told Harrell to be careful after sending Harrell a news report about a shooting Harrell was involved in. This behavior indicates that the defendants were researching news reports regarding their crimes to determine what information had been obtained by the police and to avoid

---

[10] The applicable law on relevance and hearsay is discussed above in section III.

detection.  It is therefore relevant to show consciousness of guilt.  Ayers' statements about his cars being used during the crimes is also relevant to link Ayers to the cars and show that he participated in the crimes.

       The news coverage of Charles Williams' murder is relevant to show the defendants' motives for targeting John Doe #3.  It is clear from social media posts and phone conversations that Bully Gang members mourned Williams and sought revenge for his death.  In fact, the day before Harrell and Ayers assaulted John Doe #3, Williams' family planned a memorial gathering for him and Harrell forwarded the invitation for this event on his phone.  Harrell's phone also shows that he took a screenshot of an article related to Williams' death.  This behavior indicates that Harrell and other Bully Gang members were looking to determine who killed Williams and to retaliate against this person.  The news coverage, as depicted in the New York Times article the government expects to introduce at trial, explains why Bully Gang members believed John Doe #3 killed Williams.  It also explains that Bully Gang members would have believed John Doe #3 was not being prosecuted for this killing because the news reported that the killing was in self-defense.  Harrell and Ayers would therefore have been particularly motivated to seek vigilante justice against John Doe #3.

       The news reports the government intends to introduce are not hearsay because they are not being introduced for their truth.  Rather, they are being introduced to explain how the defendants reacted to these reports.  See United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay.").  For example, with respect to the Charles Williams news reports, even if the news articles were wrong in reporting that John Doe #3 killed Charles Williams, it is relevant that Bully Gang members believed that John Doe #3 committed this crime.  Similarly, the defendants' efforts to seek out information about

the crimes they committed by accessing news reports is relevant, regardless of the accuracy of the reports themselves, because the mere act of finding these reports and sending them to one another demonstrates that the defendants were eager to avoid detection for their crimes.

V.   Evidence of Significant and Unexplained Wealth

The government seeks to introduce evidence of the defendants' significant and unexplained wealth, which gang members accumulated and displayed during the timeframe of the crimes charged in the S-8 Indictment.  That evidence constitutes direct proof of the charged crimes—namely, the defendants' participation in the charged racketeering enterprise, and in the gang's various money-making rackets, including the narcotics and money laundering conspiracies, robberies, and extortion charged in the S-8 Indictment, among other crimes.

A.   Applicable Law

It is well established that "evidence of unexplained wealth is generally probative in narcotics crimes, and therefore is not relevant simply to propensity." United States v. Ojeda, 412 F. App'x 410, 412 (2d Cir. 2011).  Rather, "[t]he possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means." United States v. Tramunti, 513 F.2d 1087, 1105 (2d Cir. 1975).  Courts have, therefore, repeatedly rejected the notion that evidence of a defendant's unexplained wealth, including "[p]roof of cash expenditures," constitutes inadmissible proof of "other crimes." United States v. Viserto, 596 F.2d 531, 536 (2d Cir. 1979).  The accumulation of "a large amount of unexplained and unreported wealth"—beyond what is earned through legitimate means—is "highly probative" of a defendant's "involvement in narcotics trafficking." United States v. Young, 745 F.2d 733, 762-63 (2d Cir. 1984).  Accordingly, courts "regularly admit evidence of unexplained wealth, without more, as circumstantial evidence of participation in a drug

conspiracy." United States v. Tavarez, No. 13-CR-947 (JGK), 2015 WL 1137550, at *9 (S.D.N.Y. March 12, 2015).

For instance, the Second Circuit has held that "proof of the availability of cash by defendants with no legitimate occupation is permitted as tending to show that it was derived from ill-gotten gains." Viserto, 596 F.2d at 536. Similarly, "[w]here there is no affirmative evidence that the cash was derived from legitimate business, there is sufficient relevance in a narcotics case for the cash to be considered by a jury." United States v. Johnson, No. 16-CR-281 (PGG), 2019 WL 690338, at *7 (S.D.N.Y. Feb. 16, 2019) (internal citations, quotation marks, and brackets omitted). A defendant's suggestion that the funds may have come from another source "goes only to the weight, not the admissibility, of the evidence." Viserto, 596 F.2d at 536.

B.    Discussion

At trial, the government expects to offer evidence that the defendants generated significant quantities of cash, and that their lavish lifestyles reflect wealth that far exceeds any income they derived from legitimate sources. As set forth above, the Bully Gang's Maine trafficking scheme and Rikers Island trafficking scheme were lucrative and long-running operations that collectively generated hundreds of thousands of dollars. The defendants also used violence—including robberies and extortion—to generate income for the gang and its members. Their trappings of wealth and luxury, acquired using criminal proceeds, were captured in social media posts, cell phone evidence, and physical property seized during the course of the investigation, which the government expects to introduce at trial.

For instance, on August 25, 2020, the same day that Gillespie and co-defendant Latrell Johnson robbed three victims at gunpoint, a video was posted to Johnson's Instagram account with the caption, "Ya'll Thought It Was Over [emoji]!! #27BG." In the video, a portion

of which is reflected below, Gillespie is sitting in the driver's seat of a Nissan—the same vehicle used in the robbery—holding multiple large stacks of cash.



