

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

LRO
F. #2018R00788

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 12, 2024

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Latrell Johnson
              Criminal Docket No. 20-239 (S-8) (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in advance of defendant Latrell Johnson's sentencing, scheduled for December 19, 2024. Johnson was a core member of the Bully Gang, and one of its most vocal proponents. He boasted over social media about the gang's crimes—and his own role in them—and participated in some of the gang's most serious and violent criminal rackets. Indeed, after many of the gang's leaders were arrested in 2020, and charged the above-captioned case, Johnson took on the mantle of the Bully Gang, committing at least one armed robbery with co-defendant Franklin Gillespie and orchestrating a months-long extortion scheme that targeted a vulnerable small business owner in Brooklyn. Johnson used violence, including brandishing and discharging firearms, to terrorize his victims into submission. And he bragged that his criminal ventures were in furtherance of a violent criminal enterprise: the Bully Gang.

      For these reasons, and for reasons set forth below, the government respectfully submits that a sentence of incarceration of 168 months is appropriate after considering the relevant statutory factors.

I.      <u>Background</u>

      Latrell Johnson, also known as "Barlie Buckz," was a years-long member of the Bully Gang. As the Court is aware, the Bully Gang is a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York. <u>See</u> Pre-Sentence Investigation Report ("PSR") ¶ 12. The Bully Gang had many criminal rackets, including trafficking large volumes of narcotics and committing violent crimes, including robbery, extortion, assault and murder. PSR ¶¶ 12-16. Evidence of the gang's criminal schemes is detailed below, and some of its members and crimes were established at the recent trial of Bully Gang members Moeleek

Harrell, Derrick Ayers, Franklin Gillespie and Anthony Kennedy.  See United States v. Moeleek Harrell, et al., 20-CR-239 ("Harrell").[1]

      A.      The Defendant's Membership in the Bully Gang

           Since at least 2017, Johnson has been outspoken about his allegiance to the Bully Gang, and has vocally promoted the gang over social media.  For instance, in a May 2017 video posted to YouTube, Johnson and others—including Bully Gang members Ronald Davis, also known as "Ronno," Rashaad Craig, also known as "Skeeno"—laid out an oral history of the gang.  See GX 2408, 2408-T.



The video, which is largely narrated by Johnson, was filmed on Fulton Street in Brooklyn, near the de facto Bully Gang headquarters at 1625 Fulton Street.  In the video, Johnson explained how two founding members (Moeleek Harrell and deceased member Charles Williams, also known as "YB") "took over Brooklyn" after serving federal prison time; how the gang originated in "the Stuy," or the Bedford-Stuyvesant neighborhood of Brooklyn; and how some of the gang's members were incarcerated, while others were on the street committing crimes, including robbery ("taking . . . chains"), carjacking ("taking . . . whips"), and murder ("taking . . . lives," "down for bodies"):

      OFF CAMERA:      Bully Gang, n****.

      JOHNSON:         N****s already know.  My n****s made history.  Bully Gang. My n****s made history.  Two n****s, n****.  Took over Brooklyn.  N****s came home.  Came home from up top—from the Feds, n****.  Six years.  Eight years.  N****s came home and took over, n****.  Two n****s, n****.  Chains.  Whips.  Fucking n****s' bitches.  Taking n****s' lives.  All that, n****.  All that,

---

      [1]      Citations to "GX" refer to government exhibits from the Harrell trial, which will be provided for the Court's review.

n****.  N****s know what's up.  Taking n****s' chains—all that.  Wearing it.  All that.  N****s know what's up.  Wearing them shits, n****.  N****s know what's up, my n****.  Bully Gang.  N****s know what's up.  N****s say that Bully Gang shit from the Stuy, n****s know what's up.  N****s know "Oh, all right.  Yeah."

DAVIS:              Not that Brownsville shit.  Not none of that other shit.  Nothing towards ya'll n****s, but we Bully Gang from the Stuy, you heard.

JOHNSON:         But we Bully Gang from the real shit.  01's, n****.  2000s, n****.  2002, n****s was out here.

OFF CAMERA:    [inaudible]

JOHNSON:         N****s already know what's up.

                              *          *          *

JOHNSON:         Google my man, Moe.  Google my man, YB, n****.  Charles, n****.  Google my man, Marly G, n****.

OFF CAMERA:    Free my man, Moe.  Free Jae O.

