

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:LRO
F. #2018R00788

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 11, 2025

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Robert Holt
       <u>Criminal Docket No. 20-239 (S-8) (BMC)</u>

Dear Judge Cogan:

    The government respectfully submits this letter in advance of defendant Robert Holt's sentencing, scheduled for June 16, 2025. For the reasons set forth below, the government respectfully submits that the statutory maximum sentence—240 months' incarceration—is appropriate after considering the relevant statutory factors.

I.  <u>Background</u>

    The Bully Gang is a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York. <u>See</u> Pre-Sentence Investigation Report ("PSR") ¶ 6. The Bully Gang had many criminal rackets, including trafficking large volumes of narcotics to Maine; smuggling K2 into New York City jails; engaging in "scamming" and related acts of fraud; and committing violent crimes, including robberies, extortions, shootings and murders. <u>See</u> PSR ¶¶ 6, 8, 10. Evidence of the gang's criminal schemes—and defendant Holt's involvement in them—is set forth in the PSR and in the record of the recent trial of four of the gang's leaders and most violent members: Moeleek Harrell, Derrick Ayers, Franklin Gillespie and Anthony Kennedy. <u>See</u> <u>United States v. Moeleek Harrell, et al.</u>, 20-CR-239 ("<u>Harrell</u>").[1]

    Holt was a longstanding associate of the Bully Gang and one of the early leaders of the gang's Maine drug trafficking conspiracy. He served as a violent enforcer, physically and sexually assaulting workers and addicts involved in the scheme in order to maintain obedience—

---

    [1]  Citations to "Tr." refer to the transcript of the <u>Harrell</u> trial, and citations to "GX" refer to government exhibits admitted at trial. Certain of the government exhibits cited herein will be provided to the Court under separate cover.

and punish insubordination.  At the <u>Harrell</u> trial, cooperating witness Amanda Walton, who pled guilty to racketeering in connection with the Bully Gang, testified that she met Holt (who went by "Ghost," "Rick" or "Hustle Hard Ricky") in approximately 2015, shortly after meeting Ayers. At the time, and for more than a full year thereafter, Ayers and Holt served as the leaders of the Maine drug trafficking conspiracy, managing the scheme and operating stash houses in Portland and elsewhere.  Holt's leadership in the conspiracy waned over time, as co-defendant Bermon Clarke gradually took on an increased role, ultimately replacing Holt as Ayers's partner and co-leader.  But even after Clarke's rise, Holt continued to traffic drugs in Maine and remained aware of the increasingly substantial quantities of drugs that the gang transported and sold there.

Messages recovered from various co-conspirators' phones seized during the conspiracy reflect the extent and duration of Holt's involvement in the drug scheme.  For example, in approximately March 2018, Holt and Ayers discussed over text message their dissatisfaction with co-defendant Nia Govan, who was transporting cash and drugs for the drug scheme.  In the messages below, Holt advised Ayers that, once Ayers's vehicle (or "V") was equipped with a secret stash compartment, Ayers could "cut" Govan out altogether ("Once u get the V ready u can cut her all the way out").  In response, and consistent with the manner in which the scheme operated, Ayers stated that he did not want to broadly reveal the secret stash compartment to others ("But I don't wanna show everybody the stash"):





Holt continued to exchange messages about the drug scheme throughout 2018 and 2019, including a number of discussions with Govan about transporting drugs and cash to and from various stash house in Maine.  <u>See</u> GX 1144-BL (offering payment for Govan to make trips, including from Brewer, Maine); GX 1144-BM (arranging for a trip to Frankfort, Maine); GX 1144-BN (arranging for a cash pick-up in Winterport, Maine); GX 1144-BO (arranging for trip

to Bangor, Maine). Indeed, even in 2019, messages between Holt, Ayers, Clarke, Walton and Govan discuss their respective "portion[s] of the rent" owed for the gang's primary stash house on Wilson Street in Portland, Maine. See GX 1144-AL; see also Tr. 784-89 (Govan testimony).

