NJM:LRO
F. #2018R00788

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DERRICK AYERS,
    also known as "Dee" and "Mel,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 20-CR-239 (S-8) (BMC)


THE GOVERNMENT'S SENTENCING MEMORANDUM


                    JOSEPH NOCELLA, JR.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201


Nicholas J. Moscow
Lindsey R. Oken
Joy Lurinsky
Victor Zapana
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.    Factual Background ................................................................................................. 2

      A.    Ayers's Membership in the Bully Gang................................................... 2

      B.    Violence Targeting Chris King: Murder Conspiracy and Attempted Murder ....... 7

      C.    Violence Targeting the Stukes Crew: Murder Conspiracy, Attempted Murders, and Murder of Jonathan Jackson ........................................................... 10

            1.    October 1, 2017 Shooting............................................... 11

            2.    March 3, 2018 Murder of Jonathan Jackson................................. 14

            3.    June 26 & June 27, 2018 Shootings ........................................ 21

      D.    Other Gun Crimes.................................................................. 24

      E.    Drug Trafficking & Money Laundering ............................................. 25

      F.    Obstructive Conduct .............................................................. 28

      G.    Involvement in Other Bully Gang Crimes .......................................... 30

II.   The Applicable Range Under the United States Sentencing Guidelines (the "Guidelines") 31

III.  The Defendant's Objections to the PSR ............................................................. 35

IV.   Forfeiture............................................................................................. 42

      A.    Applicable Law.................................................................... 42

      B.    Application ...................................................................... 45

V.    The Appropriate Sentence.......................................................................... 46

      A.    Applicable Law.................................................................... 46

      B.    Application ...................................................................... 48

VI.   Conclusion ........................................................................................... 53

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in advance of defendant Derrick Ayers's sentencing, scheduled for April 22, 2026.  After a 13-week trial, Ayers was convicted of 18 counts—including racketeering, drug trafficking, money laundering, several gun crimes, and various violent crimes in-aid-of racketeering.  In connection with his racketeering conviction, the jury found that the government had proven all six racketeering acts in which Ayers was named, including, among other things, drug trafficking, money laundering, murder conspiracy, and the March 3, 2018 murder of Jonathan Jackson.[1]

Ayers was a core member of the Bully Gang who, for five years, sat atop the gang's most complex, sophisticated, and lucrative drug trafficking racket.  He used fear and violence to control his vast and vulnerable work force.  He routinely carried and used guns to instill fear and to protect his drug business.  He hunted down gang rivals in furtherance of multiple long-running murder conspiracies.  And, as proven at trial, he murdered Jonathan Jackson, who was gunned down and left to die on the side of a busy Brooklyn highway.  For these reasons, and for additional reasons set forth below, the government respectfully submits that life imprisonment is appropriate.

---

[1]     Ayers was acquitted of one count of maintaining a stash house (7 Center Road, Searsport, Maine), in violation of 21 U.S.C. § 856.  The jury also hung on one count, charging Ayers with causing the death of Jonathan Jackson through use of a firearm, in violation of 18 U.S.C. § 924(j), although, as noted above, the jury found that the government had proven the corresponding racketeering act relating to the Jackson murder.  The jury also convicted Ayers of discharging a firearm, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), in connection with the Jackson murder.

## I.    FACTUAL BACKGROUND

Defendant Derrick Ayers, also known as "Dee" and "Mel," was a loyal and years-long member of the Bully Gang.    As the Court is well aware, the Bully Gang is a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York.  See Pre-Sentence Investigation Report ("PSR") ¶ 22.  The gang had many criminal rackets, which included trafficking large volumes of narcotics and committing violent crimes, such as robberies, extortion, assaults and murders.  PSR ¶¶ 22, 24.  Evidence of the gang's criminal schemes is detailed below and set forth in the record of Ayers's 2024 trial, along with co-defendants Moeleek Harrell, Franklin Gillespie and Anthony Kennedy.  See United States v. Moeleek Harrell, et al., 20-CR-239 ("Harrell").[2]

### A.  Ayers's Membership in the Bully Gang

Ayers was a longtime, trusted member of the Bully Gang who orchestrated violence on the gang's behalf and who served as the leader of the gang's most lucrative drug trafficking racket.[3]

As reflected extensively in social media evidence, Ayers was often depicted and tagged in posts accompanied by the hashtag "#BullyGang," along with other references to the gang.  See, e.g., GX 1213-G, 1213-F, 1213-H, 1214-AA, 1216-B.  A selection of those exhibits is set forth below, including multiple photographs of Ayers with fellow Bully Gang members (left), along with corresponding captions and comments invoking the gang (right):

---

[2]    Citations to "GX" and "Trial Tr." refer to government exhibits and transcript citations from the Harrell trial.

[3]    While Ayers continues to deny any association with the Bully Gang, see ECF No. 2459 ("Def. Ltr.") at 4, the evidence at trial (some but not all of which is detailed herein) overwhelmingly established his longstanding membership in the gang—and indeed, the jury convicted him of racketeering.





bg.ac3_b0000gy Never Hate Just Wait Your Turn !!!!!
#AllWHITEDUSSE
#AllWhiteParty
#BullyGang
#YoungKings
#Brooklyn
#StuyIsh





bg.ac3_b0000gy Rooklyn
#BUlly Ang
#AllWhiteParty

Liked by 1625dee and 547 others

MAY 15, 2015





bg.ac3_b0000gy Happy BirthDay Bro Bro
You Already Know This Our Year
BULLY ANG
#4EveryKingMarly
#4EverDee
#4EverRah

3




These social media posts, dating back as early as 2015, show Ayers with fellow Bully Gang members, including the gang's founder and leader, Moeleek Harrell, and deceased Bully Gang co-founder Charles Williams, also known as "YB."  In the associated captions, both Harrell ("bg.mo3mon3y") and Williams ("bg.ac3_b0000gy") explicitly referenced the gang, including by using a stylized "B" and a gas can emoji (signifying the letter "G").

Ayers's own social media accounts (such as "1625dee"—a reference to the gang's de facto headquarters at 1625 Fulton Street in Brooklyn) contain posts and other activity that celebrate the gang and its members, including Harrell:

4







See, e.g., GX 1238-B, 1238-A, 1216-B. In his own posts, Ayers explicitly references the gang, including by using the hashtag "#bullyseason" in a caption celebrating Harrell. Other Bully Gang members similarly recognize Ayers as a member of the gang, referring to him as a "Bully Brother[]," and tagging him in posts of Bully Gang members with Bully Gang captions—even when Ayers does not personally appear in the posted photograph.

Ayers was revered and valued by even the most senior members of the gang. For instance, on March 4, 2018—the day after Ayers murdered Jonathan Jackson—Harrell praised Ayers during a recorded jail call with incarcerated Bully Gang member Joell Joyce. See GX 2040-A. During that call, Harrell gleefully advised Joyce that Ayers was "super super sturdy," a "banimal" (a blend of "Bully" and "animal," implying that Ayers was both), and "one of us."

As set forth in more detail below, Ayers is responsible for serious and deadly acts of violence on behalf of the gang. Along with Harrell, Ayers orchestrated multiple long-running murder conspiracies targeting gang rivals—including Chris King and Christopher Stukes—

6

which spawned at least four separate shootings proven at trial: two in a single day (on October 1, 2017), and two on consecutive days in June 2018. In the midst of the Stukes murder conspiracy, on March 3, 2018, Ayers shot and killed Jonathan Jackson in a residential Brooklyn neighborhood. Ayers was also the leader of a sophisticated, widespread, and tremendously lucrative drug trafficking and money laundering scheme, which relied on drug addicts and other vulnerable workers who were physically, psychologically, and sexually abused in order to maintain obedience and punish insubordination.

B. Violence Targeting Chris King: Murder Conspiracy and Attempted Murder

The Bully Gang's rivalry with Chris King began as early as 2015. In September 2015, Bully Gang co-founder Charles Williams, known as "YB," was shot and killed following an exchange of gunfire between Williams and King. See GX S-11.[4] Williams was a beloved member of the gang, see, e.g., GX 1214-AJ, and after his death, members of the gang called for revenge. See GX 1234 (post by co-defendant and Bully Gang member Rashaad Craig, from account "bg_rahskeeno," stating: "BULLY GANG We all Bosses!! Rip BroBro  Revenge is DA Key").

Ayers, along with Harrell, led the charge in hunting down Chris King. For instance, in September 2017, Ayers researched King's whereabouts, including King's upcoming court appearances, and sent his findings to his co-conspirators:

---

[4]     Williams shot at King outside of a hookah bar in Queens but did not strike King. King then returned fire, fatally striking Williams. King was charged only with criminal possession of a weapon, after state law enforcement officers and prosecutors determined that the Williams homicide was justified.