The defendants' criminal proceeds are also reflected in financial records that the government expects to introduce at trial.  For instance, records from Cash App accounts maintained by the defendants' girlfriends and other family remembers reflects various transfers of drug proceeds, including money exchanged in connection with the Bully Gang's Rikers Island drug trafficking conspiracy.

        The defendants also flaunted designer clothing and flashy jewelry, including items that match those worn by the defendants during several of the crimes charged in the S-8 Indictment. Examples of photographs and videos recovered from the defendants' social media accounts are reflected below:























The government further expects to present evidence that the defendants generated only modest (if any) income from legitimate sources, and/or were often unemployed during prolonged periods of incarceration.

Courts have repeatedly recognized that this type of evidence is probative and admissible, particularly in narcotics cases. See Ojeda, 412 F. App'x at 412 (evidence of the defendant's gambling was "probative of unexplained wealth" and not "unfairly prejudicial"); Viserto, 596 F.2d at 536 ("[t]he admission of evidence that [the defendants] made substantial purchases for cash" was "proper" as "tending to show that it was derived from ill-gotten gains"); Johnson, 2019 WL 690338, at *7 (denying the defendant's motion to preclude the government from introducing photographs depicting him "in possession of large amounts of cash"); Tavarez, 2015 WL 1137550, at *9 (the defendant's "financial records and tax returns were properly admitted" as "evidence of unexplained wealth"); see also United States v. Falley, 489 F.2d 33, 39 (2d Cir. 1973) ("[P]roof that a defendant is living far above the means provided by his disclosed income is of great probative value in a case involving a crime where the motive is financial gain."). As depicted above, the defendants flaunted the proceeds of their criminal endeavors and routinely made extravagant purchases, including expensive vehicles, flashy jewelry, and luxury designer clothing that they broadcasted on social media. Evidence showing the defendants' possession of crime proceeds is direct evidence of the charged crimes, and proof of their unexplained wealth is admissible as "circumstantial evidence of [the defendant's] participation in a drug conspiracy." Tavarez, 2015 WL 1137550, at *9. Accordingly, the Court should permit the government to admit evidence of the defendant's significant, unexplained wealth, including through social media records, cell phone evidence, testimony, and financial records.

VI.     The Court Should Preclude Improper Defense Arguments and Evidence

    A.     Prior Acquittals and Dismissals

        The Court should preclude the defendants from offering evidence or arguments regarding any prior acquittals or dismissals.  Notably, Harrell's motion practice and arguments to the Court to date frequently emphasize his prior New York State acquittals and dismissals of state prosecutions.  See ECF No. 1338 at 3 n.1 ("Harrell was incarcerated on a homicide.  A jury found Harrell not guilty of all charges on May 26, 2017, the same morning Harrell's farther was found dead in his apartment."); id. at 8 n.9 ("All charges pertaining to Harrell's arrest were dismissed after trial on August 23, 2023."); id. at 10 ("On March 14, 2023, Harrell was acquitted of all charges by a jury resulting in all charges being dismissed."); id. at 10 n.10 ("All Criminal Possession of Marijuana charges were dismissed on August 10, 2022."); ECF No. 1338-1 to 1338-3 (offering evidence of prior acquittals and dismissals); ECF No. 1401 at 2 ("From September 23, 2015 to May 26, 2017, Mr. Harrell was incarcerated until a jury acquitted him of Murder and related charges.  On May 26, 2017, the day of Mr. Harrell's acquittal, his father unexpectedly died in the early morning."); ECF No. 1401 at 2 ("[P]rosecutors and NYPD let Mr. Harrell sit in jail until his acquittal of all charges on March 14, 2023."); ECF No. 1401-1 at ¶ 11 (Harrell Decl.) ("All charges were dismissed against me after trial.").

        Harrell's repeated invocation of his prior criminal cases evinces a clear intent to do the same before the jury.  But that is entirely improper.  Evidence of a prior acquittal is irrelevant to the issues at a later trial.  See United States v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979) ("[A] judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted."); accord, e.g., United States v. Thomas, 114 F.3d 228, 249-50 (D.C. Cir. 1997); Prince v. Lockhart, 971 F.2d 118, 122 (8th Cir. 1992); United States v. Kerley, 643 F.2d 299, 300-01 (5th Cir. 1981); United States v. Ashburn, No. 11-CR-303 (NGG), 2015 WL

729818, at *2 (E.D.N.Y. Feb. 19, 2015) ("The Second Circuit has long held that absent claims of preclusion . . . evidence of prior acquittals is not relevant at trial."); United States v. Brown, No. 07-CR-874 (KAM), 2009 WL 497606, at *6 (E.D.N.Y. Feb. 26, 2009) ("In this district, evidence of a prior acquittal has been held 'inadmissible as irrelevant' under Fed. R. Evid. 401 because '[i]t takes a quantum leap of logic and a fractured syllogism to say that evidence of an acquittal tends to make government bias more probable than it would be without that evidence.'" (quoting United States v. Gambino, 818 F. Supp. 536, 539 (E.D.N.Y. 1993))).

Such evidence also should be precluded because it creates a significant "danger of unfair prejudice, confusion of the issues and misleading the jury." Kerley, 643 F.2d at 301; United States v. Jones, 808 F.2d 561, 567 (7th Cir. 1986) ("obviously substantial" prejudice). Moreover, the evidence is inadmissible hearsay. See Viserto, 596 F.2d at 537; United States v. Vega, 676 F.3d 708, 720 (8th Cir. 2012); United States v. Sutton, 732 F.2d 1483, 1493 (10th Cir. 1984); Ashburn, 2015 WL 729818 at *3 n.4.