JOHNSON:         Yeah, n****.  Google my man Jae O.  N****'s in the feds, man.

OFF CAMERA:    RIP YB, n****.

DAVIS:              Free Buzzin.

JOHNSON:         N****s down for bodies.  Beat bodies.  All that.  Google my n****s, man.

OFF CAMERA:    That's a fact.

JOHNSON:         Yeah that's a fact.  Bully Gang.  N****s know what's up.

In addition to the May 2017 YouTube video, Johnson's own social media accounts, namely his "Barlie Buckz" Facebook and Instagram accounts, are replete with conversations, videos, photographs, and other posts promoting the gang:



Better Watch How U Speak On That Two Sevv Shit That Shit I'll Die For 🙉👊💯 !! #GANGEEERRRRY 2️⃣ 7️⃣

 

Johnson's social media accounts also contain various videos and photographs depicting firearms, as well as conversations discussing Johnson's access to firearms, including:







**Author** Barlie Buckz (Facebook: 100003218552896)
**Sent** 2020-12-05 19:13:16 UTC
**Body** Go Getchu One They Here !!

And Johnson routinely flaunted the gang's criminal proceeds, including stacks of cash, jewelry, and designer merchandise:







  

See also GX 1236-E.1, 1236-L.1, 1236-M.1, 1236-N.1, 1236-O.1, 1236-R.1.

Other members of the gang praised Johnson for his commitment to the enterprise. In May 2020, for instance, Moeleek Harrell, the gang's leader, spoke to Gillespie on a recorded jail call about Johnson ("Barlie"), reassuring Gillespie that Johnson was "sturdy" and "one of us."  See GX. 2021-C.1.

In June 2020, law enforcement conducted the first of a series of arrests in the instant case.  As set forth below, over the ensuing weeks and months, Johnson continued to advance the gang's criminal rackets, including by committing an armed robbery with Gillespie as well as a months-long extortion scheme and related shooting that targeted a small business in Brooklyn.

B.    The August 25, 2020 Robbery

On August 25, 2020, Johnson and Gillespie drove a stolen vehicle to commit a brazen armed robbery, in broad daylight, outside of a luxury retail store in Manhattan.  See PSR ¶¶ 36, 38-41.  The robbery is largely captured on video, which shows Johnson and Gillespie exiting the vehicle and pointing guns at civilian shoppers on the street, while demanding money, jewelry and merchandise from the victims.  See GX 2532, 2441; PSR ¶ 38.



Despite his mask, Johnson's face is visible and recognizable.  Video surveillance also captured the tattoo on Johnson's left wrist, and red shoes consistent with those later seized by law enforcement at Johnson's residence.








Johnson can also be seen carrying a large and distinct firearm—a Mac-10-style gun with an extended ammunition magazine—consistent with one of the three firearms that was seized in connection with Gillespie's September 2020 arrest.




After the robbery, Johnson and Gillespie flaunted their illicit proceeds on social media.  See PSR ¶ 39.  In a video posted to Johnson's "Barlie Buckz" Instagram account—taken inside of the stolen vehicle used in the robbery—Johnson recorded Gillespie displaying stacks of cash.  See GX 1237-J.1.



In posts from August 26, 2020, the day after the robbery, Johnson invoked the gang (including with the hashtag "#27BG") and proclaimed that—despite numerous arrests—the Bully Gang was not "over." See GX 1231-H, 1233-B, 1236-Q, 1237-J.

 

| Upload Ip | 2600:1:f44a:906e:f801:6a23:9714:cdf6 |
|---|---|
| Comments | |
| User | barlie_buckz (1662548050) [Barlie Buckz] |
| Id | 17903425573522002 |
| Date Created | 2020-08-26 00:14:39 UTC |
| Text | Y'all Thought It Was Over 🦁!! #27BG |



Shortly after the robbery, on September 4, 2020, Gillespie was arrested while fleeing on foot, following a high-speed car chase on the streets of Brooklyn. Three firearms were recovered from the vehicle, including two that are consistent with the firearms used by Johnson and Gillespie during the August 25 robbery:

 

See GX 114-D, 114-E; PSR ¶ 41.

After Gillespie's arrest, Johnson sent a series of text messages lamenting that Gillespie ("My Big Bro" / "My Son Spazz")—who Johnson had been committing crimes with ("I Was Doing Everything Wit")—had been arrested ("Booked"):







See GX 1119-C.