Holt, along with Ayers, used physical and sexual violence (and threats of violence) to coerce compliance with the conspiracy's rules. See PSR ¶ 14. For instance, testimony at trial established that Walton and a second drug runner ("Victim-1") were assaulted with a taser after disobeying an instruction not to leave a hotel room in Portland, Maine, where Holt and Ayers were storing drugs. On one such occasion, Holt videotaped the assault and can be heard encouraging Ayers as Ayers electrocuted Victim-1 with a Taser in the bedroom of a trap house. See GX 1102-D.1 (attached). As depicted in that video, after Ayers began to electrocute her, Victim-1 fell, screamed in pain, and repeatedly begged Ayers to stop (crying "stop" and "please don't"), insisting that she was "sorry" as Ayers continued to electrocute her. Holt's voice can be heard in the background, encouraging Ayers: "That wasn't enough! That wasn't enough!" Ayers continued electrocuting Victim-1, and Holt's voice can be heard saying, "one more time!" and "no fucking games!" Holt also asked Ayers to "pass" the Taser, and stated, "let me get that!" before turning off the video recording. Holt later sent Ayers a copy of the video. See GX 1102-D.[2]

On another occasion, Holt violently punished Walton—who was then addicted to drugs, and serving as a drug runner—after she ran off with drugs and cash belonging to Holt and Ayers. As a threat, Holt sent Walton a photograph of her mother's house. Later, Ayers brought Walton from Maine down to New York, after taking her phone and refusing to tell her where they were headed. Ayers ultimately brought her to 1625 Fulton Street in Brooklyn, the de facto Bully Gang headquarters. Once there, Ayers lured Walton to a back bedroom, where Holt was hiding. Holt then violently assaulted Walton, "dragging [her] around by [her] hair" and "punching" her, telling Walton that she "shouldn't have fucking stole from him." See Tr. at 1256. Afterwards, Holt bragged that that he "almost killed her." Id.[3]

Holt was widely feared by the women employed by the drug conspiracy. Multiple witnesses reported experiencing, witnessing, and/or learning of incidents of physical and sexual assault perpetrated by Holt—including by overhearing Holt joking about committing at least one

---

[2]     Holt also received, via text message, a video of Ayers, Clarke, and co-defendant Avery Goodluck violently confronting an individual in a stairwell over a drug debt. See GX 1128-E.1; 1128-E.1-T. In the video, the victim stands on a staircase, boxed in above and below, with his back against the wall. Ayers repeatedly brandishes a gun, as the victim insists that he is just trying to "clear [his] debts." Id. During the altercation, the co-conspirators intimidate the victim and accuse him of "fuck[ing] up" their money (or "bread"), before Ayers violently assaults the victim, knocking him to the ground. Id.

[3]     After the assault, Walton learned that Holt had discussed the assault in advance, including with Goodluck, who expressed annoyance that Holt had hit Walton in the face since the bruises might draw unwanted attention during their "scamming" trips. See Tr. 1257 ("I remember [Goodluck] making a comment to [Holt] about, like, I told you you couldn't hit her in the face . . . because he can't make me bruised while I was scamming.").

3

sexual assault.  Holt sexually assaulted and engaged in forcible rape of multiple victims.  See PSR ¶¶ 14, 19.

In June 2020, multiple defendants were arrested on the initial indictments in this case, including Harrell, Ayers, and co-defendant Paul Harris.  The same day, multiple searches were conducted at locations used by the participants in the drug trafficking scheme, resulting in seizures of more than 550 grams of crack cocaine, more than 800 grams of fentanyl, and nearly 6,000 grams of powder cocaine.  On July 7, 2020, Harris called Holt over a recorded telephone at the Metropolitan Detention Center (the "MDC").  During that call, Holt inquired about the "conspiracy charge" and whether Harris knew other potential targets in the case, and expressed concern about law enforcement surveillance.

In February 2021, Holt was charged in the instant case with conspiring to distribute crack, heroin and fentanyl (Count Two of the S-8 Indictment).  On March 20, 2024, the defendant pled guilty, without a plea agreement, to that charge.