Days later, Harrell confronted King at a Queens County courthouse—and transmitted a photograph of King, standing in line, to Ayers and others:




See GX 1111-AC, 1111-BC, 1111-AF; see also Trial Tr. 2188 (King's attorney testifying that, shortly before King was shot, King was confronted "inside a courthouse in Queens" and "became alarmed").

Ayers continued to exchange messages about King's whereabouts, including in a series of September 27, 2017 messages to Harrell, in which Ayers relayed a location near King's

address in Elmont, Queens, along with an instruction for Harrell to "[f]ill up before you get

there":

 

See GX 1111-BC.

Days later, on October 1, 2017, Chris King and another victim, Renea Maragh,

were shot outside of a restaurant in Queens as they were leaving brunch. See GX 2053 (911

call), 2534 (video). After the shooting, King's vehicle was riddled with bullet holes:



See GX 60-P. Maragh testified at trial that, as she drove King to the hospital, with King

bleeding from his leg—and Maragh herself in a "blacked out" state—Maragh realized that she,

too, had been shot.  See Trial Tr. 2470-71.  Maragh suffered a gunshot wound to her abdomen and associated organ damage, which resulted in a week-long hospital stay.  See Trial Tr. 2471; GX 2234.

The shooting was perpetrated using Ayers's vehicle—a Kia Cadenza equipped with a trap compartment that, when later searched, contained a gun and a magazine.  See GX 1823 (vehicle registration to Derrick Ayers); GX 84 (Kia search photographs).  In addition, a tracking device purchased by Ayers—to facilitate the gang's criminal rackets—showed the Kia's travel from Brooklyn to the shooting location in Queens.  See GX 1883-B (tracker purchase information, listing "Derrick Ayers" as the "Name on Card" and "1625 fulton st" as the shipping address); GX 7003 (maps showing the tracker in the vicinity of the shooting).

For those crimes, Ayers was convicted of murder conspiracy, assault in-aid-of racketeering, and unlawfully discharging a firearm.

C.  Violence Targeting the Stukes Crew: Murder Conspiracy, Attempted Murders, and Murder of Jonathan Jackson

In addition to the gang's rivalry with Chris King, Ayers and the Bully Gang were also engaged in a years-long gang war and murder conspiracy, targeting Christopher Stukes (also known as "Gutta") and Stukes's crew.  At trial, the government presented evidence of three additional shootings as part of that gang war: one on October 1, 2017 (the same day that King and Maragh were shot), and two on consecutive days in June 2018.  As discussed further below, between those two sets of shootings, on March 3, 2018, Ayers shot and killed Jonathan Jackson, an associate of the Stukes Crew.

For those crimes, Ayers was convicted of murder conspiracy, assault in-aid-of racketeering, and unlawfully discharging a firearm.  The jury also determined that the racketeering act relating to the murder of Jonathan Jackson was proven.

10

*1. October 1, 2017 Shooting*

In the weeks leading up to the October 1, 2017 Stukes shooting, Ayers and Harrell exchanged a number of messages regarding Stukes's whereabouts, including messages to bring along a "chop" (gun).  When later searched by law enforcement, Harrell's phone contained a wealth of information about Stukes, including photographs, social media posts, location information, family members, and personal identifiers:

  

<u>See</u> GX 1111-AD.

Less than one hour before the shooting, Ayers texted Harrell the license plate number for Stukes's vehicle ("X28gam"), and moments later, at 12:01 am, Harrell sent Ayers a photograph of the back of Stukes's car, in which Stukes's plate—matching the plate number sent by Ayers—is partially visible.  <u>See</u> GX 1111-BC (text conversation between Ayers and Harrell); 1839 (Stukes vehicle record); 1887-A (same).

11









Shortly thereafter, as reflected on surveillance video, Ayers's Kia was used to commit the shooting on Prospect Place, one block away from Stukes's home. See GX 2402 (video); GX 1887-C, 312-B, S-3 (records reflecting Stukes's home address). Once again, the

12

tracker purchased by Ayers captured the Kia's movements—traveling from a memorial for YB (Charles Williams) directly to Prospect, where the shooting occurred.  See GX 7003.



At least 17 shell casings and 11 bullet fragments were recovered from the scene, including two stray bullets that hit a parked car.

Days later, a video of the shooting, depicting Ayers's Kia, was shown on at least one televised news broadcast.  Members of the gang circulated the video clip, and Ayers, in a message to Bermon Clarke, stated: "it's over for my car":



13

See GX 1111-BD.1 (news clip video); 1111-AF (message from Harrell to Bully Gang member Ronald Davis); 1111-BD (message from Harrell to Ayers); 1128-D (message from Ayers to Clarke).

In the weeks that followed, the gang continued to circulate messages and social media posts regarding Stukes, see GX 1128-F, and in November 2017, Ayers sent a message to Bully Gang member Joell Joyce in which Ayers bragged about bullet holes that he put through the windshield of his own car.

In February 2018, the Stukes Crew retaliated by firing shots at Harrell as he, co-defendant Nehemie Eril, and co-defendant (and Bully Gang member) Ronald Davis ("Ronno"), drove on the Palisades Parkway in New Jersey. See GX 2004 (jail call in which Harrell discusses the shooting).

### 2. *March 3, 2018 Murder of Jonathan Jackson*

Following the February 2018 shooting on the Palisades, the Bully Gang ramped up its efforts to target the Stukes Crew. On March 3, 2018, after a shootout on Kings Highway in Brooklyn, Ayers chased and gunned down Stukes associate Jonathan Jackson, who was killed.

The gang's ongoing efforts to hunt Christopher Stukes are reflected in text messages in the days leading up to Jackson's murder. For instance, on March 1, 2018—two days before Jackson's murder—Ayers (stored as "Buzzin Dee" in Harrell's phone) received a text from Harrell about Stukes's whereabouts:

14



See GX 1110-AO (referring to Stukes as "Long head").

Two days later, on March 3, 2018, Ayers attended a gender reveal party for Harrell and his then-girlfriend (and now co-defendant) Eril. The events before and after the party were largely captured on surveillance video. See GX 2497 (compilation video of the Jackson murder). Ayers arrived at the venue wearing a distinct white sweatshirt and carrying a backpack—which was brought into the bathroom by Bully Gang member (and co-defendant) Paul Harris, and then passed back to Ayers, who kept the backpack on his person for the remainder of the evening.

After leaving the venue at the end of the evening, Ayers—still carrying his backpack—crossed Kings Highway, entered the driver's side of his vehicle (a white Dodge Durango), closed the door, and started the engine. Seconds later, audible gunshots were fired by Jackson (and/or a co-conspirator), targeting Harrell and members of the Bully Gang. After a few seconds, Jackson and his co-conspirator retreated, and their getaway vehicle began to pull forward. After the gunshots stopped, Ayers can be seen exiting his vehicle carrying his backpack, recrossing Kings Highway—a busy, two-way road—and running halfway down the block, pursuing Jackson. Jackson did not fire any shots during Ayers's pursuit. See GX 2497.

15

As Ayers approached a corner, he fired several shots; the sounds of his gunshots, along with the muzzle flashes, were captured on video. As Jackson fled, Ayers continued to give chase, firing at least 15 shots before coming to a stop over Jackson's fallen body. Jackson's autopsy results confirm that he was shot 16 times, and that six of his gunshot wounds were on the back of his body. According to the testimony of the medical examiner, several of the bullets traveled back to front and upward—meaning, the gun was fired from below the entrance wound, as if someone were standing over Jackson's prostrate body while firing. See Trial Tr. 2649, 2662.

Ayers's pursuit of Jackson was also reflected in the crime scene evidence, which included a trail of 15 shell casings along Ayers's running path, ending in the vicinity of Jackson's body (depicted below on the left). By contrast, three shell casings from Jackson's .40-caliber firearm were recovered, in a location confirming that—after the initial round of shots—Jackson stopped firing and fled (depicted below on the right).

16



See 74-B.2 (left) (Ayers's shell casings); GX 74-B.1 (right) (Jackson's shell casings).

Several of Jackson's wound tracks also contained blue plastic, consistent with bullets from Ayers's firearm of choice: a Fabrique Nationale (or "FN") Herstal:

17




Evidence recovered from Ayers's phone revealed images of FN firearms, searches for "FN Mac," and web history for a video review of an FN pistol (which Ayers later tried to delete). See GX 1107-BE, 1107-BF, 1108-BB. In addition, an FN clip and blue-tipped FN ammunition were recovered from Ayers's Kia—the same Kia used in both October 1, 2017 shootings—when the vehicle was later searched. A magazine and FN firearm (with a blue-tipped round) were also recovered from 1245 Main Street in Rahway, New Jersey (where Ayers and Clarke resided), and a high-capacity magazine of FN ammunition was also recovered from the gang's primary stash house located at 101 Roosevelt Avenue in Carteret, New Jersey. See GX 83-A, 84-AV, 112-AY, 112-BD.