In light of the caselaw and consistent Second Circuit practice described above, the Court should preclude the defendants from referring to, introducing evidence of, or attempting to elicit testimony regarding prior prosecutions and acquittals.[11]

---

[11] Although the government expects to admit evidence recovered during prior arrests and criminal proceedings, the government will not offer testimony from those proceedings because it is irrelevant. If, for any reason, such prior testimony is raised at trial, the government requests that the Court direct the parties to refer to any prior trials or hearing as "prior proceedings" without reference to the defendants, charges or outcomes of those proceedings. See United States v. Wilkerson, 361 F.3d 717, 734 (2d Cir. 2004); United States v. Munoz-Mosquera, No. 95-1278, 1996 WL 281591, at *2 (2d Cir. May 9, 1996); United States v. Raposo, No. 98-CR-185 (DAB), 1998 WL 879723, at *7 (S.D.N.Y. Dec. 16, 1998) ("No reference shall be made to the outcome of the prior trial, nor to the fact that the prior trial was of the Defendant.").

B.     Hearsay Statements by the Defendants

The record evidence in this case includes, among other things, the defendants' inculpatory statements.  But the Court should preclude the defendants from referencing at trial their own self-serving statements, which are inadmissible hearsay unless the respective defendant testifies at trial and is subject to cross-examination.

The general legal standards regarding hearsay are discussed above.  Relevant here, if "the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982). Conversely, when the government offers a defendant's out of court statements for their truth, those statements are not hearsay, they are "simply a statement of the opposing party" and admissible pursuant to Rule 801(d)(2)(A).  Id. (citing Fed. R. Evid. 801(d)(2)(A)).  In general, a defendant may not "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination." United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

Importantly, the rule of completeness codified in Rule 106 precludes the defendants from offering their own prior statements even if the government offers parts of those statements. See United States v. Hill, 658 F. App'x 600, 605 (2d Cir. 2016) (affirming district court's parsing of a defendant's recorded statement to admit the discrete inculpatory statements and exclude the other self- serving statements that he was "innocent").[12]  "Under the rule of completeness, 'even

---

[12]     Rule 106 was amended last month, and the Advisory Committee has made clear that the change "does not give a green light of admissibility to all excised portions of written or oral statements" and "does not change the basic rule" of completeness, which "applies only" to certain "narrow circumstances" set forth in the caselaw.  Fed. R. Evid. 106 advisory committee's notes to 2023 amendments.  Indeed, the notes cite favorably to Second Circuit precedent.  See id. (citing United States v. Williams, 930 F.3d 44 (2d Cir. 2019)).

though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the omitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" United States v. Fawwaz, 691 F. App'x 676, 678 (2d Cir. 2017) (quoting United States v. Johnson, 507 F.3d 793, 796 (2d Cir. 2007)).  The defendants "cannot circumvent the hearsay rule simply by invoking the doctrine of completeness so as to render otherwise inadmissible evidence admissible for its truth."  Williams, 930 F.3d at 60, cited in Fed. R. Evid. 106 advisory committee's notes to 2023 amendments; accord United States v. Campos, 763 F. App'x 97, 101 (2d Cir. 2019) (affirming district-court determination that the defendant "could not use the completeness rule as an end-run around the hearsay rule").  The rule "does not 'require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.'"  United States v. Thiam, 934 F.3d 89, 96 (2d Cir. 2019) (quoting Marin, 669 F.2d at 84); accord United States v. Gupta, 747 F.3d 111, 139 (2d Cir. 2014); United States v. Harper, No. 05-CR-6068 (DGL), 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009) ("[A] defendant may not rely on the rule of completeness to put his out-of-court exculpatory statements before the jury through the testimony of another witness . . . , while at the same time maintaining his own Fifth Amendment privilege so as to avoid being cross-examined about his prior statements.").

As a result, federal courts often parse a defendant's statements to admit the inculpatory statements offered by the government and exclude the self-serving, unconnected statements offered by the defendant.  See, e.g., United States v. Lange, 834 F.3d 58, 79 (2d Cir. 2016) (finding that "omitted statements were generally post-hoc explanations for prior conduct, which did not alter the meaning of the admitted redacted portion"); Johnson, 507 F.3d at 796-97 (affirming exclusion of statements "related to the execution of" the crime because they did not

complete statements related to the "plans to execute" that crime (emphasis in original)); see also United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014) ("[I]t is often perfectly proper to admit segments of prior testimony without including everything . . . ." (citation omitted)).

Accordingly, the Court should preclude the defendants from seeking to introduce their own statements for the truth of the matters asserted in the form of recorded jail calls or prior out-of-court statements, or from seeking to elicit from government witnesses any of the defendants' prior statements, unless those statements are offered pursuant to a proper exception to the rule against hearsay. See, e.g., United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *2 (E.D.N.Y. Jan. 14, 2020) (precluding defendant "from introducing her own post-arrest statements to prove the truth of the matter(s) asserted" (emphasis omitted)); United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *2 (E.D.N.Y. Nov. 5, 2014) ("[T]he defendant's self-serving, exculpatory statements are inadmissible hearsay."). And to the extent the defendants intend to rely on the rule of completeness, the burden rests with them to demonstrate that the portions of the statement they seek to offer are necessary to clarify or explain the portions the government intends to offer. See United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

C.      Attacks on the Government's Investigation

The defendants should be precluded from introducing evidence or making arguments that seek to impugn or otherwise put at issue the conduct, motives and timing of the government's investigation. Such evidence is irrelevant to the defendants' innocence or guilt and presents a substantial risk of misleading the jury or inviting jury nullification.