On September 17, 2020, a grand jury returned a superseding indictment in Harrell that charged Gillespie and co-defendant Anthony Kennedy.  Soon thereafter, on October 14, 2020, a grand jury returned a second superseding indictment, which added 26 additional defendants and included a number of additional charges, including firearms trafficking and possessing narcotics with intent to distribute.

C.    The Extortion Scheme and November 12, 2020 Shooting

In the aftermath of the sweeping arrests in the fall of 2020, Johnson began orchestrating an extortion scheme that targeted a business owner ("Victim-1") in Brooklyn.  See PSR ¶¶ 42-48.  On November 12, 2020, at approximately 3:30 pm, Johnson entered Victim-1's store and approached an employee at the register ("Employee-1").  See PSR ¶ 42.  Surveillance video captured Johnson inside the store:

11

 

After demanding to speak to the store's owner, Johnson brandished a firearm and told Employee-1 that Victim-1 should contact him. Johnson left his phone number on a piece of paper.[2] Victim-1's family member subsequently spoke to Johnson twice by phone. During the first call, Johnson demanded a weekly payment, and Victim-1's family member refused. The second telephone call was recorded by Victim-1's family member. See Exhibit A. During that call, Johnson again demanded a weekly payment of $2,000, stating that Victim-1 was required to pay and that Johnson knew what went on in "[his] neighborhood." PSR ¶ 43.

That night, as captured on video surveillance, Victim-1's store was shot repeatedly while Victim-1 and multiple employees were inside. See Exhibit B; PSR ¶ 44. After the shooting, beginning on November 17, 2020, Johnson taunted Victim-1 in a series of text messages:

---

[2]     Johnson used that same number to communicate with inmates at Rikers Island, and a cell phone assigned that number was later seized from Johnson.



PSR ¶¶ 45-46. Ultimately Victim-1 agreed to pay Johnson $1,000 per week:





Johnson's extortion of Victim-1 continued for several weeks. In December 2020 and January 2021, in coordination with law enforcement, Victim-1 made weekly payments to Johnson. Video and audio surveillance captured Johnson collecting extortion payments:

 

 

The extortion scheme is also borne out in text messages between Johnson and Victim-1, including Johnson's instructions regarding the time, place, and amount of the payments. Among other things, Johnson demanded that Victim-1 "Come Across The Street From [the] Store" to make payments because, in Johnson's words, "Y'all Already Got The Police On Me." When Victim-1 stated that he was "scared" and "want[ed] no problem[s]," Johnson informed Victim-1 that there would be no problems so long as Victim-1 "Juss Follow Orders."

On December 10, 2020, while the extortion scheme was ongoing, a masked co-conspirator entered Victim-1's store, referenced Johnson's scheme and made renewed threats. That encounter prompted Victim-1 to send Johnson the following messages:



PSR ¶ 47.

In January 2021, Johnson increased his payment demand to $2,000 per week:



Johnson was arrested on January 15, 2021, and law enforcement conducted a search of Johnson's residence pursuant to a judicially-authorized search warrant. Among other things, law enforcement recovered: a large sum of cash; a Bully Gang t-shirt memorializing a deceased member; and jewelry and other designer merchandise, including items worn by Johnson while committing the robbery and extortion scheme.

Johnson was ultimately charged in the above-captioned case, in the eighth superseding indictment (the "S-8 Indictment"), with racketeering (Count One), unlawful use of firearms (Count Three), extortion conspiracy (Count Thirty-Nine), extortion (Count Forty), and threatening physical violence in furtherance of a plan to extort (Count Forty-One).[3] He was named in two racketeering acts, which alleged state law robbery conspiracy/robbery

---

[3]    Johnson was previously charged in Count 42 of the S-8 Indictment (unlawful possessing, brandishing and discharge of a firearm) in connection with the November 12, 2020 shooting described above. On December 14, 2022, in accordance with recent Department of Justice guidance, the government moved to dismiss Count 42, see ECF No. 968, which the Court subsequently granted. In addition, Count Three previously charged Johnson with discharging a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii). By letter dated January 30, 2024, the government advised the Court and the defendant that the government intended to prove only the lesser-included offenses in Count Three of possessing and brandishing a firearm, and moved to dismiss the 18 U.S.C. § 924(c)(1)(A)(iii) (discharging a firearm) charge. See ECF No. 1497.