II.    The Applicable Range Under the United States Sentencing Guidelines (the "Guidelines")

The parties agree on the Guidelines calculation set forth below:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. §§2D1.1(a)(5), 2D1.1(c)(2)) | | 30 |
| Plus: | Dangerous Weapon (U.S.S.G. § 2D1.1(b)(1)) | +2 |
| Plus: | Use of Violence (U.S.S.G. § 2D1.1(b)(2)) | +2 |
| Plus: | Maintained a Premises (U.S.S.G. § 2D1.1(b)(12)) | +2 |
| Plus: | Use of Fear, Criminal Livelihood (U.S.S.G. § 2D1.1(b)(16)(A), (E)) | +2 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1) | +3 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3B1.1) | -3 |
| Adjusted Offense Level: | | 38 |

With an offense level of 38 and a Criminal History Category of I, the applicable Guidelines range is 235 to 293 months.[4]

III.    The Appropriate Sentence

A.    Law

In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory.  The Court made clear that district courts are

---

[4]    Because the statutory maximum term of imprisonment is 20 years, the defendant's effective Guidelines range is 235 to 240 months.

still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns.  Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a).  After Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable.  [The sentencing court] must make an individualized assessment based on the facts presented."  Id. at 49–50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.  The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a)(1)–(6).

B.    Application

The government respectfully submits that a sentence of incarceration of 240 months would be sufficient but not greater than necessary to achieve the goals of sentencing. While it is the statutory maximum, that sentence falls towards the low end of the applicable Guidelines range of 235 to 293 months.

With respect to the nature and circumstances of the offense, the count of conviction by itself—narcotics trafficking conspiracy—does not fully capture the brutal and graphic nature of the defendant's offense conduct.  But his substantial Guidelines range appropriately reflects the egregious manner in which he operated a long-running, sophisticated, and expansive drug operation, using dangerous weapons, violence, threats, and fear to control his vulnerable workforce.

As during the Harrell trial, Holt used violence and fear to enforce the rules of the drug trafficking conspiracy, which routinely depended on abuse and manipulation tactics to

maintain control over its workforce—a workforce that included drug addicts, sex workers, incarcerated inmates in need of bail money, and other vulnerable recruits. Violence was used to coerce compliance with the conspiracy's rules and to punish those who jeopardized the successful (and undetected) operation of the drug business. For instance, as detailed above, Holt and Ayers used a Taser to electrocute drug runners, including as punishment for disobeying an instruction not to leave a hotel room where Holt and Ayers were storing drugs. During one incident that was captured on video, Holt, aware of the impending assault, began to film before the violence began. In the video, as the worker begged Ayers to stop, Holt sadistically egged Ayers on: "that wasn't enough!"; "one more time!"; "no fucking games!" See GX 1102-D.1. Eventually Holt asked Ayers to "pass" the Taser—stating "let me get that!"—before ominously shutting off the video recording. Holt and his co-conspirators also used and trafficked firearms in connection with the drug conspiracy, and Holt personally participated in securing at least one firearm, using a straw purchaser in Maine.

Holt was widely feared by workers, who were aware of his penchant for physical and sexual violence. At least one such violent assault was detailed in the trial testimony of Amanda Walton, who was kidnapped by Ayers and brought from Maine to Brooklyn, where Holt assaulted her in a bedroom at 1625 Fulton Street. During the assault, Holt was "dragging [Walton] around by [her] hair" and "punching" her, telling Walton that she "shouldn't have fucking stole from him." See Tr. at 1256. Afterwards, Holt bragged that that he "almost killed her." Id. In addition, as noted above, multiple witnesses reported experiencing, witnessing, and/or learning of incidents of physical and sexual assault perpetrated by Holt. Violence (and threats of violence) served as a core component of Holt and Ayers's business model and enabled them to run a sophisticated and lucrative drug trafficking operation that, for many years, largely evaded law enforcement detection. Indeed, for those years, many of the defendant's crimes were committed with impunity.

The defendant's Guidelines range also reflects his role as an early leader in the conspiracy (alongside Ayers), as described by multiple witnesses at the Harrell trial. And while Holt's leadership role waned over time (as Clarke emerged as Ayers's new partner), Holt remained involved in the Maine drug trafficking scheme—including by utilizing the gang's tools, stash houses, and other resources. Indeed, notwithstanding the defendant's emphasis that he was "not a member of the Bully Gang," see ECF No. 2233 ("Def. Ltr.") at 8, he was a longstanding associate of the gang with considerable and high-level involvement in the gang's Maine drug trafficking racket. Text messages and other cell phone evidence reveal the scope of the defendant's association with the gang and its members, associates, and workers—including the gang's leader, Moeleek Harrell, as well as Ayers,[5] Clarke, Tiri Brown (or "Tyhoe"), Paul Harris, Govan, and Walton. See, e.g., GX 1110-BA (message from Harrell to Holt stating,

---

[5]    The defendant's criminal association with Ayers dates back to at least 2006, when Holt and Ayers were arrested for second-degree robbery (displaying what appears to be a firearm) and second-degree criminal possession of a weapon. Holt pleaded guilty in 2007 to attempted robbery in the second degree, a felony conviction. While he was sentenced to probation, during the term that followed, at least two bench warrants were issued—one in 2009 and one in 2011—and the defendant was labeled a "probation absconder."