18

 

At trial, a firearms expert testified that the FN firearm used by Ayers is both expensive and rare; it is designed to accommodate a high-capacity magazine, and intended for military and law enforcement use.  The distinct FN ammunition used by Ayers—with specialty blue tips—is a high-velocity round used for sporting and hunting.  See Trial Tr. 2915-36.

After murdering Jonathan Jackson, Ayers fled the scene and drove to Tracy Turner's (Harrell's mother) apartment in Far Rockaway—the same location where Ayers's Kia traveled after it was used in the October 1, 2017 shooting of Chris King and Renea Maragh. While in Far Rockaway, Ayers changed his clothes—removing his distinctive white sweatshirt— and undertook efforts to conceal his involvement in the murder.  See GX 2497.  Among other things, Ayers asked co-defendant Christina Estevez to send updates from CitizenApp, and told Estevez that he was hiding his car because he did not want to "leave it out on the street."  See GX 1108-AH.  Evidence from Ayers's cell phones also reflected searches for news articles related to the murder, along with a search for "how to get rid of gunpowder residue."  See GX 1107-BI, 1108-BC, 1108-BN.  Ayers also sent Harrell a news article indicating that a suspect's photo—a photographs of Ayers's own face—has been released:



See GX 1108-BO.  Less than one week after the Jackson murder, on March 9, 2018, both Ayers

and Harrell changed their phone numbers.

In the ensuing weeks and months, Ayers and Harrell continued their search for

Christopher Stukes, including by looking up parking tickets and license plates, and exchanging

information about Stukes's whereabouts.  For example, in May 2018, Harrell sent Ayers the

address for a location on the corner of Stukes's new block in Bayonne, New Jersey, and the

following day, Ayers sent Harrell a photograph of a building in Bayonne:







These and other similar messages continued throughout May and June of 2018, at which point

Ayers and Harrell orchestrated two additional shootings targeting the Stukes Crew, described

below.  See GX 1108-BP, 1155-C.

### 3.  June 26 & June 27, 2018 Shootings

The next two shootings targeting the Stukes Crew occurred on consecutive days

in June 2018.  Both occurred in the Stukes's neighborhood in the Crown Heights section of

Brooklyn—the same vicinity as the October 1 shooting that similarly targeted the Stukes Crew.

On June 26, 2018, shots were fired on Prospect Place, one block away from

Christopher Stukes's address.  License plate reader records, cell site data, and other location data

21

tracked Harrell as he traveled from Connecticut, where he lived at the time, to Brooklyn, arriving near 1625 Fulton Street shortly after 11:00 pm. Location data similarly placed Harrell in the immediate vicinity of the crime scene, near Prospect Place, after which Harrell returned to Fulton Street before fleeing Brooklyn and returning to Connecticut, shortly after 1:00 am. Harrell and Ayers were in regular communication during the hours surrounding the shooting—including at 1:01 am and 1:07 am—though Ayers deleted the communications from his call log. See, e.g., GX 1108-BE, 1108-CG.

Less than 24 hours later, on June 27, 2018, Ayers and Harrell again tried to target the Stukes brothers—again, within one block of Christopher Stukes's home address. Location data, including license plate reader records and cell site data, show that Harrell once again traveled from Connecticut to Brooklyn to commit the shooting, with his cell phone pinging a tower in the immediate vicinity of the crime scene.[5] Although Ayers was in Maine during the June 27 shooting, a detailed account of his cell phone activity—much of which Ayers attempted to delete—captured Ayers's coordination with Harrell before and after the shooting, which occurred at approximately 11:15 pm. See GX 7008. Among other things, that electronic evidence reflects:

- Dozens of phone calls and deleted messages between Ayers and Harrell from the hours before and after the shooting;

- At 10:38 pm, Harrell received a text message from Bully Gang member Melquan Jackson that read: "HRR3669" (which is the license plate number for Anthony Stukes's Jeep, with a registered address on Utica Avenue);

---

[5] A sweatshirt with Harrell's DNA was also recovered from the sidewalk in the vicinity of the shooting. See GX 1530.

- One minute later, Harrell called Ayers. During that call, Ayers created a note on his cell phone that read: "Hrr3669 New York plates." Ayers then took a screenshot of that note;

- Seconds later, Ayers accessed websites used to look up traffic violations in order to find locations where Anthony Stukes's Jeep had received parking tickets. An image recovered from Ayers's phone showed a screenshot of a website listing traffic violations, with an option to access additional details for each violation;

- One minute later, Ayers and Harrell spoke via a video call for 3 minutes and 15 seconds. Immediately thereafter, Ayers and Harrell exchanged three text messages, which Ayers deleted;

- Harrell then called Ayers twice and, at 10:47 pm, they spoke for 17 seconds. That call was followed by 12 messages between 10:55 pm and 11:00 pm—all of which Ayers deleted;

- At 10:57 pm, Ayers again accessed the note on his cell phone with Anthony Stukes's license plate;

- Several more video calls occurred between Ayers and Harrell in the minutes just before and after the 11:15 pm shooting, including at 11:03 pm, 11:20 pm, and 12:04 am.

The shooting resulted in a three-car crash near the intersection of Saint Marks and Utica. Anthony Stukes's Jeep—one of the three cars that crashed—sustained damage from bullet holes in the side. The Jeep was occupied by Anthony Stukes, Christopher Stukes, and a female passenger, Jiton Newman. Both Anthony and Christopher Stukes were injured as a result of the crash.

Recorded jail calls captured Ayers and other Bully Gang members celebrating the shooting. See, e.g., GX 2007-T (Ayers relaying to Gillespie that "bro bro [Harrell] ran into Longhead [Stukes]" and that Harrell "gon' tell you about it"); GX 2008-T (Ayers relaying to Joyce that Harrell "touched Longhead"); GX 2011-T (Ayers stating that Harell called Stukes after the shooting because Harrell "want[s] to antagonize" people); see also GX 2009-T (Harrell

23

bragging to Gillespie); GX 2010-T (Joyce stating that he expected Harrell to be "popping champagne").

Between the four shootings targeting Bully Gang enemies discussed above—the two on October 1, and the two on June 26-27—more than a dozen shell casings were recovered. Ballistic evidence confirmed that 12 of the recovered shell casings, including casings from each of the four shootings, were fired from the same gun. See GX S-3; Trial Tr. 2774 (firearm expert testimony).

Even after the two June 2018 shootings, the gang continued to target Stukes, including by using social media and databases to locate detailed information about Christopher Stukes and his family members. See, e.g., GX 1201-J; 1111-AO; 1111-AD; 1111-AB (messages and screen shots from Harrell's phone and social media containing Christopher Stukes's name, date of birth, telephone number, social security number and address).

### D.  Other Gun Crimes

Ayers was also convicted at trial of two additional counts of unlawful use of firearms. At trial, both Govan and Walton testified that Ayers routinely carried guns—in his waistband, apartment, or in the cupholder of his car. See, e.g., Trial Tr. 824 (Govan); Trial Tr. 1346 (Walton). He was also captured on video—with a gun in his hand—threatening and assaulting a victim in a stairwell, because the victim owed Ayers money (or "bread"). See GX 1128-E.1. And Ayers bragged to others about possessing, brandishing and firing guns. See, e.g., GX 1108-AQ (messaging from Ayers showing bullet holes in his car and noting: "That's me in the windshield").

Multiple firearms were also recovered on June 25, 2020—the date of Ayers's arrest—including at Govan's residence in Boston, in a trap compartment of Clarke's vehicle, and at the gang's stash house in Carteret, New Jersey. See GX 101-AB (photograph of firearm

24

recovered from Govan's residence); GX 81-AJ (photogram of firearm recovered from Clarke's Volve); GX 82-AH (photograph of firearm recovered from Carteret stash house); see also Trial Tr. 823-26 (Govan testimony that Ayers "stopped in Boston before he went to Maine" and "realized there was a gun in the car," so Ayers "asked Govan if [she] could hold it" to allow Ayers to avoid "driv[ing] the gun up to Maine").

E.  Drug Trafficking & Money Laundering

Ayers served as the leader of the gang's long-running and lucrative drug trafficking conspiracy operating between New York/New Jersey and Maine.  Indeed, Ayers conceded at trial that he was a "drug dealer" who "ran an operation that sold crack and heroin in Maine."  Trial Tr. 519.  And the proof at trial overwhelmingly confirmed that he did so, including through witness testimony, video surveillance, cell site data, extensive electronic evidence, and thousands of grams of seized narcotics.

The Maine drug trafficking conspiracy operated up and down the east coast for at least five years, during which Ayers and his co-leaders—initially Robert Holt, and later Bermon Clarke—recruited dozens of participants.  Bully Gang members and other Brooklyn-based drug dealers would travel from New York to Maine, where they would serve as "sitters" in the gang's trap houses scattered throughout the state.  Maine homeowners and residents—often drug addicts, sex workers, and incarcerated arrestees in need of bail money—served as drug "runners," who were typically paid in drugs.  To transport drugs up to Maine, the gang used concealed compartments (known as "traps") installed in various vehicles, or enlisted women to carry drugs inside of their bodies.