In his motion practice and state criminal proceedings, Harrell has cast aspersions on the integrity of the government's investigation and the motivations of law enforcement agents more generally.  See ECF No. 1338 at 2 ¶ 2 ("Detective Vickery conferred with agencies and prosecuting bodies to see if any of Harrell's old cases could be revived."); ECF No. 1401 at 2 ("On or about October 6, 2017, Detective Christopher Vickery opened an investigation into Mr. Harrell where NYPD monitored Mr. Harrell's social media accounts, surveilled his locations, directed law enforcement to stop, detain, and arrest Harrell in order to gain access to his property including cell phones, vehicles, and his personal effects.  NYPD's investigation included GPS tracking on Mr. Harrell's cell phone and stops at the direction of Detective Christopher Vickery in Maine on June 1, 2018 and June 21, 2018. . . .  [P]rosecutors and NYPD let Mr. Harrell sit in jail until his acquittal of all charges on March 14, 2023."); ECF No. 1401-7 at 188:21-25 (defense counsel jury address) ("The evidence will show that the 32nd Detective Squad told the officer who stopped Mr. Harrell to arrest him so that he could take his property and so he could search Mr. Harrell's property.  So, Mr. Harrell was arrested for marijuana."); ECF No. 1401-10 at 512:9-12 (defense cross-examination) ("Mr. Harrell actually questioned you being able to search the vehicle?"); id. at 513:11-14 ("The 32 detective squad told you to take Mr. Harrell's property, right?").

Such attacks are unfounded and entirely improper, as the government is not on trial.  This Court has "broad discretion" in controlling jury arguments.  Herring v. New York, 422 U.S. 853, 862 (1975); see United States v. Zodhiates, 235 F. Supp. 3d 439, 461 (W.D.N.Y. 2017) (District courts "ha[ve] a duty to control final argument and to prevent any improper arguments." (quoting United States v. Spillane, 879 F.2d 514, 518 (9th Cir. 1989))).  As explained above, Rule 402 provides that "[i]rrelevant evidence is not admissible."  Rule 403 provides that the Court may "exclude relevant evidence if its probative value is substantially

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

To be clear, a defendant is entitled to argue before the jury that the absence of certain types of evidence presented to the jurors may give rise to reasonable doubt. But the Court should preclude the defendants from presenting any argument or evidence about the entirely different—and inappropriate—topics of the government's pretrial investigative motives, "enforcement initiatives" and "investigative steps." United States v. Alimehmeti, 284 F. Supp. 3d 477, 492 (S.D.N.Y. 2018). Those latter topics are "irrelevant to the defendant's innocence or guilt" under Rule 402, and inquiry into those topics invites "confusion, delay, and distraction" and enhances "the risk of unfairly prejudicing the Government at trial" under Rule 403, "with no offsetting probative value." Id.; see also, e.g., United States v. Rosado, 728 F.2d 89, 93 (2d Cir.1984) (criticizing admission of evidence about the propriety of prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial").

The Second Circuit has consistently observed—and endorsed jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and timing in bringing charges are irrelevant, unduly prejudicial, and improperly inviting of jury nullification. See, e.g., United States v. Knox, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that the "government is not on trial" is "appropriate" (internal quotation marks omitted)); United States v. Preldakaj, 456 F. App'x 56, 60 (2d Cir. 2012) (affirming instruction that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he

government is not on trial, and law enforcement techniques are not your concern" (alterations in original)); United States v. Farhane, 634 F.3d 127, 166 (2d Cir. 2011) (affirming jury charge the states in part:  "[T]he decision of the government to investigate an individual or the decision of a grand jury to indict an individual is none of your concern."); United States v. Saldarriaga, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge that states in part:  "The government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand[] other things they could have done is wholly irrelevant." (alteration in original)); Rosado, 728 F.2d at 93 (observing that selective-prosecution arguments "invited jury nullification by questioning the Government's motives in subpoenaing appellants and prosecuting them").

Numerous district courts have precluded such arguments to the jury.  See, e.g., United States v. Bankman-Fried, No. 22-CR-673 (LAK), 2023 WL 6283509, at *5 & n.30 (S.D.N.Y. Sept. 26, 2023); Pretrial Conf. Tr. 206:16-22 (rejecting proposed expert testimony about the "general custom and practice of FBI investigations" on ground that it would be "inappropriate for the jury to consider the methodology of the investigation"), United States v. Greebel, No. 15-CR-637 (KAM) (E.D.N.Y. Oct. 6, 2017), ECF No. 400; United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); United States v. Cleveland, No. 96-CR-207 (SSV), 1997 WL 253124, at *3 (E.D. La. May 14, 1997) ("Evidence introduced for the purpose of showing that the prosecution has brought these criminal charges for improper reasons shall therefore be excluded."); United States v. Sanchez, No. 92-CR-153 (JAN), 1993 WL 462846, at *4 (N.D. Ill. Nov. 8, 1993) (holding defense counsel's

"arguments and statements regarding the length of the government's investigation" and "the government's delay in bringing its indictment" were "improper"), aff'd sub nom., United States v. Neville, 82 F.3d 750 (7th Cir. 1996).