(Racketeering Act 16) and extortion conspiracy/threatening physical violence in furtherance of a plan to extort (Racketeering Act 17).

On January 31, 2024, Johnson pled guilty to Counts 1 (including Racketeering Acts 16 & 17), 3, 39, 40 and 41 of the S-8 Indictment.  In connection with his plea, the defendant admitted to being a member of the Bully Gang between January 2016 and February 2021; to robbing three people in Manhattan on August 25, 2020, and displaying a firearm while doing so; and to threatening physical violence to obtain property from another person without their consent.

II.    The Applicable Range Under the United States Sentencing Guidelines (the "Guidelines")

Subject to the exceptions set forth in Section III below, the government generally agrees with the Guidelines calculation set forth in paragraphs 74 through 99 of the PSR.  Specifically, the government's calculation is set forth below:

Racketeering Act 16 (Group 1)

|  |  |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2B3.1(a)) | 20[4] |
| Total: | <u>20</u> |

Racketeering Act 17 & Counts 39, 40 and 41 (Group 2)

|  |  |  |
|---|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2B3.2(a)) | | 18 |
| Plus: | Threat of Death, Bodily Injury, or Kidnapping (§ 2B3.2(b)(1)) | +2 |
| Plus: | Firearm Discharged (§ 2B3.2(b)(3)(A)(i)) | +7 |
| Total: | | <u>27</u> |

Grouping Analysis

|  |  |
|---|---|
| Count Group 1: | 20 |
| Count Group 2: | 27 |
| Levels Added (§ 3D1.4): | <u>+1</u> |
| Total Offense Level: | <u>28</u> |

---

[4]    Ordinarily, a five-level firearm enhancement would be applied pursuant to U.S.S.G. § 2B3.1(b)(2), but because Johnson was convicted of a corresponding firearm offense pursuant to 18 U.S.C. § 924(c), the adjustment does not apply.  PSR ¶ 53.

Less:  Acceptance of Responsibility (§ 3E1.1):                                    -2

Adjusted Offense Level:                                                          26

With an offense level of 26 and a Criminal History Category of II, the applicable Guidelines Range is 70 to 87 months.  The defendant is also subject to a mandatory consecutive sentence of 84 months' imprisonment on Count Three, see U.S.S.G. § 2K2.4(b), making his effective Guidelines range 154 to 171 months.

III.    The Parties' Objections to the Guidelines

A.    The Government's Objection

The government objects to paragraph 98 of the PSR, which provides for a one-level decrease of the offense level and states that "[t]he Government intends to make a motion stating that it was notified in a timely manner of the defendant's intention to enter a plea of guilty."  Because Johnson did not plead guilty until the eve of trial and after substantive trial preparations were well underway, the government does not intend to make a motion pursuant to U.S.S.G. § 3E1.1(b) to decrease his offense level based on timely acceptance of responsibility.

U.S.S.G. § 3E1.1(b) provides for a one-level reduction of a defendant's offense level (in addition to the two-level reduction provided in U.S.S.G. § 3E1.1(a)) "upon motion of the government" stating that the defendant has "timely notif[ied] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."  The term "preparing for trial" means "substantive preparations taken to present the government's case against the defendant to a jury," and is "ordinarily indicated by actions taken close to trial, such as preparing witnesses for trial, in limine motions, proposed voir dire questions and jury instructions, and witness and exhibit lists."  U.S.S.G. § 3E1.1(b).

Johnson's guilty plea was scheduled in January 2024—approximately one month before the scheduled start of trial, which ultimately spanned 13 weeks.  By that time, the government's trial preparations in this complex racketeering trial had been underway for months. Indeed, by the time Johnson indicated that he intended to plead guilty, the government had already: met with dozens of victims and trial witnesses, including witnesses related solely to Johnson's crimes; drafted substantive motions, including the government's 109-page motions in limine, which were filed days after Johnson's plea was scheduled; and compiled and begun preparing 3500 material and exhibits for production, among other things.  Because Johnson did not "timely" notify the government of his intention to plead guilty, and required the expenditure of substantial Court and government resources in preparation for trial, the government does not intend to move for an additional one-level reduction for acceptance of responsibility.

19

B.     The Defendant's Objections

Johnson raises two primary objections to the Guidelines calculation set forth in the PSR.[5]  First, Johnson contends that a leadership-role enhancement should not apply.  See Def. Ltr. at 10-13.  Second, Johnson argues that an enhancement for discharge of a firearm should not apply.  See id. at 13-21.