"Yoooo this da BULLY").  Holt's telephone number was stored in at least 18 devices recovered by law enforcement agents during the investigation.  See GX 7000.

Though the defendant contends that he "not pursuing wealth and power," see Def. Ltr. at 10, his contemporaneous communications paint a very different picture.  For instance, the photograph below, sent from Holt to Ayers in December 2018, shows a diamond-encrusted watch and pendant (with the insignia for "HH," or "HustleHard,") alongside a stack of cash:




See GX 1102-E.  And while the defendant's submission emphasizes his ability and desire to pursue legitimate employment,[6] those contentions only highlight that, despite possessing the tools to live a law-abiding life, the defendant chose to align himself with a destructive gang, helping to orchestrate its most lucrative criminal racket and engaging in violent and predatory conduct in furtherance of the scheme.

The defendant's submission also emphasizes that he is "charged in Count 2 alone" and is "not named in any other charge in the 43-count indictment."  See Def. Ltr. at 1, 7.  That is true—but at best, inconsequential.  As reflected in his substantial Guidelines range, the defendant's conduct is far more egregious than that of similarly charged co-defendants.  See Def. Ltr. at 9 (remarking that the defendant's Guidelines range is "startlingly high").  And to the extent the defendant suggests that the Court should limit its consideration of the offense conduct to drug trafficking activity alone—ignoring *how* the defendant operated the drug business—that suggestion is fundamentally inconsistent with the law; indeed, the Guidelines expressly contemplate that "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."  See U.S.S.G. § 1B1.3, Background; see also U.S.S.G. § 1B1.3(a) (defining "relevant conduct" to

---

[6]     The defendant's submission highlights his employment with recording artist Jermaine Coleman, also known as "Maino."  See Def. Ltr. at 7.  Maino, who was present in the courtroom for portions of the Harrell trial, previously served a substantial term of incarceration for attempting to kidnap a drug dealer.  As set forth in the May 14, 2025 Addendum to the PSR, the defendant has been unable to provide documentation or otherwise "corroborate his employment for the rapper 'Maino.'"

include, among other things, "all acts and omissions committed, aided, counseled, commanded, induced, procured, or willfully caused by the defendant" as well as certain "acts and omissions of others"). Nor is the defendant entitled to a sentencing benefit simply because, relative to certain co-defendants, he is substantially undercharged. See Def. Ltr. at 7, 8 (noting that the defendant "engaged in none of the violent crimes alleged in the indictment").

The defendant also contends that a lesser sentence is warranted due to the "deplorable conditions at MDC Brooklyn" during his pretrial detention. See Def. Ltr. at 8. But the defendant's own criminal conduct while incarcerated has contributed to the conditions of confinement at the MDC—and also undermine Holt's contention that he is a "family man" who is prepared to live a "relatively quiet life," see Def. Ltr. at 10. The defendant has twice incurred disciplinary sanctions for possessing a hazardous tool—on one occasion, a screwdriver that was wrapped in a bag and concealed in a box of "Velveeta" cheese. On another occasion, a cell phone was recovered from inside of a sock that was wedged between the defendant's locker and the wall. Photographs posted to Instagram (including with co-defendant Ayers, shown below) reflect Holt's continued use of cell phones at the MDC:

 

Additional Meta records, from as recent as 2024, show that Holt used a contraband cell phone while detained to have a conversation about his possible sentencing exposure on Instagram (using his "rickyhustlehard" account):