The conspiracy operated out of a rotating series of trap houses—up to ten houses at a time—located throughout the state of Maine.  Narcotics would initially be brought to the gang's primary stash house located at 76 Wilson Street in Portland, Maine, where they would be

25

weighed, bagged, and vacuum-sealed for distribution to the various trap houses, which were resupplied multiple times each week.  Each trap house was equipped with a "trap phone," used by sitters to regularly report the "numbers"—meaning, the drug and money quantities in the house—to enable the conspiracy's leaders to track each house's profits and drug supply, and to hold workers accountable for any shortages.

By 2020, the gang was operating seven to ten trap houses at a time, and earning up to $130,000 per week.  See Trial Tr. 1457; PSR ¶ 44.  Each trap house was resupplied every few days, receiving anywhere from 100 to 300 grams of crack and heroin at a time.  See Trial Tr. 1451.  Walton testified that she saw up to 500 grams of heroin and 1,000 grams of crack cocaine transported in a single trip, see Trial Tr. 1367, and both Govan and Walton testified that they observed Ayers personally cooking crack.  Law enforcement agents ultimately recovered over 600 grams of narcotics from one day in Maine and more from the New York/New Jersey area, including more than six kilograms from the gang's stash house in Carteret, New Jersey.  See GX S-4.

Cell site evidence and video surveillance, among other things, reflected the frequency with which Ayers traveled to Maine in furtherance of the scheme:

26

 

See, e.g., GX 7013 (cell site data showing Ayers's travel to and from Maine); GX 2502-D (pole camera surveillance showing Ayers at 76 Wilson Street, the gang's primary stash house in Portland, Maine).  In addition, thousands of text messages, like the samples contained below, show Ayers and his co-conspirators communicating with and monitoring his workforce, including by regularly inquiring about quantities of cash and drugs—namely, crack cocaine ("up" or "u") and fentanyl-laced heroin ("down" or "d"):

+12076056363 John

12000cash 23 ps down 25 ps up 65up & 35 down

6/24/2020 2:54:02 PM(UTC-4)

☑ Received

+12079496295

5/17/2020 6:04:05 PM

2539
50+18.2u
50+8.3d

+12072276722  Trap

88 u 37.72 $548
58 d 14.48 $759

Status: Read

Read: 6/13/2018 3:37:41 AM(UTC-4)

6/12/2018 9:45:00 PM(UTC-4)



From: +12076496530
To: +19174701193 (owner)

72.17 with bag D
50.22 with bag U

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19174701193 | | 7/13/201 8 3:09:12 AM(UTC -4) | |

Status: Read

7/13/2018 2:27:29 AM(UTC-4)



27



See, e.g., GX 1101-P, 1101-Q, 1107-AG, 1107-AX, 1107-BD.  At least seven electronic devices and 18 telephone numbers were attributed to Ayers throughout the scheme.  See GX 7000, 7002.

Ayers and other gang members used discipline and punishment to control their vast workforce.  Among other things, they withheld drugs from addicts, who would enter withdrawal and become physically ill; they confronted, searched, and assaulted workers who broke the conspiracy's rules; they withheld pay, or required workers to repay purported "debts," including by engaging in scamming and other crimes throughout the East Coast; and they used sexual abuse and physical violence—hitting, kicking, and choking drug runners—and using weapons, such as tasers, to punish non-compliance.  See, e.g., GX 1102-D.1 (Ayers tasing a drug runner, encouraged by co-defendant Robert Holt, while the runner screamed in pain); 1128-E.1 (video of Ayers, armed with a gun, assaulting a worker in a stairwell); Trial Tr. 1220-21 (Walton testimony that she was kicked, choked and hit by Ayers); id. at 1247-57 (Walton testimony about being kidnapped by Ayers and brought from Maine to Brooklyn, where she was assaulted by Holt).  Ayers personally participated in each of these forms of punishment.

In connection with his involvement in the Maine drug trafficking conspiracy, Ayers was convicted of narcotics trafficking conspiracy, money laundering, possession of narcotics with intent to distribute, and maintaining various stash houses.

F.  Obstructive Conduct

Ayers and his fellow Bully Gang members engaged in obstructive conduct both during and after the charged crimes in this case.  In connection with the Maine drug trafficking

28

conspiracy, when a lower-level worker was arrested or otherwise had contact with law enforcement, Ayers and Clarke made sure to swiftly intervene to ensure that participants would not "snitch" or cooperate. Among other things, the conspiracy's leaders would post bail, fund legal representation, and reclaim seized property (including vehicles) used in connection with the gang's criminal schemes. On one occasion, after Ayers and Harrell were arrested, Ayers enlisted Walton to steal a gun from a car that had been seized and impounded—and was parked at a police precinct—to ensure that law enforcement would not discover the gun. See Trial Tr. 1302-04; PSR ¶ 114. On another occasion, when Ayers learned from co-defendant Gillespie that police had been called to Gillespie's house, Ayers advised Gillespie to "get rid of the guns in the house" by "throw[ing] them out the window," and Ayers would go retrieve the guns later. See Trial Tr. 1309-10; PSR ¶ 35.

After his arrest, and in the weeks leading up to trial, Ayers made efforts to identify the cooperating witnesses who might testify against him. On multiple occasions, Ayers contacted Walton while incarcerated at the Metropolitan Detention Center in Brooklyn (the "MDC") to discuss potential cooperating witnesses. On one of those occasions, Ayers discussed with Walton his belief that Govan was cooperating. One another occasion, Ayers, Clarke, and Harrell contacted Walton via an Instagram video call in order to discuss the case and praise Walton for not cooperating. Trial Tr. 1493-95, PSR ¶ 115. Later, in the weeks leading up to trial, Ayers repeatedly contacted Walton, including to ask questions about where Walton was living.[6] Trial Tr. 1512-17; PSR ¶ 115. Screenshots from Walton's phone show multiple calls from Ayers in the weeks leading up to trial, which Walton did not answer:

---

[6]    Previously, during the Maine drug trafficking conspiracy, co-defendant Robert Holt sent Walton a photograph of her mother's house—intended as a threat—because Walton owed Holt and Ayers money. See PSR ¶ 54.

29



See GX 120-A; see also GX 120-B.

G.  Involvement in Other Bully Gang Crimes

As a trusted member of the Bully Gang, Ayers also played a role in other gang members' crimes.  For example, in the hours before Gillespie murdered Paul Hoilett, Gillespie spoke to Ayers by phone multiple times.  The two spoke again approximately two minutes after Gillespie committed the murder—Gillespie's first communication after the murder—and yet again approximately one hour later.  Ayers also spoke to Kennedy multiple times in the hours after the Hoilett murder, and during one FaceTime call with Ayers, Kennedy downloaded "Newsbreak" and the "Citizen Application" on his cell phone, which he used to obtain information about the Hoilett murder.  See PSR ¶¶ 94-97; GX 7014.

Ayers similarly connected with Gillespie and Kennedy both before and after the Hawley murder.  See GX 7014.  Before the murder, Gillespie and Kennedy met up with Ayers at Ayers's apartment in Rahway, New Jersey, leaving their cell phones there.  In fact, while Gillespie and Kennedy were out committing the murder, Ayers answered Kennedy's cell phone and spoke with a drug customer from the Rikers Island drug trafficking scheme.  See GX 2048-A.1.  During that timeframe, Ayers also repeatedly spoke to Moeleek Harrell (who was incarcerated at the time) and advised Harrell that Kennedy and Gillespie were out together.  See

GX 2045-B.1, 2046-A.1.  Ayers also communicated directly with Gillespie and Kennedy—via their burner phones—both before and after they committed the Hawley murder.  See PSR ¶¶ 98-101.

In the days after the Hawley murder, Ayers and Kennedy left town together.  See GX 7011 (cell site maps).  Less than 10 days after Hawley's murder, Ayers brought the gang's Subaru Outback (the vehicle used in the Hawley murder) to an inspection station in Massachusetts.  Although the car was not due for reinspection—it had been inspected just two months prior—Gillespie and Kennedy had changed the car's license plates and removed its inspection sticker while en route to commit the murder, in an effort to render the car less identifiable.  See PSR ¶ 101.  To forestall potential traffic stops of the Outback (which was also used in the Maine trafficking scheme), Ayers brought the vehicle for reinspection to secure a new inspection sticker.

II.    THE APPLICABLE RANGE UNDER THE UNITED STATES SENTENCING GUIDELINES (THE "GUIDELINES")

The government generally agrees with the Guidelines calculation set forth in paragraphs 174 through 224 of the PSR, subject to the exceptions specified below.[7]

Count Group 1: Drug Trafficking & Money Laundering
(Counts 2, 4, 17, 23, 28, 29, 30, 31; Racketeering Acts 1, 2, 13)[8]

Base Offense Level (U.S.S.G. §§ 2S1.1(a), 2D1.1(a)(5), 2D1.1(c)(1))    38

Plus:    Use of violence (U.S.S.G. § 2D1.1(b)(2))    +2

---

[7]    References to counts and racketeering acts employ the numbering from the S-8 indictment (rather the renumbered trial indictment).