In sum, the Court may preclude the introduction of irrelevant evidence, including irrelevant testimony during cross-examination, and protect the jury from improper argument and related confusion. The Court should do so here to prevent the defendants from attacking the conduct, motives, and timing of the government's investigation.

D.   References to Punishment

The Court should preclude the defendants from referencing at trial any consequences of their convictions. While the defense has not suggested that it intends to introduce any discussion of these consequences at trial, out of an abundance of caution, the government moves to preclude at trial any discussion of the defendants' possible punishments or collateral consequences of conviction.

Evidence regarding possible consequences a defendant may face if convicted should be precluded because it is not relevant. See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task."). (The general legal standards regarding relevance are discussed above.) Such evidence is not only irrelevant, but it also "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion." Id. Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt. See generally Sand, et al., Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.) ("The question of possible punishment of the defendant is of no concern to the jury and should not, in any sense, enter into or influence your deliberations."); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might

be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

     E.    <u>References to Elicit Jury Sympathy</u>

     In his motion practice here and in prior state court proceedings, Harrell has attempted to interject irrelevant personal details to engender sympathy.  <u>See</u> ECF No. 1338 at 3 n.1 ("A jury found Harrell not guilty of all charges on May 26, 2017, the same morning Harrell's father was found dead in his apartment."); ECF No. 1401 at 2 ("On May 26, 2017, the day of Mr. Harrell's acquittal, his father unexpectedly died in the early morning."); ECF No. 1401-15 at 1031:10-14 (noting Harrell's attempt at introducing to the jury a message about him having a baby).  The Court should preclude such arguments and references.

     Details about the defendant's family life typically have no bearing on the issues in this case because they are not probative of whether the defendant is guilty of the crimes charged in the indictment.[13]  <u>See, e.g.</u> <u>United States v. Paccione</u>, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy); <u>United States v. Battaglia</u>, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged").  The evidence also is primarily designed to engender

---

[13]    To be clear, evidence of a defendant's family life may be relevant for other purposes.  For instance, the government expects to demonstrate that a shootout occurred at a "gender reveal" party hosted by Harrell, and that the shootout prompted retaliatory violent acts by the Bully Gang—including Ayers' murder of Jonathan Jackson, a member of the Stukes Crew. Evidence about the party, for instance, is not intended to elicit sympathy, but rather helps to establish why Harrell and other Bully Gang members committed the charged violent acts.

sympathy, which improperly encourages jury nullification.  See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . .  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent.").  Federal courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct."  Id. at 616.

Thus, this Court should preclude the defendants from offering argument and evidence designed to elicit sympathy.

## VII.    The Court Should Set a Discovery Disclosure Schedule as to the Defendants

Rule 16(b) of the Federal Rules of Criminal Procedure requires each defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  Moreover, Rule 26.2 requires, at the government's request, "the defendant and the defendant's attorney to produce, for the examination and use of the [government], any statement of the witness that is in their possession and that relates to the subject matter of the witness' testimony."

This Court should direct the production of reciprocal discovery in advance of the government's case-in-chief.  A defendant may start making his case-in-chief during his cross-examination of the government's witnesses.  See United States v. Hsia, No. 98-CR-57 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000) ("Defendant's cross-examination, and the evidence introduced during that cross-examination, certainly may be used to support her defense.").  Accordingly, Rule 16(b) requires the production of any documents that the defendant plans to use as affirmative support of his theory of the case (as opposed to mere impeachment evidence) and that he seeks to admit while cross-examining a witness during the government's case-in-chief.  See id. at *2 & n.1.  Numerous federal courts have recognized this requirement.  See United States v.

Ellison, 704 F. App'x 616, 624-25 (9th Cir. 2017); United States v. Sanft, No. 19-CR-258 (RAJ),

2021 WL 5283959, at *2-3 (W.D. Wash. Nov. 12, 2021); United States v. Palafox, No. 16-CR-

265 (GMN), 2018 WL 10016686, at *2 (D. Nev. Dec. 12, 2018); United States v. Napout, No. 15-

CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017); United States v. Aiyaswamy,

No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017); United States v.

Crinel, No. 15-CR-61 (SM), 2016 WL 5779778, at *3-4 (E.D. La. Oct. 4, 2016); United States v.

Holden, No. 13-CR-444 (AJB), 2015 WL 1514569, at *4 (D. Or. Mar 19, 2015); United States v.

Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014).

    To date, no defendant in this case has disclosed documents he intends to introduce

at trial.  The government previously requested reciprocal discovery from all but one of the six New

York pod defendants,[14] and hereby requests such discovery from all of them.  To avoid

gamesmanship and unfair surprise, the government respectfully requests under Rule 16(b) that the

Court order each defendant to provide a list of exhibits he intends to introduce during the

government's case (i.e., not those documents to be used for impeachment purposes only) or any

defense case no later than February 19, 2024—a week before the start of trial.

    Finally, the government respectfully submits that, to avoid delay in the upcoming

trial, the Court should set a recommended schedule for the defendant's disclosure of the statements

of any witnesses.  See Fed. R. Crim. P. 26.2.  The government proposes that Rule 26.2 material

should be provided no later than two days before a witness testifies.