1.     Leadership Enhancement

Johnson first objects to the PSR's determination that, "[a]fter the initial takedown of this case in June 2020 and the subsequent arrest of Franklin Gillespie in September 2020," Johnson "assumed a leadership role in the gang," warranting a three-level aggravating role adjustment pursuant to U.S.S.G. § 3B1.1(b).  See PSR ¶¶ 50, 52.  As set forth above, the government's proposed Guidelines calculation does not include a leadership enhancement, and the government is not asking the Court to apply it.  Nonetheless, the government submits that the defendant's core role in the gang—including as set forth above—is appropriately considered by the Court pursuant to 18 U.S.C. § 3553(a).

2.     Firearm Enhancement

Because Johnson's violent extortion scheme involved a shooting—designed to scare his victims, who initially refused to make payments—a seven-level increase for discharging a firearm is wholly appropriate.  Johnson's claim that the firearm enhancement should not apply is undermined by overwhelming evidence—most notably, Johnson's own statements, which are corroborated by video surveillance, location data, messages with co-conspirators, and ballistic evidence.

As set forth above, on November 12, 2020, at approximately 3:30 pm, Johnson entered Victim-1's store, brandished a firearm and demanded to speak to the "boss."[6]  As Victim-1 was not present, Johnson left his phone number on a piece of paper, and later that afternoon, Victim-1's family member spoke to Johnson twice by phone.  During the first call, Johnson demanded payment, and Victim-1's family member refused.  During the second call,

---

[5]     Johnson previously raised a number of additional objections to the PSR, including to various factual statements that constitute critical components of the offense conduct underlying the extortion scheme to which he pled guilty.  To the extent Johnson maintains those objections at sentencing, the government reserves the right to argue that a reduction of Johnson's offense level for acceptance of responsibility is unwarranted.  See U.S.S.G. § 3E1.1, Application Note 3 (noting that a defendant is not "entitled to an adjustment [ ] as a matter of right" simply because he pleads guilty, and that acceptance of responsibility includes "not falsely denying any additional relevant conduct for which [the defendant] is accountable").

[6]     Store merchandise positioned beneath the overhead surveillance camera blocks much of Johnson's encounter with Employee-1, including Johnson's display of the firearm.  After the encounter, however, as Johnson approaches the exit, his right hand can be seen reaching beneath his jacket.

which was recorded, Johnson issued a clear threat, demanding a payment of $2,000 every Friday "or that shit is a done deal." Victim-1's family member pushed back, responding that "we don't even make $2k a week." <u>See</u> Exhibit A.

Hours later, at approximately 6:07 pm, Victim-1's store was shot by a masked and hooded perpetrator firing repeatedly from the street.[7] The shooting is captured on video surveillance, <u>see</u> Exhibit B, and though the shooter's face is concealed, he approaches Victim-1's store from across the street near 1625 Fulton Street—the same location where Johnson would later require Victim-1 to meet each week to make payments.



The occupants of the store, including Victim-1 and other store employees, took cover as shots were fired around them. Fortunately, no one was hit.

Law enforcement responded to the crime scene that evening, and maintained a presence outside of Victim-1's store over the ensuing days. On November 17, 2020, five days after the shooting, Johnson contacted Victim-1 by text message, writing:

*Y'all Got My Money Or I Gotta Sho[o]t Somebody This Time ?*

After more than 10 minutes passed—and Victim-1 did not respond—Johnson wrote:

*Lol [laughing out loud] Okay*

*Y'all N****s Don't Have My Money It's Gonna Get Ugly So U Better Give Them Workers Guns*

Approximately two weeks later, after Victim-1 still had not agreed to pay, Johnson contacted Victim-1 yet again, writing:

*Still Playing Games Just Know When Police Leave Imma Shoot Ya Worker*

---

[7]    The surveillance video that captures the shooting (Exhibit B) is approximately 10 minutes ahead of real time, and therefore reflects the shooting at approximately 6:17 pm.