> **Author** dannyboyhustlehard (Instagram: 1968646975)
> **Sent** 2024-02-15 13:56:26 UTC
> **Body** Have you gotten any news yet?
>
> **Author** dannyboyhustlehard (Instagram: 1968646975)
> **Sent** 2024-02-15 13:56:35 UTC
> **Body** What's the story wit these clowns
>
> **Author** rickyhustlehard (Instagram: 19413581)
> **Sent** 2024-02-15 13:56:52 UTC
> **Body** I'm about to go to court and plea to the charge
>
> **Author** rickyhustlehard (Instagram: 19413581)
> **Sent** 2024-02-15 13:57:04 UTC
> **Body** Hopefully I get sentences be4 April
>
> **Author** dannyboyhustlehard (Instagram: 1968646975)
> **Sent** 2024-02-15 13:57:18 UTC
> **Body** What's the guideline
>
> **Author** dannyboyhustlehard (Instagram: 1968646975)
> **Sent** 2024-02-15 13:57:21 UTC
> **Body** Range
>
> **Author** rickyhustlehard (Instagram: 19413581)
> **Sent** 2024-02-15 13:58:01 UTC
> **Body** 0-20 years

Tellingly, Holt expressed that he hoped to be sentenced before April 2024—the time period that the Harrell trial was expected to begin[7]—exposing his concerns about the testimony and evidence that might come out. After learning of Holt's Guidelines range, Holt's friend assured Holt that he is "not getting 20 years," but offered, "[i]f you have your judge[']s name, I can tell you right away what you're getting," noting: "If your judge is a liberal you're walking" but "If you[r] judge is conservative, he's giving you the book." Holt supplied the name of his sentencing judge ("Cogan"), prompting the following response:

---

[7]        The Harrell trial was original expected to begin on February 26, 2024, but on February 8—one week before the above messages—jury selection was adjourned to March 25, 2024, with trial to commence immediately thereafter.

**Author** dannyboyhustlehard (Instagram: 1968646975)
**Sent** 2024-02-15 14:04:45 UTC
**Body** Hold on let me see what President made him

**Author** dannyboyhustlehard (Instagram: 1968646975)
**Sent** 2024-02-15 14:05:24 UTC
**Body** Fuck

**Author** dannyboyhustlehard (Instagram: 1968646975)
**Sent** 2024-02-15 14:05:29 UTC
**Body** I don't even wanna give you the news

Holt then received a screenshot of the Wikipedia page for "Brian Cogan" show below (annotation in original):



The following commentary ensued:

> **Author** rickyhustlehard (Instagram: 19413581)
> **Sent** 2024-02-15 14:05:40 UTC
> **Body** Lol I already know
>
> **Author** dannyboyhustlehard (Instagram: 1968646975)
> **Sent** 2024-02-15 14:05:48 UTC
> **Body** A Republican conservative redneck fuck
>
> **Author** dannyboyhustlehard (Instagram: 1968646975)
> **Sent** 2024-02-15 14:05:55 UTC
> **Body** George Bush made him

Holt advised his friend that "Ppl say he fare [sic]," noting that Holt had tracked the sentences of his co-defendants in the case:  "He been going like 12-20 months under everybody guide line who's on my case."

   As the Court is aware, the possession of contraband at the MDC—including cell phones—creates substantial security issues and can wreak havoc both inside the jail and beyond the prison walls.  And here, Holt's disciplinary history exemplifies those issues and demonstrating his ongoing unwillingness to live a law-abiding life.  Holt should not be entitled, at sentencing, to invoke the kind of harsh conditions that his own conduct necessitated and created.

   Finally, the defendant's sentencing submission reflects that he is "widely loved and appreciated" by friends and family.  See Def. Ltr. at 9.  The government has no reason to dispute that—like many defendants who are sentenced in this district—Holt is beloved by many people in his life.  But that portrayal stands in stark contrast to the person the defendant was, for years, in the context of the Bully Gang's drug trafficking racket.  To the participants in that scheme, the defendant was widely feared.  He was ruthless.  He was physically, mentally and sexually abusive.  He gleefully took part in episodes of extreme violence.  And he targeted drug addicts, sex workers, and other vulnerable participants in the scheme.  The maximum term of incarceration is warranted.

11

IV.    <u>Conclusion</u>

   For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 240 months' imprisonment, which would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

<div style="margin-left:40%">

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

</div>

By:  /s/_____
       Nicholas J. Moscow
       Lindsey R. Oken
       Joy Lurinsky
       Victor Zapana
       Assistant U.S. Attorneys
       (718) 254-7000