[8]    The PSR did not include Count 30 (renumbered Count 24) in Count Group 1, see PSR ¶¶ 122, 175, but the government understands that this error was inadvertent.

Plus:   Maintained a premises for manufacturing or distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12))                                               +2

Plus:   Use of fear, impulse, friendship and/or affection; obstruction of justice; criminal livelihood (U.S.S.G. § 2D1.1(b)(16)(A), (D), (E))                  +2

Plus:   Conviction under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B))          +2

Plus:   Aggravating Role (U.S.S.G. § 3B1.1(a))                                 +4

Total:                                                                         50[9]

Count Group 2: Murder Conspiracy, Attempted Murder & Assault of Christopher Stukes (Counts 10, 15; Racketeering Acts 4A-4B)

Base Offense Level (U.S.S.G. § 2A2.1(a)(1))                                     33

Plus:   Aggravating Role (U.S.S.G. § 3B1.1(a))                                 +4

Plus:   Obstruction (U.S.S.G. § 3C1.1)                                         +2

Total:                                                                         39

Count Group 3: Murder Conspiracy (Chris King) (Count 9; Racketeering Act 5)

Base Offense Level (U.S.S.G. § 2A2.1(a)(1))                                     33

Plus:   Life-threatening injury (U.S.S.G. § 2A2.1(b)(1)(A))                     +4

Plus:   Aggravating Role (U.S.S.G. § 3B1.1(a))                                 +4

Plus:   Obstruction (U.S.S.G. § 3C1.1)                                         +2

---

[9]     Ordinarily, an additional two-level enhancement for possessing a firearm would be applied pursuant to U.S.S.G. § 2D.1(b)(1), but because Ayers was convicted of a corresponding firearm offense pursuant to 18 U.S.C. § 924(c), the adjustment does not apply. See PSR ¶ 123.

|  |  |  |
|---|---|---|
| Total: | | <u>43</u> |

Count Group 4: Assault in-aid-of Racketeering (Renea Maragh)[10]
(Count 11)

|  |  |  |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2A2.1(a)(1)) | | 33 |
| Plus: | Life-threatening injury (U.S.S.G. § 2A2.1(b)(1)(A)) | +4 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: | Obstruction (U.S.S.G. § 3C1.1) | <u>+2</u> |
| Total: | | <u>43</u> |

Count Group 5: Murder of Jonathan Jackson
(Count 14; Racketeering Act 6)

|  |  |  |
|---|---|---|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2A1.2(a)) | | 38 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: | Obstruction (U.S.S.G. § 3C1.1) | +2 |
| Total: | | <u>44</u> |

Grouping Analysis

|  |  |
|---|---|
| Count Group 1: | 50 |
| Count Group 2: | 39 |
| Count Group 3: | 43 |

---

[10]    The King and Maragh assaults were charged together in a single count of conviction (Count 11), and therefore ordinarily cannot form two separate groups. See U.S.S.G. §§ 1B1.1(a)(4) (explaining that grouping applies "if there are multiple counts of conviction"), 3D1.1 (instructing courts to use the grouping section of the Guidelines "[w]hen a defendant has been convicted of more than one count"). Here, however, Maragh sustained more significant injuries, and therefore the Maragh assault (rather than the King assault) is used for purposes of Count 11. That count, then, does not group with Count 9 and Racketeering Act 5, which pertain to the conspiracy to murder Chris King—a distinct victim.

By contrast, the assault of Christopher Stukes and Jiton Newman (Count 15) form a single count group (together with Count 10 and Racketeering Acts 4A-4B—the Stukes murder conspiracy), as Stukes sustained the more serious injury.

| | |
|---|---|
| Count Group 4: | 43 |
| Count Group 5: | 44 |
| Levels Added (U.S.S.G. § 3D1.4): | +3 |
| Total Offense Level: | 53 |

Pursuant to U.S.S.G § 5A, note 2, an offense level of more than 43 should be treated as an offense level of 43. With a total offense level reduced to 43, PSR ¶ 224, and a criminal history category of IV, see PSR ¶ 232, the Guidelines range on the groups set forth above is life imprisonment.

Ayers is also subject to the following mandatory consecutive sentences: 120 months (Count 3), 120 months (Count 12), 120 months (Count 13), 120 months (Count 16), 60 months (Count 36). In total, Ayers faces a Guidelines range of life imprisonment plus 45 years, see U.S.S.G. § 2K2.4(b), and a mandatory minimum sentence of 55 years' imprisonment.[11]

The government's Guidelines calculation differs slightly from the calculation contained in the PSR. First, with respect to Count Group 1, the government removed the Rikers Island drug trafficking scheme and inclusion of synthetic cannabinoids from the defendant's calculation. While this change does not affect the overall drug weight (or base offense level), it does remove the two-level enhancement for distribution of a controlled substance in a

---

[11]     The defendant repeatedly contends that the mandatory minimum term of imprisonment will constitute a "virtual life sentence" and requires the defendant to remain incarcerated until "his mid-nineties." See Def. Ltr. at 1, 7, 8. That is wrong. Accounting exclusively for good-conduct time, and not for any reductions associated with programing in the Bureau of Prisons, if sentenced to the mandatory minimum term, the defendant would serve 46.75 years, resulting in an expected release date in March 2067, when he will be 80 years old. Courts are permitted to accurately account for time that a defendant will serve in prison in assessing "age at release," which may be relevant to an analysis of the sentencing factors under 18 U.S.C. § 3553(a). United States v. James, 151 F.4th 28, 42 (2d Cir. 2025); see also United States v. Fowler, 948 F.3d 663, 669-70 (4th Cir. 2020).

34

correctional facility pursuant to § 2D1.1(b)(4).  However, the government included a two-level enhancement pursuant to multiple provisions of § 2D1.1(b)(16)—specifically, § 2D1.1(b)(16)(A), (D), and (E).[12]  The government calculates the offense level for Count Group 1 as 50 (rather than 52, as set forth in the PSR), which affects the grouping analysis but does not alter the total offense level, or Guidelines term of life imprisonment.

Next, with respect to the murder of Jonathan Jackson, the government's calculation conservatively employs a base offense level of 38, pursuant to U.S.S.G. § 2A1.2(a) (Second Degree Murder), rather than a base offense level of 43, pursuant to U.S.S.G. § 2A1.1(a) (First Degree Murder).  While this lowers the offense level for Count Group 5 (from 49 to 44), it does not alter the total offense level, or Guidelines term of life imprisonment.

III.    THE DEFENDANT'S OBJECTIONS TO THE PSR

Ayers raises three primary objections to the PSR—none of which impact the Guidelines calculation—set forth below:

1.  Ayers objects to PSR ¶ 46, which specifies the drug weight for which the defendant is accountable (totaling 418,659.7 kilograms of

---

[12]    The Guidelines provide that a two-level enhancement for obstruction of justice under § 3C1.1 does not apply if the defendant receives an enhancement under § 2D1.1(b)(16)(D).  See § 3C1.1, application note 7; PSR ¶ 123.  Here, however, multiple subsections of (b)(16) apply—not just subsection (D)—and therefore the additional two-level obstruction enhancement under § 3C1.1 should arguably be applied (as it would not result in "double counting" of the defendant's obstructive conduct).  However, because application of the enhancement does not impact the defendant's overall Guidelines calculation, the government has omitted the obstruction enhancement under § 3C1.1 from Count Group 1.

converted drug weight). Ayers contends the assertion is "unsupported by record evidence." See ECF Nos. 2383, 2448.

2.  Ayers objects to PSR ¶ 47, which states that Holt, Ayers and Clarke relied on sexual violence to ensure that Maine-based employees of the conspiracy did what they were directed. See ECF No. 2383.

3.  Ayers objects to PSR ¶ 67, which provides that Clarke and Ayers often referenced the arson in Blaine, Maine (committed by Clarke) to show that they should be taken seriously. See ECF No. 2383.

Each of these objections should be rejected.

First, with respect to drug weight, using even the most conservative calculation, the quantities set forth in the PSR are well supported. As the Court is aware, in determining drug quantity, a court has broad discretion to consider a wide range of evidence. While seized narcotics are one appropriate metric, "where the quantity [of drugs] seized does not reflect the scale of the offense, the Guidelines require the district court to estimate the amount of drugs involved in the offense." United States v. Blount, 291 F.3d 201, 215 (2d Cir. 2002). In making an estimate of the total drug quantity, "the court has broad discretion to consider all relevant information." Id. In other words, "a sentencing court may rely on any information it knows about, including evidence that would not be admissible at trial, as long as it is relying on specific evidence—e.g., drug records, admissions or live testimony."[13] United States v. McLean, 287 F.3d 127, 133 (2d Cir. 2002) (internal citations and quotations omitted). For instance, courts may rely on witness testimony regarding a pattern of drug transactions as a method of approximating drug weight. See, e.g., Payne, 591 F.3d at 71 (affirming drug calculation that

---

[13]   In estimating drug quantity, "a district court may find that the conspiracy involved a greater quantity of drugs than formed the basis for the jury's conviction." United States v. Kirk Tang Yuk, 885 F.3d 57, 76 (2d Cir. 2018); see also United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) (affirming sentencing when a district court "ma[d]e its own preponderance finding of a higher drug quantity than the amount found by the jury").