VIII. The Court Should Empanel an Anonymous and Partially Sequestered Jury

---

[14] The government has requested reciprocal discovery from Ayers at least four times since August 17, 2020; Gillespie at least three times since December 6, 2020; Harrell at least on August 28, 2020; Johnson at least four times since March 10, 2021; and Kennedy at least twice since October 19, 2020.  Meanwhile, all of the New York pod defendants have received from 12 to 18 discovery productions from the government.

This Court should empanel an anonymous and partially sequestered jury. More specifically, the government respectfully requests that (1) the identities of all prospective jurors—including their names, addresses and places of employment—not be revealed to the public, the parties or the attorneys; and (2) from empanelment to the conclusion of trial, the jurors eat lunch together and be transported to and from the courthouse by members of the United States Marshal Service ("USMS").[15]  The Court should adopt these limited measures, which are necessary to protect the integrity of the trial and the jury's impartiality by preventing intimidation and other types of interference. There is also no risk that the measures will deprive the defendants of their constitutional rights.

A.    Applicable Law

For decades, "many" multi-defendant racketeering trials have involved anonymous juries.  Hayden v. United States, 814 F.2d 888, 892 (2d Cir. 1987).  Countless Second Circuit precedents show that anonymity and sequestration are often necessary to protect the trial's integrity and the jury's impartiality.  See, e.g., United States v. Napout, 963 F.3d 163, 188-90 (2d Cir. 2020); United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Stewart, 590 F.3d 93, 124-25 (2d Cir. 2009); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); Wong, 40 F.3d at 1376-77; Thai, 29 F.3d at 800-01; United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); Locascio, 6 F.3d at 946-47; United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v.

---

[15]    To be clear, it is appropriate for the USMS, which will be responsible for maintaining the safety and security of the jury during the trial, to know the names and addresses of the jurors.  The government respectfully submits that the USMS will keep that information confidential and will not reveal it to the attorneys, the parties or any other third party.

Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Ferguson, 758 F.2d 843, 854 (2d Cir. 1985); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

Accordingly, district courts have granted requests for protective measures in numerous cases, including recent ones.  See, e.g., United States v. Brown, No. 20-CR-293 (WFK); United States v. Shelton, 18-CR-609 (RJD).  "The jury selection process (voir dire) is not a matter of constitutional dimension and the selection of an anonymous jury was implicitly held to be constitutional in Barnes."  United States v. Gotti, 777 F. Supp. 224, 227 (E.D.N.Y. 1991).

Federal courts in the Second Circuit have adopted a two-step approach to deciding whether to impose protective measures.  This Court may impose measures such as anonymity and sequestration "upon '(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant to ensure that his fundamental rights are protected.'"  Stewart, 590 F.3d at 124 (quoting Paccione, 949 F.2d at 1192); accord Thomas, 757 F.2d at 1365.  The Court has "broad discretion to take such steps as may be necessary and appropriate to permit the jury to concentrate on the trial proceedings and to evaluate the evidence in an atmosphere free from apparent threat or danger, so long as those steps do not violate the defendant's fundamental rights."  Maldonado-Rivera, 922 F.2d at 971; accord Persico, 832 F.3d at 718 ("sound discretion").  The "protection of jurors is vital to the functioning of the criminal justice system," and "we cannot expect jurors to 'take their chances' on what might happen to them as a result of a guilty verdict."  Thomas, 757 F.2d at 1364.  The

Court also must take reasonable measures to protect the defendants' "interest in effectively conducting voir dire and in maintaining the presumption of innocence." Wong, 40 F.3d at 1376.

When determining a "strong reason" for protection, Paccione, 949 F.2d at 1192, the Court may consider factors such as (1) the "seriousness of the charges and dangerousness of the defendant" and (2) the "risk of interference with the judicial process," adjudged by the "ability" and "previous attempts" to interfere by the defendants or their "associates," United States v. Asainov, 618 F. Supp. 3d 105, 115-16 (E.D.N.Y. 2022) (citation omitted).[16] The second factor "has been described as 'crucial' to the determination to empanel an anonymous jury." United States v. Locascio, 357 F. Supp. 2d 558, 561 (E.D.N.Y. 2005).

The tampering of witnesses alone, as opposed to jurors, suffices to support juror anonymity. See United States v. Blackshear, 313 F. App'x 338, 343 (2d Cir. 2008); Aulicino, 44 F.3d at 1116-17. "A defendant's apparent 'willingness to tamper with the judicial process' will support the use of an anonymous panel." Stewart, 590 F.3d at 124. Still, the defendant need not "personally intimidate[] or attempt[] to intimidate witnesses or others associated with trial." Napout, 963 F.3d at 189-90. The defendant also need not be charged with any obstruction-related counts. See Mayes, 2013 WL 6175824, at *3. The Court may consider "a 'demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf.'" Pica, 692 F.3d at 88 (quoting Vario, 943 F.2d at 241). Such actors include co-conspirators. See Vario, 943 F.2d at 240. The "Court has a duty to protect the jurors from harm, regardless of the source, when, as here, the threats and violence have a clear connection and are directed to

---

[16]     The government does not argue that the "amount of public and media attention expected during the trial" may cause juror pressure here. Asainov, 618 F. Supp. 3d at 115 (citation omitted). All the factors need not be present; "anonymity is appropriate when some combination of these factors is present." United States v. Ashburn, No. 11-CR-303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014).

preventing the investigation and/or prosecution of one of the crimes for which the defendants are on trial." Napout Op. 4 n.2; see also United States v. Pugh, 150 F. Supp. 3d 218, 224 (E.D.N.Y. 2015) ("The question is not whether Defendant himself poses a threat to the jury, but rather whether there is good reason to believe that the jury needs protection.").