*So Be Happy The[y] Protecting Yall Faggot Goya Eating Ass Mfs*

These messages, by themselves, establish by more than a preponderance of the evidence that the firearm enhancement should apply. The meaning of these messages is plain: Johnson explicitly took responsibility for the shooting, repeatedly threatening to return to Victim-1's store to ensure that, "[t]his [t]ime," someone would be hit. Indeed, Johnson told Victim-1 to "Give Them Workers Guns," as it would "Get Ugly"—meaning Johnson would "Shoot [a] Worker" at Victim-1's store—if Victim-1 did not pay. Johnson's strained contention that these messages are "open to interpretation," see Def. Ltr. at 19-20, finds no basis in common sense or fact. Having heard Victim-1's emphatic refusals to pay, Johnson employed violence— shooting at Victim-1's occupied store—to scare Victim-1 into submission.

While those messages alone would be more than sufficient for the Court to apply the enhancement, Johnson's own statements are well-corroborated, including by cell-site data, ballistic evidence, and text messages with co-conspirators. As the defendant concedes, cell-site data places him in the vicinity of Victim-1's store at the time of the shooting. See Def. Ltr. at 15-16 (noting that cell-site data "places Mr. Johnson in the general area of the convenience store around the time of the shooting").[8] But the location data shows much more than that. See Exhibit C. As reflected in Exhibit C, attached hereto, Johnson's location data puts him in the vicinity of his home (744 Gates Avenue in Brooklyn) between approximately 5:50 pm and 5:55 pm. See Exhibit C at 1. By 6:05 pm, Johnson's cell phone has moved south, placing him directly in the vicinity of 1625 Fulton Street and Victim-1's store, where Johnson remains through the time of the shooting. See Exhibit C at 2-3. Immediately after the shooting, Johnson departs the vicinity, traveling north and west—away from the crime scene. See Exhibit C at 4.[9]

In addition, shortly before the November 12, 2020 shooting, Johnson made coded references to obtaining a firearm in text messages with co-conspirator Demetrius Johnson (hereinafter, "D. Johnson"). Specifically, on October 26, 2020, after D. Johnson committed a shooting in Brooklyn, Johnson sent a link to an article about the shooting, writing "Yea Gang Get Busy":

---

[8]    The government has never contended that cell-site data can "pinpoint" Johnson's precise location, see Def. Ltr. at 15, but rather that the data corroborates that Johnson was in the vicinity of the November 12 shooting location (and therefore not elsewhere).

[9]    The defendant's characterization of the location data as "low confidence" is misleading, at best, as that label does not speak to the reliability of the relevant cell tower and sector and used by the defendant's phone. In other words, the location data mapped in Exhibit C is reliable.





Later that same day—and less than three weeks before the November 12, 2020 shooting—Johnson asked D. Johnson to "bring" an unspecified item "over here":



Ballistics analysis confirmed that shell casings recovered from the scenes of both shootings—Johnson's November 12, 2020 shooting and D. Johnson's October 23, 2020 shooting—were fired from the same firearm.[10]  Moreover, as described above, numerous posts, photographs, and

---

[10]    Johnson contends that this ballistic evidence is unreliable because "it is not possible to determine what ballistic evidence actually is from the November 12, 2020 shooting." See Def. Ltr. at 17.  That is inaccurate.  Law enforcement recovered six shell casings from the scene of the November 12, 2020 shooting—all of which were fired from the same firearm, and which were also fired from the same firearm used in D. Johnson's October 23, 2020 shooting.  Similarly, at least three bullet fragments recovered on November 12 were fired from the same firearm—again, the same firearm used to discharge at least three bullet fragments recovered on October 23.  Only a single bullet fragment recovered on November 12 was deemed "inconclusive" when compared to the other bullet fragments recovered that day, and when compared to a bullet fragment recovered on October 23, was identified as having been

videos from Johnson's social media accounts tout his access to firearms. For instance, in the following December 22, 2020 conversation, Johnson criticizes those members who are not carrying firearms ("Aint Copp No Chops" or "Lacking"), and insists that they "Stop Spending That Money On Bitches" and instead "Cop A Fucking Gun":

**Author** Barlie Buckz (Facebook: 100003218552896)
**Sent** 2020-12-22 16:41:05 UTC
**Body** Y'all Niggas Still Aint Copp No Chops Right ?