36

relied on testimony that a defendant "packaged the crack and delivered the packages to sellers '[f]or about a year or so'; that they were selling seven days a week; and that sales averaged 62 to 125 grams of crack a day" (internal citations omitted)); see also Blount, 291 F.3d at 215 ("[G]iven the wide latitude of the district court to make credibility determinations, the court is not restricted to accepting the low end of a quantity range estimated by a witness." (internal citations omitted)).

Here, the government has proven the applicable drug weights by far more than a preponderance of the evidence. Looking only at the testimony of Amanda Walton, and focusing on 2020 alone, the trial record established that the conspiracy operated seven to 10 trap houses at a time, each of which was resupplied every few days with at least 100 grams (and up to 300 grams) of crack and heroin. Trial Tr. 1451-53, 1457. In other words, in 2020 alone, the conspiracy sold a minimum of 40.6 kilograms (and a maximum of 264 kilograms) of both crack and heroin—well above the amount needed to trigger the highest possible base offense level. But Walton's testimony went much farther than that. She testified, for example, that she observed Ayers cooking crack on the stove more than one occasion, each time making "[f]ive hundred or a thousand grams" of crack, see Trial Tr. 1236; that she has seen up to 500 grams of heroin and 1,000 grams of crack cocaine transported to Maine in a single trip, see Trial Tr. 1367; that she observed Ayers picking up a "brick" of more than 500 grams of cocaine, see Trial Tr. 1238-40; and that, by 2020, the drug conspiracy was earning up to $130,000 each week, see Trial Tr. 1457. Most conservatively of all, of course, this testimony accounts only for drug sales in 2020, notwithstanding that Ayers led the massive conspiracy for years prior.

Contrary to Ayers's primary contention, Walton's testimony is not "unreliable" simply because the quantity of drugs sold by the conspiracy "fluctuated over the relevant

37

period." See ECF No. 2448. Indeed, Walton's testimony explicitly described how the drug business changed over time; the volume of drugs increased dramatically over the years that the conspiracy operated. See, e.g., Trial Tr. 1240-43 (discussing early years of the drug operation, in 2015 and 2016); Trial Tr. 1451-58 (testifying about the drug operation in 2020, prior to her arrest). Walton expressly testified, for example, that the quantity of drugs sold by the conspiracy changed over time and that, after she was released from custody in 2019, the drug business was "more organized," and "there were more houses," each of which was resupplied more regularly. See, e.g., Trial Tr. 1243, 1349-50. And to the extent Ayers suggests that exact precision is a prerequisite for calculating drug quantity, that argument is inconsistent with the Second Circuit's instructions that sentencing courts should "estimate the amount of drugs involved in the offense." Blount, 291 F.3d at 215 (affirming district court's determination that a defendant was responsible for 60 kilograms of cocaine when the district court explained at sentencing: "60 kilograms also may not be absolutely precise. I'm sure it's not. But I think it comes closer to being the amount of cocaine which is attributable to [the defendant]."); U.S.S.G. § 2D1.1, n. 5 (noting that "the court shall approximate the quantity of the controlled substance" and that, in making that determination, "the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant").

In any event, Walton's testimony was overwhelmingly corroborated. For example, on a single day of the conspiracy, law enforcement recovered thousands of grams of narcotics, including nearly six kilograms of cocaine and 600 grams of a heroin/fentanyl mixture from the gang's stash house in Carteret, New Jersey. See GX S-4. From just four of the gang's stash houses in Maine, law enforcement seized a combined total of approximately 630 grams of

38

fentanyl and cocaine base. See id. (Swanville, Detroit, Garland and Levant stash houses). Law enforcement also recovered drug paraphernalia from each of these locations, including scales, vacuum sealers, money counters, baking soda (used to cook crack), and mannite cicogna (used to cut heroin). See Trial Tr. 4165-68, 4214. Similarly, law enforcement seized large quantities of cash—including nearly $135,000 from Bermon Clarke after a single trip to Maine—corroborating the significant proceeds amassed by the gang as a result of the high volume of drugs sold on a regular basis. And notably, unlike many of his co-defendants, Ayers's direct involvement in (and leadership of) the Maine drug trafficking conspiracy spanned the entire duration of the scheme, preventing Ayers from lodging any argument that he should not be accountable for the full weight of the conspiracy.[14]

Additionally, thousands of pages of text messages and other electronic evidence corroborate the immense volume of drugs routinely sold during the conspiracy. As detailed above, sitters at each trap houses would regularly report the amount of crack ("up"), heroin ("down") and cash in their possession, enabling co-conspirators to resupply drugs to the houses and collect drug proceeds. See, e.g., GX 1101-N, 1101-P, 1101-Q, 1106-AW, 1106-AU, 1151-F, 1151-G, 1142-K. Similarly, members of the conspiracy took notes (both on paper ledgers, and on their phones) about drugs and drug proceeds at various stash houses. See, e.g., GX 1123-I (notes from Clarke's phone), 1106-AR (notes from Ayers's phone), 1141-G (notes from Kennedy's phone), 1149-AZ (notes from Govan's phone), 1152-N (notes from Walton's phone). Cell phone evidence and location data also corroborate the substantial number of stash houses operated by the gang over the course of the conspiracy. See Trial Tr. 1429-35 (Walton's

---

[14] Unlike several of his co-defendants (including Harrell, Gillespie, and Kennedy), Ayers does not argue that he should not be held responsible for narcotics trafficking during the full scope of the conspiracy.

testimony about the stash houses listed in her GPS); GX 1152-L (GPS data from Walton's phone); GX 1152-S (selected Waze data from Walton's phone); GX 1149-BH (Waze data from Govan's phone). Dozens more exhibits admitted at trial further corroborate the massive scope of the Maine drug trafficking racket. Given the volume of corroborative evidence—as well as the jury's verdict—Ayers cannot credibly argue that the PSR's drug calculation is unsupported.

Nor is an evidentiary hearing warranted pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir. 1978). As detailed above, the record of the Harrell trial includes, among other things: hundreds of pages of witness testimony, including from law enforcement officers and multiple cooperating witnesses; electronic evidence derived from dozens of cell phone seized during the conspiracy (at least seven of which belonged to Ayers), including thousands of pages of text messages about drug trafficking activity; drug paraphernalia seized from multiple stash houses, including scales, ledgers, packing equipment, and trap phones; photographs showing co-conspirators with drugs and drug proceeds; location data showing members of the drug conspiracy (including Ayers) traveling to and from the gang's various stash houses; hundreds of thousands of dollars in seized drug proceeds; seized vehicles, including multiple vehicles equipped with specialized "trap" compartments; video surveillance, including pole camera footage showing Ayers and others frequenting the gang's primary stash house in Maine; and narcotics seized from multiple stash houses, including more than six kilograms of narcotics seized from the gang's stash house Carteret, New Jersey—seizures that form only a single-day snapshot of this multi-year conspiracy. A Fatico hearing would serve only to waste limited

40

Court resources and inconvenience government witnesses, who would offer duplicative testimony.[15]

With respect to the defendant's remining two objections—concerning the use of sexual violence, and threats referencing the arson—the government maintains its position that each of the challenged provisions of the PSR is accurate as written, readily provable, and appropriately contained in the PSR. See ECF Nos. 2385, 2394.[16] The government's sentencing recommendation, however, remains the same irrespective of those paragraphs of the PSR; indeed, some of those disputed facts are not even referenced (or discussed in detail) elsewhere in this submission because, in the government's assessment, they are not among the most troubling aspects of the defendant's conduct in this case. The Court therefore need not resolve these factual disputes in order to impose sentence in this case.

At bottom, as a result of the defendant's 18 counts of conviction, he faces a 55-year mandatory-minimum term of incarceration. The defendant has not proffered a Guidelines calculation that would yield a total offense level less than 43, or a term of imprisonment less than life. See Def. Ltr. at 4 n.16 (conceding that, "regardless of the Court's ultimate determination on the issue of drug weight, the Guidelines range is life imprisonment"). In light of the defendant's sentencing exposure—along with the breadth and the seriousness of the conduct that the

---

[15]    Ayers has not indicated that he would offer any testimony or evidence to the contrary, with the exception of a footnote in his February 27, 2026 filing indicating that, at a Fatico hearing, Ayers "may call co-defendant Berman [sic] Clarke," in the event that Clarke is "willing to testify." See ECF No. 2448 at 3 n.3.