This Court may use anonymity and sequestration methods "based on 'threats made to cooperating witnesses by other participants in the' defendant's conspiracy." Napout, 963 F.3d at 190 (quoting United States v. Vondette, 83 F. App'x 394, 400 (2d Cir. 2003), vacated on other grounds, 543 U.S. 1108 (2005)). Anonymity and sequestration are amply justified if the Court finds that "the 'threats and violence' faced by the potential witnesses 'ha[d] a clear connection and [were] directed to preventing the investigation and/or prosecution of one of the crimes for which the defendants [were] on trial.'" Id. (citation omitted); see also, e.g., Thai, 29 F.3d at 801 (affirming sequestration because of two defendants' subversion of "the judicial process through intimidation and murder"); Thomas, 757 F.2d at 1364-65 (affirming protective measures when the defendants "were alleged to be very dangerous individuals engaged in large-scale organized crime who had participated in several 'mob-style' killings," there was "strong evidence of defendants' past attempts to interfere with the judicial process," and "defendants were alleged to be part of a group that possessed the means to harm jurors").

The Court may "rely on the government's proffer of facts showing that the jury needs protection." United States v. Persico, No. 10-CR-147 (SLT), 2012 WL 1188243, at *4 (E.D.N.Y. Apr. 6, 2012); see also United States v. Kaziu, 559 F. App'x 32, 37 (2d Cir. 2014); Wong, 40 F.3d at 1376-77; Op. 2, United States v. Loera, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), ECF No. 187; Op. 4, United States v. Napout, No. 15-CR-252 (PKC) (E.D.N.Y. Oct. 17,

2017), ECF No. 717, aff'd, 963 F.3d 163 (2d Cir. 2020); United States v. Mayes, No. 12-CR-385 (ARR), 2013 WL 6175824, at *3 (E.D.N.Y. 25, 2013).

B.      There Are Strong Reasons for Jury Protection

Applying the standards and considering the factors set forth above, this Court should find the interests of justice would best be served by protecting the identities of the jurors and partially sequestering them for the duration of the trial.

First, the "organized crime status of the defendants, although not alone sufficient to support empaneling an anonymous jury, is plainly not irrelevant." Locascio, 357 F. Supp. 2d at 562.  The Bully Gang's activities—which include the multiple murders and attempted murders to be proven at this trial—have "some direct relevance to the question of juror fears or safety in the trial at hand." Vario, 943 F.2d at 241.  And when the charges are "serious" and mostly involve "the use of violence," the indictment supports "the use of an anonymous jury" because they reflect the outsize dangerousness of the defendants.  United States v. Prado, No. 10-CR-74 (JFB), 2011 WL 3472509, at *6 (E.D.N.Y. Aug. 5, 2011) (Bianco, J.); see also Amuso, 21 F.3d at 1251 ("crimes of extreme violence"); Vario, 943 F.2d at 241 ("trial evidence [that] will depict a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety").  The "substantial prison term" that the defendants are facing—with five of the six New York pod defendants facing a racketeering count and at least one count with a mandatory minimum sentence—also provide an "incentive to tamper with the jury." United States v. Antico, No. 08-CR-559 (CBA), 2010 WL 2545877, at *1 (E.D.N.Y. June 11, 2010).

Second, there is a high likelihood that one or more of the defendants (and/or their associates) will interfere with the judicial process here.  As explained above, Bully Gang members frequently intervened by providing bail and legal representation to ensure that individuals arrested in connection with the gang's rackets would not cooperate with law enforcement.  Moreover,

during the May 11, 2017 YouTube video described above, Bully Gang members and associates (including co-defendant Latrell Johnson) read out loud Bully Gang-related court transcripts of witness testimony—which shows that the defendants and associates will try to publicize witnesses when they have the opportunity.  Multiple individuals recorded on the YouTube video, though apparent associates of the Bully Gang, have not been charged.

As previously explained in public court filings (see Gov't Opp'n 21, ECF No. 1389), Harrell was prosecuted at the state level in connection with the July 17, 2018 murder of Zuquone Lurk.  Exhibits admitted during the state trial show that, while the state prosecution was ongoing, Harrell received what appeared to be partially redacted discovery materials produced to others in the state case (including what appeared to be several Bates stamped pages from the affidavit in support of a search warrant).  Harrell sent a portion of those discovery materials (including statements to law enforcement by a witness whose identity was redacted) to another individual and asked the individual:  "This not your name that's blanked out gangsta??"  The text message demonstrates Harrell's propensity to intimidate and harasses perceived witnesses.

Also in connection with the Lurk prosecution, Harrell sent an obstructive text message an associate of Bully Gang member Terrell Ratliff—who was a co-defendant in the state case and would later plead guilty to a state weapons possession charge.[17]  In the text message, Harrell offered to pay for the attorney's fees for Ratliff in connection with the state prosecution.