**Author** Barlie Buckz (Facebook: 100003218552896)
**Sent** 2020-12-22 16:41:27 UTC
**Body** ViLO Gone Catch One Of U Niggas Lacking Dont Come To Me After GANGSTER

**Author** Barlie Buckz (Facebook: 100003218552896)
**Sent** 2020-12-22 16:41:44 UTC
**Body** GONE have Us Looking Bad

**Author** Barlie Buckz (Facebook: 100003218552896)
**Sent** 2020-12-22 16:42:02 UTC
**Body** Stop Spending That Money On Bitches And Cop A Fucking Gun

Johnson asserts that a "reasonable alternative explanation" for the shooting is that "the owner of the convenience store was operating an illegal gambling establishment" and that the shooting related to those "illicit activities" rather than Johnson's extortion scheme. See Def. Ltr. at 20-21. The baseless notion that an unknown perpetrator violently targeted Victim-1's store—hours after Johnson first appeared there to extort Victim-1, using a firearm shared by Johnson's co-conspirator, and while Johnson was in the vicinity—is undermined by the evidence and defies common sense. Indeed, days later, Johnson claimed credit for the shooting and explicitly threatened further violence.

Nor is a <u>Fatico</u> hearing required to resolve the parties' dispute. Though Johnson minimizes the weight of the government's proof—and disputes the appropriate inferences to be drawn from it—Johnson does not contest: (1) that he visited Victim-1's store on November 12, 2020 and demanded payment; (2) that he spoke to Victim-1's family member by phone that day; (3) that Victim-1's store was shot later that evening, and the shooting was captured on video; (4) that Johnson was "in the general area of the convenience store" at the time of the shooting; and (5) that he thereafter sent a series of threatening text messages to Victim-1, detailed above. That evidence overwhelmingly establishes Johnson's involvement in the November 12, 2020 shooting perpetrated in connection with his extortion scheme. The seven-level firearm enhancement therefore properly applies.

---

discharged from a second firearm. In short, the overwhelming ballistic evidence confirms that the firearm used to target Victim-1's store on November 12 was also used on October 23. In any event, given the overwhelming evidence detailed above, the Court need not rely on ballistic evidence to apply the firearm enhancement.

24

IV.    The Appropriate Sentence

    A.    Law

       In <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory.  The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns.  <u>Booker</u>, 543 U.S. at 220; <u>see</u> 18 U.S.C. § 3553(a).  After <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)."  <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  <u>Id.</u> at 113.

       The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable.  [The sentencing court] must make an individualized assessment based on the facts presented."  <u>Id.</u> at 49–50 (citation and footnote omitted).

       Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.  The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.  <u>See</u> 18 U.S.C. § 3553(a)(1)–(6).

    B.    Application

       The government respectfully submits that a sentence of incarceration of 168 months' incarceration, which falls within the applicable Guidelines range, would be sufficient but not greater than necessary to achieve the goals of sentencing.

       Johnson was a core and vocal member of the Bully Gang.  He promoted the gang across social media platforms and embraced the gang's primary values: touting his access to firearms and flaunting illicit proceeds brought in by robbing, extorting and otherwise victimizing innocent members of the community.  After witnessing the initial series of arrests in the instant

case—in the defendant's words, when the "Feds" were "Tryna Take All My Bullies"—the defendant was not only undeterred, he was emboldened to undertake increasingly violent criminal acts. Indeed, the August 25, 2020 robbery that Johnson committed with Gillespie occurred just a few weeks after the first indictment in this case. And shortly after Gillespie was arrested in September 2020, and after a series of superseding indictments resulted in additional arrests, Johnson began extorting Victim-1 for weekly payments. The defendant's brazen criminal conduct speaks to the depth of his loyalty to a dangerous criminal enterprise, and demonstrates that he is undeterred by the prospect of criminal consequences.

Johnson contends that his "involvement in the alleged racketeering enterprise was limited" and that his crimes were "relatively minor" compared to those of his co-defendants. See Def. Ltr. at 7, 27. Those assertions find no basis in the vast social media evidence recovered from the defendant's accounts, which reflects Johnson's deep entrenchment in the Bully Gang since at least 2017, and suggest a troubling effort to minimize the seriousness of the defendant's violent crimes. Indeed, in broad daylight on a summer day, Johnson brandished a Mac-10-style firearm with an extended clip, pointing it at helpless and frightened civilian victims on the street as Johnson demanded their money, jewelry and merchandise. Weeks later, Johnson orchestrated a shooting of an occupied bodega in Brooklyn, intended to frighten the owner into making weekly extortion payments. The notion that Johnson "never intended for anyone to be injured," see Def. Ltr. at 7, is undermined by Johnson's own actions, which inflicted lasting trauma on his many victims—and could have easily resulted in one or more deaths. A substantial term of incarceration is therefore necessary to reflect the seriousness of Johnson's crimes and to protect the public from further harm.