[16]    The facts underpinning these paragraphs are generally not contained in the transcript of the Harrell trial. With respect to the use of sexual violence, the Court excluded that evidence pursuant to Rule 403 of the Federal Rules of Evidence. See ECF No. 1573 at 19. With respect to the arson, and threats referencing the arson, the government did not seek to offer that evidence, as Clarke was not a trial defendant.

41

government has already proven—the government submits that the Court can appropriately impose sentence in this case without resolving the "disputed" issues discussed above, on the basis that resolution of those issues would not ultimately affect the Court's sentencing determination.  See, e.g., United States v. Borrego, 388 F.3d 66, 67 (2d Cir. 2004) (affirming judgment where the district court "declined to resolve several disputed sentencing issues after determining that the resolution of those issues would not affect the ultimate sentence").  In other words, resolution of those factual disputes is unnecessary for the Court to impose sentence in this case, and a Fatico hearing would serve only to waste limited Court resources.

IV.    FORFEITURE

As a result of his convictions, and for the reasons set forth below, the government seeks a criminal forfeiture money judgment in the amount of $4,046,940.00 with respect to (i) Count One, in accordance with 18 U.S.C. § 1962(a), (ii) Count Two, in accordance with 21 U.S.C. § 853(a), and (iii) Counts 17, 23, 28, 29, 30, and 31, in accordance 21 U.S.C. § 853(a).[17] A proposed order of forfeiture is forthcoming.

A.    Applicable Law

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought in this case.  Rule 32.2 is not limited to specific property but may include the imposition of a personal money judgment.  Rule 32.2(b)(1)(A) provides that, if the government seeks a personal money judgment, the Court must determine the amount money that the defendant will be ordered to pay.  Fed. R. Crim. P. 32.2(b)(1)(A); see also United States v.

---

[17]    The government is seeking concurrent forfeiture amounts for each count.  United States v. Brown, No. 04-CR-159 (NGG), 2006 WL 898043, *4 (E.D.N.Y. Apr. 4, 2006) (if defendant is found liable to pay a money judgment under two different theories in the same case, but the judgments relate to the same funds, i.e., the proceeds of a fraud and the property involved in laundering the fraud proceeds, the judgments are concurrent).

Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) ("A criminal forfeiture may take several forms[,] . . . [including] an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense.").

The Supreme Court has recognized that criminal forfeiture is part of a defendant's sentence and is mandatory when the defendant has been convicted of an offense giving rise to forfeiture.  See United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited."); accord United States v. McGinty, 610 F.3d 1242, 1246 (10th Cir. 2010) (stating that language in forfeiture statute "express[es] Congress's intent that criminal forfeiture is both mandatory and broad"); United States v. Bourne, No. 08-CR-888 (NGG), 2012 WL 526721, at *2 (E.D.N.Y. Feb. 15, 2012) (finding that entry of money judgment is mandatory, even if defendant has no assets).

In contrast to the guilt phase of a criminal trial, the government bears the burden of establishing the amount of money subject to forfeiture only by a preponderance of the evidence.  See United States v. Capoccia, 503 F.3d 103, 116 (2d Cir. 2007) (Sotomayor, J.) ("Sentencing courts determine forfeiture amounts by a preponderance of the evidence."); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).  Further, Rule 32.2(b)(1)(B) provides that the Court's determination may be based on evidence already in the record, as well as on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.  See Capoccia, 503 F.3d at 109; United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) ("[D]istrict courts may 'use general points of reference as a starting point' for a forfeiture calculation and 'make reasonable extrapolations'

43

supported by a preponderance of the evidence." (quoting United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011)).

The government may seek gross receipts, not merely profits, as the relevant forfeiture statues here are not limited to profits but extend to all proceeds obtained. See United States v. Khan, 761 F. App'x 43, 47 (2d Cir. 2019) (summary order); United States v. Colon, 522 F. App'x 61, 62-63 (2d Cir. 2013) (summary order); United States v. Christensen, 828 F.3d 763, 822 (9th Cir. 2015); United States v. Robilotto, 828 F.2d 940, 948 (2d Cir. 1987); cf. United States v. Peters, 732 F.3d 93, 100-02 (2d Cir. 2013) (18 U.S.C. § 982). A defendant who personally acquired the criminal proceeds may be "held liable to forfeit the value of those tainted proceeds, even if those proceeds are no longer in his possession because they have been 'dissipated or otherwise disposed of by "any act or omission of the defendant."'" United States v. Tanner, 942 F.3d 60, 68 (2d Cir. 2019) (quoting Honeycutt v. United States, 581 U.S. 443, 451-52 (2017)); accord United States v. Pastore, No. 18-2482, 2022 WL 2068434, at *6-7 (2d Cir. June 8, 2022) (summary order) (upholding forfeiture based on showing that defendant "at one point possessed proceeds"); United States v. Guerrier, No. 20-3469, 2022 WL 610338, at *2-3 (2d Cir. Mar. 2, 2022) (summary order).

The government is not required to provide a precise calculation of the amount of money a defendant must forfeit. Treacy, 639 F.3d at 48. Instead, the money judgment amount may be reasonably estimated based upon the available information. Id. Sentencing courts may consider trial evidence and hearsay, as well as "evidence or information submitted by the parties

44

and accepted by the court as relevant and reliable," in determining forfeiture.  Fed. R. Crim. P. 32.2(b)(1)(B); see also Capoccia, 503 F.3d at 109-10.

Lastly, the government need not prove that the defendant can pay the forfeiture money judgment.  It need only prove, by a preponderance of the evidence, that the amount it seeks is forfeitable.  See United States v. Awad, 598 F.3d 76, 78-79 (2d Cir. 2010) ("[M]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime."  (quoting United States v. Casey, 444 F.3d 1071, 1077 (9th Cir. 2006))).

B.        Application

As set forth in the Indictment, forfeiture is authorized, for certain counts of conviction, including racketeering and drug trafficking, under 18 U.S.C. § 1963 and 21 U.S.C. § 853.  As a result of his racketeering conviction, the defendant must forfeit as part of his sentence (1) any interest he acquired or maintained in violation of 18 U.S.C. § 1962; (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which the person has established, operated, controlled, conducted or participated in the conduct of, in violation of 18 U.S.C. § 1962; and (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.  See 18 U.S.C. § 1962(a).

As a result of his convictions for drug trafficking and maintaining various stash houses, Ayers must forfeit as part of his sentence: (1) any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of such offenses; and (2) any property

45

used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses.  See 21 U.S.C. § 853(a).

The amount set forth in the proposed order of forfeiture for each count represents an exceedingly conservative estimate of proceeds obtained by the defendant from his racketeering and drug trafficking.  Specifically, the amount was calculated based on the number of the defendant's trips to Maine taken between March 2018 and June 2020, excluding trips taken with co-defendants Harrell, Gillespie or Kennedy—assuming, conservatively, that the defendant yielded any profit from such a trip to his co-conspirator—and a reasonable estimate of the proceeds collected in a single trip.  More specifically, according to the defendant's location data, Ayers traveled to Maine on 30 occasions (excluding trips to Maine with Harrell, Gillespie, and/or Kennedy) between March 2018 and June 2020.  (Of course, Ayers also traveled to Maine many times prior to 2018, but the government's conservative estimation excludes that timeframe.)  Based on cash proceeds seized from Bermon Clarke following a trip to Maine in June 2020, the government estimates that Ayers obtained $134,898 per trip.

As a result of these proceeds, Ayers is liable to forfeit the amount of $4,046,940.00.

V.      THE APPROPRIATE SENTENCE

A.  Applicable Law

In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory.  The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns.  Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a).  After Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section

46

3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable.  [The sentencing court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.  The court must also consider the kinds of sentences available, the applicable

47

sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(6).

B. Application

The government respectfully submits that, under the very serious circumstances of this case, a sentence of life imprisonment is necessary to achieve the goals of sentencing.

For years, the defendant built, ran, and profited handsomely from the gang's most expansive criminal racket: the Maine drug trafficking scheme. The conspiracy was massive in scope; it employed dozens of workers who were recruited into the defendant's web of criminality. Much of the scheme's workforce was comprised of the most vulnerable recruits the defendant could find, including drug addicts and sex workers, many of whom suffered profound trauma both before and during their time working for Ayers. Ayers's scheme profited from the wreckage inflicted on entire communities, exploiting an already-devastating opioid crisis and multiplying the pain and suffering endured in countless neighborhoods throughout the East Coast. The conspiracy preyed upon the weak, without regard for the untold lives that would be shattered and the communities that would be ravaged—all so that the defendant and his fellow gang members could wear diamond chains, drive flashy cars, and carry stacks of cash. The Maine drug trafficking scheme was the gang's most sophisticated and lucrative criminal racket, and for the entire duration of the scheme, Ayers sat at the very top of the criminal ladder.