---

[17]     Ratliff also is a defendant in this case and pleaded guilty to racketeering on March 25, 2022.  (See ECF No. 683.)  On June 29, 2023, the Court sentenced Ratliff to 71 months' imprisonment running consecutively to the sentence imposed in his parallel state criminal case. (See ECF No. 1239.)

The facts described above support the requested protective measures.[18]   They reflect an extreme disregard of the judicial process and a willingness to tamper with witnesses and other actors involved in that process.  Some of the obstructive conduct was performed by defendants who were detained.  Moreover, the murder of a witness "in retaliation for his cooperation with law enforcement authorities" provides an ample and independently sufficient basis for anonymity and sequestration.  Quinones, 511 F.3d at 295; see also United States v. Rivera, 60 F. App'x 854, 858 (2d Cir. 2003) ("Defendants were charged with hunting down and killing a man for publicly embarrassing their gang leader.").

Given the totality of circumstances, anonymity alone is insufficient.   Partial sequestration with the assistance of the USMS preserves the impartiality of jurors because, absent such measures, anonymous jurors could be identified by, for example, the license plates of their vehicles parked near the courthouse.  Thus, strong reasons for jury protection are present here.

C.    Protective Measures Will Not Prejudice the Defendants

To safeguard the defendants' fundamental trial rights, the Court should conduct "a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself." Paccione, 949 F.2d at 1192 (quoting Vario, 943 F.2d at 242); see also Wong, 40 F.3d at 1377 (endorsing district-court questioning of potential jurors "about their familiarity with the case, the defendants and the crime scenes," as well as "their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters").  In selecting jurors, the parties will learn, among other things, the

---

[18]      As the government noted above, additional information concerning the defendants' obstructive conduct will be disclosed as part of its 18 U.S.C. § 3500 materials.  Should the Court wish to review information relevant to these issues sooner, the government can provide that information ex parte.

geographic area where prospective jurors reside, the general nature of their employment, their age, and the level of their formal education.  But information such as the names, exact addresses, and places of employment is not necessary to making an informed choice.  Information regarding the neighborhoods in which the prospective jurors live and the nature of their work is sufficient.  The names of prospective jurors, to the extent they provide information about ethnicity, are not relevant to meaningful voir dire.  See Georgia v. McCollum, 505 U.S. 42, 55 (1992) (prohibiting use of peremptory challenges in racially discriminatory manner by criminal defendants).

Moreover, the Court also should "give the jurors a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures."  Id.; see also Thomas, 757 F.2d at 1364-65 & n.1; Maldonado-Rivera, 922 F.2d at 971.  For instance, the Court may instruct the jurors that it is "common practice" to keep juror identities "in confidence."  Vario, 943 F.2d at 241 (quoting Tutino, 883 F.2d at 1133).  The Court may instruct the jury that the additional safeguards are to protect against intrusion by the media.  See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363.  As this Court has noted before, "any potential prejudice to defendant[s] will be mitigated when the Court advises the jury that their names are not being publicly disclosed out of respect and concern for their privacy, which is true, and that neither the Government nor defendant[s] will know their identities."  Loera Op. 4; see also id. ("The Court will instruct the jurors that their daily transportation and escort within the courthouse are provided to protect their privacy and to ensure that the trial proceeds expeditiously.").

With respect to sequestration, the Court may advise the jury that transportation is being provided to protect their privacy and ensure that the multi-week trial proceeds expeditiously because, among other things, restaurant accommodations for large groups such as juries are

difficult to obtain for the lunch break.  See, e.g., Wong, 40 F.3d at 1377; Amuso, 21 F.3d at 1265; United States v. Dervishaj, No. 13-CR-668 (ENV), 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015); Prado, 2011 WL 3472509, at *11; United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783359, at *3 n.3 (E.D.N.Y. July 15, 2008); United States v. Gammarano, No. 06-CR-72 (CPS), 2007 WL 2077735, at *6 (E.D.N.Y. July 18, 2007); United States v. Basciano, No. 05-CR-060 (NGG); United States v. Stone, No. 05-CR-401 (ILG); United States v. McGriff, No. 04-CR-966 (FB); United States v. Wilson, No. 04-CR-1016 (NGG); United States v. Urso, No. 03-CR-1382 (NGG), 2006 WL 1210886, at *3 (E.D.N.Y. May 2, 2006); United States v. Aguilar, No. 01-CR-1367 (RJD); United States v. Nelson, No. 94-CR-823 (DGT); United States v. Orena, No. 93-CR-1366 (ERK); United States v. Malpeso, No. 93-CR-1365 (RJD); United States v. Cutolo, No. 93-CR-1230 (EHN); United States v. Thai, No. 91-CR-838 (CBA).

If this Court conducts adequate voir dire and gives appropriate jury instructions, the above-described security measures will not "infringe a defendant's constitutional rights." Aulicino, 44 F.3d at 1116.  Therefore, the Court should implement the protective measures requested above.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should admit the evidence outlined herein by the government, preclude the defense arguments articulated above, set a discovery disclosure schedule as described above, and empanel an anonymous and partially sequestered jury.


Dated:      Brooklyn, New York
            January 19, 2024

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Drew G. Rolle
Nicholas J. Moscow
Lindsey R. Oken
Joy Lurinsky
Victor Zapana
Assistant United States Attorneys
        (Of Counsel)