While Johnson's crimes may be "less serious" than the most serious charges in the case—which include two point-blank, execution-style murders committed four days apart—his crimes are nonetheless among the most serious in the case. The requested sentence would not, therefore, create any unwarranted sentencing disparities, as Johnson contends. Simply put, Johnson is not remotely comparable to the co-defendants cited in his submission, including Tyquawn Lane (who admitted to drug trafficking & money laundering), Terrell Ratliff (drug trafficking & bribery), Chrishawn Penn (drug crimes). See Def. Ltr. at 29. To the contrary, Johnson is one of the most culpable defendants—if not the most culpable defendant—that the Court has sentenced to date in the instant case. A serious sentence, well above the sentences imposed for less serious crimes, would appropriately reflect the defendant's status in the gang and his overall culpability in the case.

The defendant argues that a below-Guidelines sentence is appropriate, in large part due to his personal history and challenging childhood. The government does not discount the facts highlighted by the defendant's submission, but submits that they must be balanced against the factors set forth in 18 U.S.C. § 3553(a), including the devastating impact of the defendant's actions on his victims. Indeed, while Johnson points to his "low-income neighborhood" and exposure to street gangs as mitigating factors, notably, part of what made the neighborhood where Johnson grew up so dangerous and violent was the persistent presence of criminals, like Johnson himself, who victimize the community. A below-Guidelines sentence for Johnson's serious conduct would only undermine efforts to rid the community of violent individuals like Johnson and would continue the cycle of victimization that has plagued similar communities for decades.

The defendant also contends that a lesser sentence is warranted due to the conditions at the Metropolitan Detention Center (the "MDC") during Johnson's pretrial detention. See Def. Ltr. at 30-32. But the defendant's own criminal conduct while incarcerated—including at least eight disciplinary incidents, and one as recent as November 2024—has contributed to the conditions of confinement at the MDC, and undermine Johnson's contention that he has "reroute[d] his life away from crime" in order to "become a productive member of society," see Def. Ltr. at 4. The defendant has incurred disciplinary sanctions for, among other things: committing an assault; possessing a cell phone; possessing a dangerous weapon and hazardous tools; destroying or disposing of an item during a search; and refusing to obey orders. As the Court is aware, the possession of contraband at the MDC—including cell phones—creates substantial security issues and can wreak havoc both inside the jail and beyond the prison walls.[11] Johnson's extensive disciplinary history exemplify an ongoing unwillingness to live a law-abiding life—and he should not be entitled, at sentencing, to invoke the kind of harsh conditions that his own conduct helped to create.

Finally, unlike many defendants sentenced in this District, including some of Johnson's co-defendants in the instant case, Johnson possessed the tools to pursue legitimate employment and the judgment to distinguish right from wrong. He successfully graduated from Cobble Hill High School, receiving above average grades throughout his academic career. See PSR ¶ 123; Def. Ltr. at 3. For several years, the defendant held legitimate employment, see PSR ¶¶ 127-129, and "[t]hroughout his life," the defendant "has had strong and lost-lasting ties to both his friends and family," see Def. Ltr. at 26. The defendant, however, chose to align himself with a destructive gang, and orchestrated some of its most violent and predatory criminal rackets. A substantial term of incarceration is necessary to promote respect for the law and to send a message—to the defendant and to others—that furthering the goals of a dangerous criminal enterprise will not be tolerated.

---

[11]     Defendants also use contraband cellphones to discuss their cases, Judges and possible sentences with others, including other MDC inmates. For instance, a defendant in the instant case, United States v. Robert Holt, 20-CR-239 (BMC) (E.D.N.Y.), used a contraband cellphone to have a conversation about his possible sentencing exposure on Facebook. After Holt informed his friend that he did not yet know his sentencing Guidelines, the friend asked which Judge he was before, because "if your judge is a liberal you're walking" but "if you[r] judge is conservative, he's giving you the book."

V.    <u>Conclusion</u>

   For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 168 months' imprisonment, which would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:   /s/_____
        Drew G. Rolle
        Nicholas J. Moscow
        Lindsey R. Oken
        Joy Lurinsky
        Victor Zapana
        Assistant U.S. Attorneys
        (718) 254-7000