The defendant and his fellow leaders—Robert Holt, and later, Bermon Clarke— employed physical, sexual, and psychological abuse to control their workers, and to punish any perceived rule-breaking. Perhaps most disturbingly, Ayers and his co-conspirators employed violence and brutality with apparent glee. Ayers, for instance, was captured on video, with a gun in hand, grinning in a stairwell before he assaulted a victim who "owed [him] bread," see GX 1128-E.1, and Ayers can be seen joking sadistically as he used a taser on a drug runner while she

begged him to stop, see GX 1102-D.1. Ayers hit, kicked, and choked his workers, and he allowed his co-conspirators to do the same. Trial Tr. 1220-21 (Walton testimony that she was kicked, choked and hit by Ayers); id. at 1247-57 (Walton testimony that she was kidnapped by Ayers and brought from Maine to Brooklyn, where she was brutally assaulted by Robert Holt). Ayers callously withheld drugs from addicts, knowing that withdrawal symptoms would cause them to become physically ill.

This violence was a characteristic feature of Ayers's involvement in particular. Indeed, Ayers employed similar manipulation tactics to control and exploit multiple romantic partners, who became ensnared in the Bully Gang's criminal affairs. See ECF No. 1098 (co-defendant Christina Estevez's sentencing memorandum) (referencing her "toxic abusive" relationship with Ayers and discussing, among other things, his "blows to her body," his "hands wrapped around her neck," and her "hair being pulled so hard that it felt as though her head would dislodge"); ECF No. 1037 (co-defendant Chinasa Strachan's sentencing memorandum) (discussing abuse by Ayers, including being "beaten until she was black and blue" and "constant surveillance" by Ayers, who "demanded that Chinasa turn on her location tracking on her phone"). Estevez and Strachan are only two of the many women who Ayers abused, and who were roped into his violent enterprise. See, e.g., Trial Tr. 1215 (Walton testifying that Ayers initially promised to "take care of her"); Trial Tr. 708 (Govan testifying that she had "a romantic relationship" with Ayers at the time she was "moving drugs for him"); Trial Tr. 583-84 (law enforcement observation, on Govan's device, that Ayers would be notified if Govan's phone left her expected location). Simply put, the scheme's brutality cannot be overstated, and Ayers's callous use of manipulation and exploitation tactics warrant serious punishment.

49

Ayers's culpability in this case, however, goes far beyond the Maine drug trafficking scheme. Along with Harrell, Ayers orchestrated two murder conspiracies targeting two Bully Gang rivals—Chris King and Christopher Stukes—which spawned multiple shootings and could have easily resulted in multiple murders. Ayers's "opposition research" enabled the gang to hunt down and shoot at their enemies—violent incidents that were celebrated by the gang's most senior members. As detailed above, Ayers worked closely with Harrell to track down personal identifying information for their targets (and their targets' family members), and determine their whereabouts. And several of those shootings resulted in serious injuries, including near-fatal injuries to innocent bystanders whose lives were forever scarred.

In connection with the Bully Gang's long-running rivalry with the Stukes crew, Ayers murdered Jonathan Jackson, a Stukes associate, whom Ayers chased and gunned down on the side of Kings Highway, in a residential Brooklyn neighborhood, following a gender reveal party. Jackson initiated the shootout—targeting and firing at members of the Bully Gang—but the evidence also established that Jackson fired three shots in quick succession, stopped firing, and began to flee. Ayers, however, was prepared (and equipped) for violence; though the threat had subsided, Ayers exited his vehicle, ran across the highway, and pursued Jonathan Jackson, firing as Jackson fled on foot. Ayers's weapon of choice—and the one he used to kill Jackson—was a high-capacity, lethal FN firearm, packed with high-velocity ammunition with specialty blue tips, used for hunting down animals. Ayers fired his FN at least 15 times, repeatedly shooting Jackson in the back, and continuing to fire as Ayers stood over him—and as Jackson lay dying on the side of the road. Ayers's continued insistence that he acted "with the intent to defend" others—even though no "others" were in the vicinity when he gunned down Jackson—constitutes a troubling distortion of the facts, including Ayers's willing and active participation

50

in a broader gang war.  Indeed, Ayers was involved both directly—as the triggerman who murdered Jackson—and indirectly—as a leader of a gang involved in myriad acts of violence, begetting additional violence, inexorably leading to death.  Ayers's continued reliance on his failed defense strategy also reflects an utter failure to show remorse or accept responsibility for taking a young man's life.

While the instant case comprises the defendant's most serious crimes to date, his criminal history reflects a troubling pattern of crimes involving drug-dealing and firearms.  In 2005, the defendant was convicted of criminal possession of a weapon in connection with his possession of a firearm.  See PSR ¶ 226.  Approximately one year later, in 2006, he was arrested and later convicted of attempted robbery for a gunpoint robbery committed with Robert Holt—Ayers's co-defendant in the instant case.  See PSR ¶ 227.  Ayers was sentenced to 30 months' incarceration.  See id.  While he was still on parole, in 2011, Ayers was arrested for criminal possession of a controlled substance after he was found in possession of narcotics (marijuana, crack/cocaine, again ecstasy), including drugs that were individually wrapped for distribution, and ammunition.  See PSR ¶ 228.  Approximately six months after that arrest, and while that case remained pending, Ayers was again arrested for criminal possession of a controlled substance—this time, marijuana, crack cocaine, heroin, and ecstasy.  See PSR ¶ 229.  While several years passed between that conviction (2013) and the defendant's arrest in the instant case (2020), during the intervening years, the defendant persistently committed a staggering array of crimes for which he is now being held to account.  In other words, despite multiple serious convictions—and multiple prior terms of incarceration—Ayers has remained dangerous and undeterred.  Indeed, while incarcerated in the instant case, Ayers incurred sanctions for five disciplinary incidents (two of which post-date the PSR), including as recently as March 9, 2026.

51

Unlike many defendants sentenced in this District, including several of Ayers's co-defendants, Ayers possessed the tools to pursue legitimate employment and the judgment to distinguish right from wrong. According to Ayers's own submission, he enjoyed a "childhood filled with love and support"; maintained a "loving and close relationship with both his parents"; attended Christian grade school; and "did not get into any trouble as a minor, either at school or with law enforcement." See Def. Ltr. at 2. Despite that good fortune, Ayers chose to align himself with a violent and destructive criminal enterprise; to commit violence on its behalf; and to orchestrate predatory money-making rackets that exploited and profited off the devastation of others. His conduct victimized others: the workers in his narcotics trafficking scheme; drug users and addicts throughout the state of Maine; gang rivals like Chris King and Christopher Stukes; innocent bystanders, like Jiton Newman and Renea Maragh, who suffered injuries as a result of gang violence; and of course, Jonathan Jackson, and the family members who continue to mourn his loss. The government's requested sentence would not, therefore, create any unwarranted sentencing disparities, as Ayers contends. Indeed, Ayers's culpability in this sprawling, 53-defendant racketeering case is at most surpassed only by Moeleek Harrell, the gang's long-time leader, and Franklin Gillespie, who is responsible for multiple execution-style murders, among other crimes.[18]

---

[18] The two cases cited by Ayers in support of a sentence short of life imprisonment are readily distinguishable. In United States v. Gioeli, No. 08-CR-240 (BMC) (E.D.N.Y.), this Court sentenced the defendant to "224 months out of a possible 240 months' custody," and the "principal reason" the Court "did not impose the maximum sentence was because of [the defendant's age and ill health." See No. 08-CR-240, ECF No. 2140 at 3. In United States v. Garcia Luna, No. 19-CR-576 (BMC), which Ayers properly characterizes as a "narcotics-corruption prosecution," the defendant was not convicted of any of the violent crimes present here—including multiple shootings and murder.

The defendant committed a breathtaking array of crimes on behalf of a violent street gang.[19] For years, he led a sprawling drug operation—motivated by greed—that employed ruthless tactics to control and punish its workers. He orchestrated murder conspiracies targeting gang rivals that spawned at least four shootings. And in connection with one of those murder conspiracies, he took the life of Jonathan Jackson—a crime for which he has not, to date, shown any remorse. Ayers's extraordinary crimes call for an extraordinary sentence.

VI.     CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of life imprisonment, which is necessary in this case to achieve the goals of sentencing.

Dated:     Brooklyn, New York
           March 25, 2026

                                    Respectfully submitted,

                                    JOSEPH NOCELLA, JR.
                                    United States Attorney

                          By:     /s/
                                    Nicholas J. Moscow
                                    Lindsey R. Oken
                                    Joy Lurinsky
                                    Victor Zapana
                                    Assistant U.S. Attorneys
                                    (718) 254-7000

---

[19]     Remarkably, despite overwhelming evidence to the contrary (some of which is outlined herein), Ayers continues to "vehemently deny" any association with the Bully Gang. See Def. Ltr. at 4.